*ANNA F. COLE v.*
*ORION MARION, LLC, et al*

---

*LANCE R. YOULES*
*November 14, 2014*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 111414LY.txt
Min-U-Script® with Word Index

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

---

Page 1

```
1            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF KENTUCKY
2                   PADUCAH DIVISION

3   ANNA F. COLE, Individually and as
    Administratrix of the Estate of GEORGE COLE,
4
            Plaintiff,
5
      -vs-
6
    ORION MARION, LLC d/b/a CRITTENDEN
7   COUNTY HEALTH & REHABILITATION
    CENTER, ORION OPERATING
8   SERVICES, LLC AND
    ATRIUM CENTERS, LLC,
9
            Defendants.
10  _____/

11        The Deposition of LANCE R. YOULES, taken before

12   me, Carol L. Martin, CSR-3532, a Notary Public  at

13   The Moretti Group  10524 Grand River Avenue,

14   Suite 101  Brighton, Michigan, on Friday,

15   November 14  2014  commencing at 10:08 a.m.

16   APPEARANCES:

17   FOR THE PLAINTIFF:

18        EDWARDS & KAUTZ, PLLC
          BY: MR. DAVID C. TROUTMAN (Via Video Conference)
19        222 Walter Jetton Boulevard
          P.O. Box 1837
20        Paducah, Kentucky 42002
          (270) 442-9000
21
     FOR THE DEFENDANT:
22
          WHONSETLER & JOHNSON, PLLC
23        BY: MR. CRAIG L. JOHNSON
          11901 Brinley Avenue
24        Louisville, Kentucky 40243
          (502) 895-2297
25
```

---

Page 2

```
1              I N D E X

2   WITNESS:                           PAGE NO.

3   LANCE R. YOULES

4       Examination by Mr. Johnson         3

5

6

7        E X H I B I T   I N D E X

8   EXHIBIT NO.                        PAGE NO.

9   Deposition Exhibit No. 1 -             18

10    Summary of Qualifications

11  Deposition Exhibit No. 2 -             18

12    Testimonial History

13  Deposition Exhibit No. 3 -             76

14    Report of Lance R. Youles

15  Deposition Exhibit No. 4 -             77

16    Survey Notes

17  Deposition Exhibit No. 5 -             78

18    Crittenden County Health and Rehabilitation
      Center Document
19
    Deposition Exhibit No. 6 -             83
20
      Medicare.gov Documents
21
    Deposition Exhibit No. 7 -             88
22
      Negligent Retention Article
23
    Deposition Exhibit No. 8 -            142
24
      Licensure as a Nursing Home Administration
25    Document
```

---

Page 3

1  Brighton, Michigan
2  November 14, 2014
3  At or about 10:08 a.m.
4              *    *    *
5        L A N C E   R.  Y O U L E S
6  having been called by the Defendant, being first duly
7  sworn, was examined and testified as follows:
8              EXAMINATION
9  By MR. JOHNSON:
10 Q.  Good morning  Could you state your full name?
11 A.  Yes  Lance, middle name R-a-n-d, last name
12     Youles, Y-o-u-l-e-s.
13 Q.  Mr. Youles, name is Craig Johnson and I represent
14     the defendants in the case that's been brought on
15     behalf of the Estate of George Cole.  You have
16     been identified as an expert witness on behalf of
17     the plaintiff and we are here today to take your
18     deposition, so that I may find out your full
19     opinions, the basis of those opinions and a
20     little bit about you
21        I take it that you have given
22     depositions on numerous occasions before?
23 A.  Yes, sir.
24 Q.  Just a little bit of the ground rules  My
25     purpose here today is to find out what your

---

Page 4

1      testimony is going to be at trial, so that I am
2      not surprised.  Do you understand that?
3  A.  Yes, sir.
4  Q.  If I ask you a question today that you don't
5      understand, just stop me and say, "Craig, I don't
6      understand.  Could you please rephrase it," and
7      I'll be happy to do so.  If you answer the
8      question, I'm going to assume that you understood
9      it and gave me a full and complete response.  Is
10     that fair as well?
11 A.  Yes, sir.
12 Q.  If you need to find a document in order to answer
13     a question, please feel free to do so.  It is not
14     a memory contest.  If you need to take a break,
15     let me know and we'll get to a break within, you
16     know, a question or two  Okay?
17 A.  Yes, sir.
18 Q.  All right.  If you would give me your business
19     address, please?
20 A.  1555 Sexton Road, Howell, Michigan, H-o-w-e-l-l,
21     48843.
22 Q.  And is that solely your business address?
23 A.  Business and residence
24 Q.  All right.  And what business do you operate out
25     of that address?

---

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 5

1  A. It's just a sole proprietorship. Lance and
2     Associates, which is either expert witness work
3     or teaching or speaking.
4  Q. Who are the associates in Lance and Associates?
5  A. We started that in '93 until about 2000, when I
6     did a lot of work with nursing homes and assisted
7     living facilities. It could have been any
8     subcontractors I had. There were times where I
9     had 20, maybe 10 nurses whenever I go into
10    certain projects. In the last ten years, it's
11    only been my wife and I.
12 Q. And what's your wife's professional background?
13 A. She's a social worker. Medical social worker.
14 Q. Is she an employee of Lance and Associates?
15 A. I guess you could say that. She helps me with my
16    expert witness work. She's not a testifying
17    expert, but she does all the -- she helps me with
18    research, proofing my work. She does all the
19    scheduling, all the billing. Sort of a division
20    of responsibilities, if you will, but she's not a
21    testifying expert.
22 Q. Does she generate any income for Lance and
23    Associates in the sense that are her services
24    billed separately --
25 A. No.

Page 6

1  Q. -- and apart from yours?
2  A. No.
3  Q. Is she issued a 1099 or a W2 at the end of the
4     year by Lance and Associates?
5  A. No.
6  Q. So she's not paid by Lance and Associates
7     directly?
8  A. That's correct.
9  Q. All right. And, therefore, has it just been you
10    and your wife since 2000?
11 A. Probably around -- I want to guess around 2003 or
12    '04. Maybe 2004 I would say for sure. The last
13    ten years, but before then probably not.
14 Q. And has there ever been an employee of Lance and
15    Associates other than yourself?
16 A. No. Everybody has been 1099 subcontractors.
17 Q. Is that your -- sorry. Is Lance and Associates
18    your sole source of active income?
19 A. A little bit from speaking and so forth, but
20    about 95 plus percent of it would be in the last
21    few years with expert witness work.
22 Q. And if you can estimate for me from what period
23    of time has 95 percent of your income been due to
24    expert witness work?
25 A. I would say within the last probably four to five

Page 7

1     years. Prior to that, I did a lot of consulting
2     and the mix would begin to get more and more
3     consulting and less and less legal work.
4  Q. 2009 would be about five years ago?
5  A. Right.
6  Q. The prior five years, how much would be
7     consulting work income versus expert witness
8     income?
9  A. I'd have to guess. Less than 50 percent expert
10    witness work. Maybe 30. It's hard to say from
11    -- and it really would be from really 2005 to
12    '09. There would be a mix in there. Somewhere
13    between maybe half. A little bit more of my work
14    was expert witness and the rest would be other
15    kinds of things as I recall.
16 Q. And I just want to make sure I am clear. 2005 to
17    '09 income would still be more expert witness
18    work?
19 A. Probably. Yes, sir.
20 Q. And then prior to '05 more income from
21    consulting?
22 A. Yes, all the way back to the first legal case I
23    ever took, which might have been '93, and there
24    were a lot of years I didn't have any legal
25    cases at all.

Page 8

1  Q. Do you have any explanation why in approximately
2     2009 almost the entire portion of your income was
3     due to expert witness work as opposed to
4     consulting?
5  A. Well, I have been in the industry a long time and
6     my kids are out of the house and I was tired of
7     traveling and I found that the expert witness
8     work was one that I liked to do on both sides and
9     one in which, as time went on, was in demand with
10    various attorneys, again both sides, that I
11    would encounter and I found that that work was
12    more rewarding to me.
13       I learned in the last five or ten years
14    the kinds of things that would take me five
15    lifetimes as an administrator to learn. So I
16    just enjoy the work. It's tragic sometimes, but
17    -- and it pays well.
18 Q. Can you estimate for us what your -- what the
19    amount of income was that you had in 2013 from
20    expert work?
21 A. My wife manages all that and people ask me that.
22    I don't know for certain, but I can tell you it
23    would be -- the number she gave me is in the 260
24    range, and that would be for all expert work I
25    do. Nursing homes are maybe only 50 percent.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 9

1  Q. But $260,000 from all expert witness activity,
2     whether it be long-term care, assisted living,
3     adult facilities?
4  A. Right. Somewhere in that range. It could be,
5     you know, bordering 270, but she gave me a
6     figure. I just can't remember exactly what it
7     is.
8  Q. Sure. Fair enough. What about the year prior to
9     that?
10 A. I would say within five percent, give or take.
11 Q. North of 250, south of 300?
12 A. South of 300. Yes, sir.
13 Q. All right. Do you estimate that 260 has been the
14    most that you've earned in one year as an expert?
15 A. I'd have to go back and look there. Probably a
16    year -- a few years ago where I might have made
17    more than that. I'd have to check and see.
18    Could be 20,000 higher. Again, I'm just
19    referring to the figures she gives me.
20 Q. All right. What are your charges?
21 A. My Fee Schedule is part of what I gave you, but I
22    can explain that.
23 Q. Sure. Go ahead.
24 A. The Summary of Qualifications at the back has my
25    Fee Schedule. The fees for this particular case

Page 10

1     I think would be current to what is listed in
2     here. Asked for a retainer, which I use
3     immediately. My standard rate for records
4     review, conferences, research, travel is 180 per
5     hour. Anything that I write would be, generally
6     speaking, 205 an hour. Depositions are 325, with
7     a three-hour minimum, and I have what I call a
8     fatigue factor. So if we go over six hours
9     today, it jumps to 475, and then I just have my
10    testimony fees, which is per day in the courtroom
11    1,800, second day would be 1,500 and, of course,
12    just paying my expenses to and from whatever
13    destinations I have.
14 Q. All right. How long has this particular schedule
15    been in effect?
16 A. I would say approximately a year, year and a
17    half.
18 Q. Okay. And I believe I saw in one of the letters
19    that you provided a retainer check. I think it
20    said 1,500?
21 A. It did.
22 Q. I think it's behind the Notice.
23 A. Yeah, and I think you're correct. It was an old
24    retainer amount that I had been asking for before
25    and some law firms presume that that's still in

Page 11

1     effect and I just accept it as such, if it's a
2     firm I have done work with before.
3  Q. So we can presume that you've done work for
4     Mr Troutman or his firm prior to this case?
5  A. I have testimony that I have. Yes, sir.
6  Q. Do you advertise your services at all?
7  A. I have a website that I have maintained for a
8     long time, and it's nursinghomeinsider.com. I
9     guess you could say that's what that's for. It's
10    more my expert witness work. I have another
11    website, because I like to teach and I do several
12    seminars and teach, which is
13    ltceducationbylance.com   That's purely an
14    education website that I use to promote speaking.
15         Aside from that, there have been times
16    in the very distant past where I have advertised
17    both on the defense and plaintiff side in their
18    various journals, but, boy, you got to go back at
19    least six more -- six or so years to get to
20    those. I haven't done that in a long time.
21 Q. All right. So the ltceducationbylance.com is
22    strictly an education site?
23 A. Yes, sir
24 Q. What information could you gather from that
25    particular site?

Page 12

1  A. I offer a variety of seminars and my specialty is
2     elder abuse and neglect. I have three, what I
3     call, libraries that I teach. One would be
4     management and one would be nurses and when I
5     teach nurses, it's really those things that an
6     administrator would teach a nurse. Management,
7     resident rights, and then I have direct care
8     givers, and I have various programs that I put
9     together for nursing homes or anyone else that
10    would be interested in that.
11 Q. When would have been the last time that you gave
12    a seminar underneath -- or for Lance and
13    Associates?
14 A. I taught -- I've got three I'm working on now. I
15    taught at Washtenaw Community College, which is
16    in Ann Arbor, in June of this year. I think it
17    was June 6. I taught a group of administrators,
18    nurses and so forth on a recent article that I
19    wrote that was published this year called,
20    "Negligent Retention," and it had to do with
21    keeping people you shouldn't care for or can't
22    care for in nursing homes and assisted living.
23    So I taught that. It was about a six-hour
24    course I taught on that day at the community
25    college, which is accredited.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 13

1 Q. Sir, is that the only seminar that you have done
2    in 2014?
3 A. It is. I'm working on some others. Yes, sir
4 Q. Any idea how many seminars you had in 2013?
5 A. I'm not sure  I'm not sure that I had any  I
6    know that in the prior year I did one or two
7    One particular that I remember was in August of
8    2012. I taught again one of my articles
9    "Preventing Neglect" in front of the Missouri
10   Health Care Association  There was about 600
11   DONs and administrators  I got very, very high
12   ratings on that, and that was about five hours.
13        Also taught them how to do management
14   rounds. So it was on the subject of resident
15   neglect and management rounds. I did that in
16   August of 2012.
17 Q. And for what associations?
18 A. The Missouri Health Care Association, which as
19   you probably know, most states have associations
20   affiliated with the American Health Care
21   Association  Missouri -- that is their
22   affiliate
23 Q. And did you do that in St. Louis or Columbia?
24 A. Right outside St. Louis. St. Charles actually
25   It's the town. It's a really neat town.

Page 14

1    St. Charles, which is outside of St. Louis.
2 Q. All right. And then what is the purpose of the
3    website nursinghomeinsider.com?
4 A. The purpose is -- I guess candidly it's just to,
5    you know, let individuals know that I'm available
6    as an expert witness and it also describes the
7    scope of my expertise and the issues that I have
8    in the past opined on and so forth
9 Q. And how long have you had that particular
10   website?
11 A. The current one I've had for about a year, year
12   and a half and the one prior to that was probably
13   around for, I want to say, seven, eight, nine
14   years. So it's been revised about a year and a
15   half ago.
16 Q. Still with the same domain name?
17 A. Yes, sir.
18 Q. You mentioned that you advertised in some
19   journals, but it's been five plus years ago.
20   What journals were those?
21 A. Well, when -- it used to be called Atla I think
22   It was that and then I always felt I needed to
23   have a balance, so that I also needed to
24   advertise on the defense side, which I didn't get
25   a lot of work, but -- and I think it was the

Page 15

1        Trial -- Trial Lawyers Association and I can't
2        remember -- it was a magazine that was
3        published back then by the primarily defense
4        attorney -- or, you know, that particular side
5        and I can't remember what it's called, but I
6        advertised in there as well.
7 Q. Any other journals?
8 A. No
9        MR. JOHNSON: Off the record.
10       (Discussion held off the record)
11   BY MR. JOHNSON:
12 Q. Have you ever received any case referrals from an
13   expert witness finding service?
14 A. In the past I have. It's been, I want to say, a
15   couple of years and I don't accept them anymore
16   on services that do my billing. So I tend to not
17   accept them anymore, but I have in the past.
18 Q. Do you know what particular services you have
19   received case referrals from?
20 A. Not offhand. I know that there were one or two a
21   couple years ago that I accepted only because
22   they just put the parties together and I worked
23   from that perspective on, but, gosh, it's been
24   not many. I would say in the last five years
25   maybe just two or three.

Page 16

1 Q. Are you familiar with E Witness as being one of
2    those?
3 A. I know what it is
4 Q. And how do you know what it is?
5 A. I've heard it.
6 Q. All right  Do you know whether you have received
7    any case referrals from them in the past?
8 A. Not that I know of. I think I have with
9    expertwitness.com, but it's been about four or
10   five years. There are some services that are
11   still advertising me unfortunately on their web,
12   but they're doing it without my authority and I
13   just can't seem to get them off for some odd
14   reason.
15 Q. To your knowledge, do you pay any fee to any
16   service to allow them to utilize your name?
17 A. No.
18 Q. Do you know any services currently that are
19   utilizing your name with or without your
20   approval?
21 A. I think expertwitness.com, despite four or five
22   e-mails and letters, still has it on there and
23   there might be another one or two as I surf that
24   just haven't taken it off despite my best
25   efforts. I don't ever recall ever receiving any

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

**Page 17**

1    referrals from them any time recently, but you
2    would think that they would take you off, but I
3    just have had difficulty with it, so I just gave
4    up.
5 Q. Do you know how Mr. Troutman or his firm received
6    your name?
7 A   With this case you mean?
8 Q   Well, we'll start it this way then. How many
9    cases have you reviewed for Mr. Troutman or his
10   firm?
11 A  I don't know how many I have been designated in,
12   but I've testified in one or at deposition, but
13   I've had a couple of cases with this law firm.
14 Q  And a couple meaning three or four?
15 A  I would say no more than five, no less than
16   three -- it's just guessing -- over the couple of
17   years.
18 Q  And you gave testimony in one of those other
19   cases?
20 A  Yes, sir
21 Q  And do you recall the name of that case?
22 A  I knew you were going to ask me. Not offhand.
23 Q  And will that be on -- will that particular
24   case be on the testimonial history that you're
25   going to provide for us?

**Page 18**

1 A  Yes, sir, and I believe it was this year
2 Q  While we're on the topic a little bit, what
3    we'll do is attach as Exhibit 1 your Summary of
4    Qualifications and also includes your Fee
5    Schedule.
6 A  Okay.
7 Q  And what I'd like to attach as Exhibit 2 is the
8    testimonial history that you will provide and if
9    you could provide that to the court reporter.
10 A  Okay.
11 Q  Are you able to do that?
12 A  Yeah. It's an E file.
13 Q  That would be fantastic. So we'll mark that as
14   Exhibit 2 to the deposition.
15         (Deposition Exhibit Nos. 1 and 2 marked
16         for identification)
17   BY MR. JOHNSON:
18 Q  How far back does the testimonial history listing
19   go?
20 A  I had a flood in my basement. So the depositions
21   don't go back before about 2000, but there were
22   so few of them, I would say I could probably
23   count them on one hand. I do have all of my
24   appearances before a Magistrate, and I say
25   Magistrate, because it could be arbitrations, it

**Page 19**

1    could be medical panel. Some states have those.
2    Could be a bench trial, jury trial. I have had
3    Federal hearings in front of a Federal judge.
4    Any type of Magistrate. I have all of those,
5    including the four this year
6 Q. Okay. And would the listing provide where the
7    case was pending?
8 A. No, I don't do that. I can let you know the year
9    it was, I can let you know the caption of the
10   case, I can let you know the attorney that I was
11   retained by and I also indicate on there what the
12   outcome was. Whether it was a defense verdict or
13   a plaintiff verdict or if there's a settlement,
14   but, you know, I don't always keep that -- the
15   docket number and things of that nature. So
16   everybody tells me there is enough on there to
17   meet the Federal requirement
18        I never had that problem, but I don't
19   really have the kind of details in maybe ten
20   seconds you can find it, but you should be able
21   to find whatever you're looking for.
22 Q. Do you know how plaintiff's counsel originally
23   obtained your name to review cases?
24 A. I do not, sir
25 Q. Have you ever inquired?

**Page 20**

1 A. Well, if I have, I don't recall.
2 Q. Do you know if their original retention was
3    through any expert witness service?
4 A. I believe it was not as I recall.
5 Q. How many times would you estimate that you have
6    given depositions over the course of your career
7    as an expert witness?
8 A. I'd have to speculate. It would be in the 180
9    range.
10 Q. And that would be since 1993?
11 A. Yes. First case I had. Yes, sir.
12 Q. When did you begin giving depositions with more
13   frequency?
14 A. 2005 and '06.
15 Q. And how many of the approximate 180 would you
16   estimate that you've given since '05 forward?
17 A. All but maybe five or ten.
18 Q. Okay. So you got a couple sprinkled from '93 to
19   2005?
20 A. Yes, sir.
21 Q. And then '05 forward is when it really took off?
22 A. Yes, because I was really working full-time in
23   the industry until right before -- well, part of
24   2004, but really 2005 is where I began mostly all
25   expert witness work.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 21

1 Q. How many times would you estimate that you have
2 testified at trial/arbitration proceedings before
3 a magistrate?
4 A. If you put it all -- if you collected all
5 together, I would say it's in the -- the 30 to 35
6 range. I believe there is somewhere around 24 or
7 25 jury trials and there is at least, I would
8 say, between 16 and 20 different states in there
9 too. So 16, 20 different states, including
10 Kentucky.
11 Q. And then the number of case reviews that you
12 would estimate that you have done since '05?
13 A. Boy, I don't know. I have no idea. In my
14 career, I would say I'm probably somewhere
15 between 800 and 1,000 cases, if you take all the
16 venues I've got, other than nursing homes, but
17 that's just a speculative number.
18 Q. What other types of cases do you review?
19 A. I review and testify in assisted living or those
20 states that have facilities similar to assisted
21 living, independent living, adult foster care,
22 because I've managed those. I also have
23 testified -- because I've managed group homes for
24 the mentally challenged. Are you familiar with
25 ICFMRs?

Page 22

1 A. Yes.
2 Q. Okay. I've also testified and reviewed cases for
3 ICFMRs, because I've worked with those years and
4 years ago. Almost everything but home care and
5 hospitals.
6 Q. Out of the different sectors of cases that you've
7 reviewed, with nursing homes being the most
8 frequent, what types of cases have you reviewed?
9 A. Yes, nursing homes followed by assisted living
10 and groups homes are close behind.
11 Q. And what percentage roughly would you estimate
12 nursing homes comprise of your reviews?
13 A. Anywhere from 40 to 60 percent depending on my
14 caseload.
15 Q. As far as breakdown being retained by the
16 plaintiff versus being retained by the defense,
17 what's your overall --
18 A. It's fluctuated over the years. When I first
19 started, about 30 percent were defense. I would
20 say in the last maybe three years, only about
21 five or ten percent are defense, but I think
22 that's changing quickly, because I'm going to be
23 receiving a lot of defense cases coming up here.
24 Actually, I've received some already. So I
25 would expect that I might start inching up

Page 23

1 toward that -- maybe the 20 percent range for
2 defense cases.
3 Q. Why are you all of a sudden -- or why are you
4 expecting to receive a bunch of defense cases?
5 A. Because I have a couple of firms -- I can't
6 mention them, because I haven't been designated
7 yet -- particularly here in Michigan that have
8 contacted me and have an interest to use me. In
9 fact, they've already sent -- I've had three
10 defense cases sent in the last month and I've
11 got one or two more coming. So it mostly is
12 because of my involvement here in Michigan in the
13 past.
14 Q. Do you testify against facilities in Michigan
15 as well?
16 A. Not as much. I've had cases in the past both
17 sides really. I would say it's kind of mixed in
18 Michigan. About 50 percent has been defense the
19 last couple of years, 50 percent has been
20 plaintiff. I don't -- I take a lot more cases
21 below nursing homes. I try to stay away from
22 nursing homes, because that's mostly what I did
23 in this state and I know too many people and I
24 have to remove myself because of conflicts all
25 too often. It's just not something I like to do

Page 24

1 in this state.
2 Q. How many depositions would you estimate you've
3 given this year?
4 A. I can only speculate. More than 15, maybe less
5 than 20. Somewhere in there, and that's just
6 speculating. I would defer to my list when I get
7 it to you, sir.
8 Q. And the list is up to date as of 2014?
9 A. There might be one I haven't put on there, but I
10 will make sure when I send it to you I do. There
11 is only maybe one or two that hasn't been
12 Q. Have you given any -- I'm sorry -- any deposition
13 testimony on behalf of a defendant this year?
14 A. Not this year. No.
15 Q. How about last year?
16 A. Not last year. Maybe the year before I did an
17 Illinois case. Not that many of those
18 unfortunately. I've had a lot that have come
19 close, but no.
20 Q. And I forgot. If I asked you, I apologize. Does
21 your testimonial history indicate whether you
22 were retained on behalf of the plaintiff or
23 defense?
24 A. I don't think it does.
25 Q. It just indicates --

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 25

1 A. Well, you know, I'm not sure. I think it might.
2 I'd have to go back and look, because I know the
3 people can count and they have on that list how
4 many I've done on each side, but I think it does,
5 sir.
6 Q. Have you arrived at any explanation on your own
7 as to why your 90 to 95 percent of the case
8 involvement on your behalf in the last three
9 years has been on behalf of the plaintiff?
10 A. I mean I have theories about that, but that's all
11 I have. I mean I've turned down cases on both
12 sides. Even this week I turned down cases on
13 both sides and I do that a lot, but I really
14 don't know. I just have theories on why I get
15 more plaintiff cases. I that's all.
16 Q. And what's your theory?
17 A. Well, in talking to various people -- and this is
18 just my theory -- that there tends to be more
19 cost-consciousness on the defense side and they
20 look more for either using employees of the
21 facility as experts and use their testimony or
22 they're more interested in local experts; whereas
23 the plaintiff attorneys that -- some that I work
24 with -- they don't care where you are in the
25 country. If you're the person that fits what

Page 26

1 they're looking for, they're going to retain you.
2 So that's been my experience, but I
3 tend to see more defense experts more local to
4 the case than I do plaintiff and that's just a
5 speculation. I don't know that to be the case.
6 Q. And you indicated that you have turned down some
7 cases. Does that mean that you have declined to
8 review them or have reviewed them and then
9 declined them?
10 A. There's two ways that I can do that. I had a
11 case this week that I got that on the surface I
12 thought might be a case I could accept -- a fall
13 case -- and then I looked at it, because it was
14 presented that way, and it just wouldn't meet
15 that standard and so I turned it down on the
16 plaintiff's side.
17 Usually I can screen upfront and I try
18 to do that, so I don't waste anybody's time and
19 money. Most of the time in the last couple of
20 years I've been able to do that, but this one
21 this week came to me and I just looked at the
22 circumstances and felt that I couldn't. Well, my
23 opinions would not be favorable to them and so
24 they decided not to use me.
25 Q. So you reviewed the case, gave them -- gave the

Page 27

1 retaining party an opinion and that opinion was
2 not favorable for their position or theory?
3 A. The essence or core issues of the case I did.
4 Like I usually look at narrative nurse's notes,
5 because that's the best thing to look at and
6 sometimes surveys, and if I don't find that it
7 breaches the standard that I would feel is
8 applicable as an administrator, then -- and falls
9 in particular sometimes fall into that when there
10 is just one fall and that's what happened here.
11 So I just explained to them that, you know,
12 "These are the circumstances I have. If you've
13 got more records, I will look at it, but based on
14 when you've got," I couldn't go to where they
15 felt I needed to go.
16 Q. What do you view your role as an expert?
17 A. I review these records -- I don't have a role to
18 try to find something in favor of the attorneys,
19 the families, the facility or anyone. I just
20 look at the records. Unlike a lot of experts, I
21 do feel standards are extremely important and do
22 to some extent form the standard of care and I
23 try to stay consistent with them whether it's
24 one side or the other, but I look at the records
25 and I step back and consider myself maybe an

Page 28

1 administrator under those circumstances would I
2 find that that would be a breach of the standards
3 that I would opine on. What would I have done?
4 What would I have expected to do?
5 Q. Do you view yourself as an advocate?
6 A. I'm an advocate for short depositions. No. I
7 mean I'm an advocate across the board I mean
8 for families and facilities and owners and
9 everybody I mean in my role outside as an expert,
10 but as an expert, I have to be unbiased, I have
11 to look at these standards to the extent of how
12 maybe a surveyor would to an unbiased third party
13 and I think to be an advocate is to be biased and
14 I'm not an advocate.
15 Q. Let's talk about your experience a little bit
16 then. Have you ever acted as a surveyor?
17 A. No, not -- I've worked with them and directed
18 them in projects I've had here in Michigan like
19 receiverships and things of that nature where
20 I've done projects, but I've not actually been a
21 certified Federal surveyor. No, sir.
22 Q. All right. Are you a physician?
23 A. No.
24 Q. Not trained as a physician?
25 A. No.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 29

1  Q.  Don't hold yourself out as a physician?
2  A.  I do not.
3  Q.  Do you agree that you're able to render medical
4      opinions?
5  A.  I render no causation opinions.  No.  Obviously
6      you know that physicians are responsible under
7      regulations, if they do something wrong, that an
8      administrator would be responsible for.  I might
9      jump in, but I don't offer any causation
10     opinions.  No, sir.
11 Q.  All right.  So you won't testify in this case or
12     any case that any particular breach caused an
13     injury?
14 A.  The standards I'm held to look at the outcome as
15     a way of measuring compliance, but in terms of
16     offering opinions of a medical nature,
17     physiological or underlying conditions, no, I
18     don't offer that, but in order to be an
19     administrator, if someone goes to the hospital in
20     this condition and is being described as such,
21     I work myself back in time, but those are just
22     liability issues.  They're not medical issues.
23 Q.  Well, do you render -- I'm sorry.  Have you ever
24     rendered a medical opinion?
25 A.  No.  No, not in my opinion I haven't.  I just

Page 30

1      render opinions that I'm entitled to as an
2      administrator.
3  Q.  Are you capable of rendering an opinion as to
4      cause of sepsis?
5  A.  No.
6  Q.  Are you capable of rendering an opinion as to
7      cause of MRSA?
8  A.  No.
9  Q.  Are you capable of rendering an opinion as to
10     cause of dehydration?
11 A.  No.  The cause I couldn't, but the factors
12     surrounding it, such as no intake, what the staff
13     weren't doing -- now, the doctor may have to
14     connect the dots to those, but in terms of the
15     staff's duties to have prevented that, I would
16     certainly point out whether they were or weren't
17     done, but in terms of connecting those dots and
18     arriving at that conclusion, that would be a
19     physician.
20 Q.  And likewise, I take it that you have never made
21     a diagnosis?
22 A.  I am not entitled to do that, sir.
23 Q.  Or prescribed treatment for any such diagnosis?
24 A.  Only a doctor can do that.  Even a nurse can't
25     really do that unless they're a practitioner.

Page 31

1  Q.  Same questions relative to a nurse.  Are you a
2      nurse?
3  A.  No.
4  Q.  Don't have a Licensed Practical Nurse degree or a
5      R.N. degree?
6  A.  That's correct.
7  Q.  Have you ever rendered bedside care as a nurse?
8  A.  Not as a nurse.  No.
9  Q.  I know from your summary that at some point in
10     time you were a nurse's aide?
11 A.  Right.
12 Q.  When was that?
13 A.  Early '70s in high school and then throughout the
14     years any administrator will help out the
15     bedside.  Feed.  Whatever.  Snowstorms, but that
16     would only be in an emergency, but in terms of
17     actually that being my only job, it would have
18     been the early '70s and they weren't even --
19     was just called an orderly back then.  They
20     weren't even certified back then.
21 Q.  That's what I was going to ask you.  If you had
22     to become certified.
23 A.  I could have, because I had an agency where I
24     certified aides.  I could have certified myself
25     I just never did that, but I had that for a

Page 32

1      while.
2  Q.  So you never held a nurse's aide certification?
3  A.  No.
4  Q.  Have you ever rendered bedside clinical care to a
5      patient in a long-term care facility?
6  A.  I'm sure I have, but again, as an administrator
7      would assisting somebody that I maybe lifted.  I
8      mean there are -- it would depend on the range.
9      Answering someone's call light in essence can be
10     that very form.  I do not venture into the
11     practice of nursing in terms of administering
12     medications or providing treatments, but there's
13     a range of things that a lot of administrators do
14     that could fall within that scope.
15 Q.  I guess that scope could be answering a call
16     light to see what a resident needs and then
17     finding someone that can deliver the need?
18 A.  Well, sometimes, you know, if they want a drink
19     of water, if -- I mean there's things that
20     sometimes you can help them with.  You know, they
21     want a towel or washcloth or there's things that
22     you can do.  You know, if you know what their
23     diet is and they want something from the kitchen
24     It depends, but take them to activities, but if
25     it's rendering care in terms of, "I need to go to

**MORE III GROUP   800-536-0804**
**Court Reporting and Videoconferencing**

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 33

1    the bathroom," then I would get an aide and if
2    the aide had some trouble and there's nobody
3    else around, I might help them, but again, I
4    would -- the primary caregiver would be there
5  Q. So would you agree that in general, as an
6    administrator, you do not deliver hands-on
7    bedside care?
8  A. As a rule, yes, sir, that's true.
9  Q. And do you anticipate rendering nursing opinions
10   in this particular case?
11 A. No. A lot of the regulations are really facility
12   regulations, not nursing, and I think that a lot
13   of people know that and basically what I've done
14   in my report -- I have three buckets that
15   everything falls into. It's on Page 4 of my
16   report. It's either regulatory -- it's
17   Paragraph 18 -- or administrative or
18   institutional, and so every opinion I have today
19   would fall into one of those three buckets.
20        The regulatory gets into the conduct of
21   nurses and doctors with regard to a regulation
22   and to the extent that one is not met or internal
23   standard, yes, I would. Either you follow a
24   doctor's order or you don't and I am responsible
25   for that, but in terms of the clinical practice

Page 34

1    of nursing, absolutely not. That would generally
2    be confined to the Nurse Practice Act. Same in
3    Kentucky.
4  Q. So your opinions or your area of expertise would
5    be in administrative, regulatory and
6    institutional?
7  A. Yes, and the administrative would be my peer.
8    The institutional would be what a same or similar
9    nursing home would do under the same
10   circumstances. Those standards. Regulatory
11   would be laws/regulations. Those things that
12   exist. They all fit under those three
13   categories. I'm very careful to stay in those
14   three categories.
15 Q. When is the last time that you have been a
16   nursing home administrator?
17 A. I sat in a facility about a month in 2002 and
18   that would be the last time.
19 Q. And was that just on an interim basis?
20 A. It was, because I had an administrator in
21   northern Michigan that wasn't doing too well and
22   I knew the state well, because I worked with them
23   in the past, and I just said, "Well, I will be
24   there until I replace them" and that's what I
25   did.

Page 35

1  Q. I guess what was the name of that facility?
2  A. Then it was called Cheboygan Health Care Center.
3    It's just south of Mackinaw.
4  Q. And what's the name of it?
5  A. Now it's owned by Extended Care. I'm not sure
6    what it's called.
7  Q. Prior to that one-month stint in '02, when would
8    have been the last time that you acted as a
9    licensed nursing home administrator?
10 A. I managed nursing home administrators all the way
11   back from that date, but in terms of me having a
12   license on the wall and being only the
13   administrator would have probably been around '96
14   or '97. Somewhere in there. I was in facilities
15   every day and my offices were in there and I
16   managed administrators, but it wouldn't have been
17   me that was the licensed person. It would have
18   been somebody else, even though again, as I said,
19   I would be in the building every day.
20 Q. But as far as being the licensed administrator of
21   the facility, the last time you would have done
22   that would have been in 1996?
23 A. Ninety-seven. Somewhere in there. Yeah.
24 Q. All right. What did you do in-between '96 and
25   '02 then?

Page 36

1  A. I managed administrators in various facilities in
2    Wisconsin, Indiana, Michigan, Texas and helped
3    turn around some of those troubled homes. So I
4    really worked as a -- either a chief -- or a
5    chief operating officer or a regional
6    vice-president in a corporate role, if you will.
7  Q. Somewhat like a regional director?
8  A. Right, or in some cases, you know, in the last
9    company I worked for, I was a chief operating
10   officer, and we -- it was a non-profit company.
11   We owned a lot of facilities and we had
12   management companies and I managed or oversaw
13   them, but when they weren't performing well, we
14   made a couple replacements and I sat in and
15   actually managed day to day until we found a
16   replacement, for example, in Indiana and here in
17   Michigan. So again, I'm in the buildings every
18   day, just wasn't me as the licensed
19   administrator.
20 Q. And did you do that for ServiceMaster Diversified
21   Health from '96 to '99?
22 A. I did.
23 Q. And it appears that your title at that time
24   was Vice-President of Facility Operations?
25 A. Right. I managed facilities, but because a lot

Page 37

1   of my background was turning around extremely
2   troubled homes, they would also pull me out of my
3   region sometimes and have me help with very
4   troubled homes throughout the country.
5       I remember I was sent for about a week
6   in Louisville once for a real troubled home. So
7   they'd send me all over, because of my turnaround
8   background, but most of what I did was managing
9   these troubled homes.
10  Q.  Does ServiceMaster still have their Diversified
11      Health Division?
12  A.  No.  It ended about a year or two after I left.
13      It was not a profitable division for them and
14      their president they replaced and I knew her
15      before they became ServiceMaster and it's one of
16      those situations where you only want to work for
17      a person and not a company.  So when she left, I
18      left.
19  Q.  And how many facilities would you say that you
20      had some supervision or responsibilities for
21      while you worked for ServiceMaster?
22  A.  Gosh, eight to ten.  I was -- I had a facility in
23      Wisconsin, I, Texas, three or four here in Michigan
24      Somewhere between six to ten.
25  Q.  During the period of time in which you were the

Page 38

1   Vice-President of Facility Operations and had
2   responsibility for administrators, did any of
3   those facilities receive citations?
4   A.  Oh, they did.  Everybody has to say yes to that
5       question.
6   Q.  Why is that?
7   A.  When you have 400 odd regulations and you have
8       facilities that are surveyed frequently,
9       statistically -- I mean I've had personally
10      deficiency-free surveys in my past, but they're
11      very rare.  Maybe one percent of administrators
12      get them.
13          Now, having said that, most violations
14      that most facilities get are low level, non-harm
15      that don't affect residents, but it's pretty
16      tough for -- in fact, there's no administrator
17      that can be around as long as I am -- 35, 36
18      years -- that could ever say, "I have never had
19      violations."  They would be lying.  Statistically
20      it's impossible.
21  Q.  Why is that?
22  A.  Well, you know, I think that it's a complex
23      industry.  Regulations -- I think OBRA
24      regulations are good.  I was around a long time
25      before then.  They're more outcome-oriented.

Page 39

1       My background is taking over extremely
2   troubled homes and that's why ServiceMaster got
3   a lot of their contracts, because they send me in
4   to fix the home for the owner and they get it.
5   So the nature of the buildings that I went into
6   had severe violations.
7       I mean I think one of the buildings I
8   went into for the state here still has the worst
9   survey in state history.  So it was just the
10  nature of what I did and I saw more troubled
11  homes than anything else.  I fixed them, but they
12  were troubled when I got them for sure.
13  Q.  And even if you exclude the troubled homes from
14      your time of service, did the facilities in which
15      you were an administrator receive citations?
16  A.  Oh, sure.  A couple here and there.  Sure.
17  Q.  All right.  And would you agree that, you know,
18      likely every nursing home in the country has
19      received some type of citation from a regulatory
20      agency?
21  A.  If they've been open more than five years, yeah,
22      I would say.  I only know a couple of facilities
23      that have ever gone more than two or three years
24      deficiency free, but that's very rare.
25  Q.  And would you agree that just because a facility

Page 40

1   receives a citation from a regulatory agency,
2   that does not necessarily equate to them
3   providing inadequate care?
4   A.  I agree.
5   Q.  So it sounds like you left on your own accord
6       from ServiceMaster in August of '99?
7   A.  Yes.
8   Q.  And then went to Metro Health Foundation?
9   A.  Right.
10  Q.  What did you do for them?
11  A.  The owner of some of the facilities I had for
12      ServiceMaster had his facilities -- he wanted me
13      to help manage them and I did a lot of the same
14      thing.  I was his chief operating officer.  His
15      office was based out of Roswell, Georgia, which I
16      lived for a while, and it's nonprofit and because
17      of their bond covenants, they had to have a
18      third-party manager.  Well, they don't always
19      work out and my job was to oversee them, and the
20      states I was in with him -- New Hampshire,
21      Massachusetts, Michigan, Texas, Wisconsin and
22      Indiana, and we had some trouble with our Indiana
23      properties, so we took them back and I went and
24      managed them for about a year or so, but in the
25      meantime when I wasn't managing them, I would go

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 41

1   and visit. I would look at the financials, I
2   would look at the surveys and my job was to make
3   sure that they were abiding by the management
4   contracts.
5 Q.  Did you have direct responsibility for the
6   administrators of these facilities?
7 A.  When I took over the Indiana region for about a
8   year I did. The other ones -- I knew a lot of
9   them anyway and I would go in and help out, but
10   formally, it would have been the management
11   company.
12 Q.  Who was the management company with Metro?
13 A.  Oddly enough, I think for some of them it might
14   have been Atrium Living Centers. I think they
15   might have changed ownership since then, but out
16   of Georgia they were.
17 Q.  It sounds like your role then between
18   ServiceMaster and Metro Health was a little bit
19   different; would that be fair?
20 A.  Yes.
21 Q.  With ServiceMaster did administrators report
22   directly to you?
23 A.  Yes.
24 Q.  With Metro did they report directly to you?
25 A.  Only when we took over the Indiana region and I

Page 42

1   knew a couple of the administrators. The one
2   here in Michigan in particular -- he did. There
3   were some that knew me better and the management
4   company just said, "Fine, Lance, you just work
5   with them," but formally everywhere, but Indiana
6   for about a year.
7 Q.  Do you remember the name or the names of the
8   Indiana facilities?
9 A.  No, not offhand.
10 Q.  Or the ones in Michigan?
11 A.  Well, Michigan was the Cheboygan Health Care
12   Center.
13 Q.  And then what happened in April of '03?
14 A.  The president of Metro Health Foundation was
15   thinking that he didn't want to stay around and
16   again, I didn't want to stay, if he wasn't.
17   Unfortunately, when they financed some of their
18   bonds -- some of their facilities -- and Indiana
19   was a good example -- it was not financed
20   properly and they lost a lot of money over time
21   and it was apparent to him it was not going to
22   work out and because of those issues and so he
23   decided that he wanted to move on and when I
24   heard that, that was fine with me.
25       I was traveling a lot then and I would

Page 43

1   rather just stay with my wife and my kids were
2   out of the house, so that was just a point where
3   I wanted to change my career.
4 Q.  And then who did you become employed by in 2003
5   when you left Metro?
6 A.  I was paid through the end of the summer. I
7   started to do some consulting in the fall. The
8   following year -- really starting in the fall
9   through 2004 there was a consulting company -- my
10   competitor for years -- Advantage Health Systems
11   -- I can't remember what their name is -- out of
12   Southfield. They had always consulted, but never
13   owned facilities and so I consulted with them
14   and spent a lot of time -- almost half my time in
15   2004 helping them launch their management
16   company. It's not in there, and explaining how
17   to manage facilities, systems, so forth and so
18   on, and so that's what I did for 2004. A lot of
19   that, plus a little bit of consulting with expert
20   witness work.
21 Q.  Did you leave Metro on your own accord?
22 A.  Yes, sir. I've never been fired from anyplace.
23 Q.  Are facilities required to -- long-term care
24   facilities required to have a medical director?
25 A.  Nursing homes are. Yes, sir.

Page 44

1 Q.  Why is that?
2 A.  Is it 501, or whatever the F Tag? They've
3   always had them in the past, even before OBRA,
4   but there's an expectation that a medical
5   director is necessary. This is just what I've
6   heard from CMS over the years.
7       If you ask me, the biggest thing is to
8   be a policeman over the other attendings, since
9   they don't always come in and do their job, but
10   they're a valuable resource for helping to
11   develop policies/procedures, address medical
12   issues and they're probably a right-hand person
13   to both the administrator and the DON. So
14   they're a great medical resource and certainly
15   they're a fallback and sort of an enforcement, if
16   you will, for attendings that aren't doing their
17   job.
18 Q.  And are the requirements that facilities have a
19   Director of Nursing?
20 A.  Yes, sir.
21 Q.  And why is that?
22 A.  Well, I didn't decide why that was important.
23   It's -- as long as I've ever been in long-term
24   care, there has been that role. I believe that
25   there's an expectation on CMS's part that you

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 45

1 need someone who is not the best nurse in the
2 facility, not the greatest nurse, although some
3 DONs profess to be that. You need someone who is
4 a nurse manager. Who manages the nursing
5 department. So you need a good manager of
6 nurses. You need a good supervisor of the staff
7 and that's their role.
8        They're really sort of a nursing
9 administrator, if you will, more than a DON and
10 it's because it is the largest department by far
11 and it is the core department that delivers the
12 care and unlike the other departments, it's 24/7.
13 So you -- it's the only department that is always
14 in the building.
15 Q. Would you agree that the DON and the medical
16 director have areas of expertise that the
17 administrator does not have?
18 A. I'm sure. I'm sure. I mean just by virtue of
19 their medical background and expertise. Sure.
20 Q. Would you agree that the State Licensing and
21 Federal Regulations were designed for
22 participation in the Medicare and Medicaid
23 programs?
24 A. That's one of their -- that's their primary
25 function, that if you want to be part of those

Page 46

1 entitlement programs, that you need those
2 standards; however, a lot of states have adopted
3 that language almost sometimes chapter and verse
4 for their own administrative rules. So a lot of
5 states have all but adopted them as well in the
6 administrative rules. So they obviously agree
7 with them as well, but, yeah, I think that's the
8 primary purpose. You want to participate with or
9 follow these rules.
10 Q. And would you agree that the basis of your
11 opinions as to whether a violation occurred or
12 not is generally based on a regulation of some
13 sort?
14 A. That's the three buckets. Again, I think if you
15 look at the regulatory, it would be any
16 laws/regulations that would exist.
17 Administrative would be the practice of
18 administration. Now, institutional would be --
19 could be internal standards. If you have a
20 standard that says that you're supposed to do
21 such and such, as an administrator I would have
22 to enforce that standard and also what a
23 reasonable facility would do under the same or
24 similar circumstances. For example, if you've
25 got a facility that can't explain why they didn't

Page 47

1 turn and reposition someone and practically every
2 other facility in the state uses ADL sheets, well
3 ADL sheets is a way to comply with that practice.
4 It's not required by a regulation, but as a
5 practical matter, a reasonable facility would use
6 such a practice. So I would look at
7 circumstances such as that.
8 Q. Have you reviewed any policies and procedures
9 relative to this particular facility?
10 A. Only to the extent where they may have crept into
11 the medical records, but not in terms of any
12 manuals or anything. No, sir. I might have
13 requested that.
14 Q. And are you of the opinion that the Federal and
15 state regulations establish the standard of care
16 in long-term negligence -- long-term care
17 negligence cases such as this?
18 A. To some extent I do. Yes, sir.
19 Q. And to some extent do you not believe that?
20 A. Well, I think it's not the only standard. I
21 think that the internal standards of a facility
22 and what the industry does is important. Some
23 people say it's OBRA. The only standard? No.
24 You have the administrative rules of the state,
25 you've got the internal policies and procedures,

Page 48

1 you've got what other facilities do both in one
2 state and throughout the country, but, yeah,
3 absolutely. In fact, if you look at most
4 policies and procedures in almost every facility
5 I look at, they're crafted right after the C.F.R.
6 in particular and, in fact, a lot of policies and
7 procedures actually reference the C.F.R. in their
8 own internal standards. So I would say it's a
9 very dominant -- let me just put it that way.
10 They're a dominant source. Yes, sir.
11 Q. But in a particular negligence action such as
12 this, are you of the opinion that the -- whether
13 it would be the Federal or the state regulation
14 is what establishes the standard of care?
15 A. It's a dominant part of that, yes, sir, in my
16 opinion. That's the scope of my practice.
17 That's what the state holds me to.
18 Q. Have any of your opinions or testimony ever been
19 excluded by a court?
20 A. There's been a motion in limine here and there.
21 The only exclusion I've had -- outright
22 exclusion -- it wasn't a -- what do you call it?
23 A daubert? I've never had any of those. It was
24 a case in Cleveland where I think all the experts
25 were stripped out on both sides, except the

Page 49

1  doctors I think and I had another facility --
2  another case with the same facility. I was told
3  it was a pleadings issue. It had nothing to do
4  with me personally, but that's the only case I
5  can think of, other than just motions that are
6  made in some states, where you can't talk about
7  staffing or you can't talk about this in terms of
8  my expertise, and actually, I've testified in
9  Ohio after that case. So, you know --
10 Q  And is that particular case where your testimony
11    was excluded listed on your testimonial history?
12 A  It is to the extent of a deposition that I took.
13    Yes, sir.
14 Q  And do you know that name?
15 A  No. It's been what, five or seven years, but if
16    I don't circle it or -- I'll make sure that you
17    know which one it is, if you're interested in it.
18 Q  All right. Great. Thank you. Have you ever had
19    to testify at a daubert hearing?
20 A  No. No.
21 Q  And do you know what the basis of the exclusion
22    was in the case in Cleveland?
23 A  There was a pleading that was done by the
24    attorney -- it was a plaintiff case I had -- and
25    the explanation I had by the other attorney I had

Page 50

1  who retained me in the same facility a year or
2  two later was that the pleading sort of backfired
3  and instead of the attorney I was working with
4  trying to exclude experts on the defense side,
5  the judge excluded them on his side as well and
6  it sort of backfired on them. That's the
7  explanation I had, but again, I don't know that I
8  even saw the ruling.
9  Q  That's what I was going to ask you, if you ever
10    received a copy of the order and opinion?
11 A  I don't think I did. No.
12 Q  Tell you what. Let's take a short break, if you
13    don't mind, and then we'll get into it.
14    (Break taken)
15 BY MR. JOHNSON:
16 Q  Mr. Youles, when were you contacted to review
17    this case?
18 A  I don't know the exact date, but the initial
19    letter that was sent by the law firm engaging me
20    is dated October 4, 2013. So it would have been
21    prior to that date, I would guess, within 30
22    days.
23 Q  What information were you provided at the time
24    that you received the initial letter?
25 A  I didn't keep any notes, so I'm not certain, but

Page 51

1  my practice with Mr. Troutman would have been
2  just to screen it in terms of just a brief
3  overview of the case itself to see if we get to
4  the next stage, which would be my review.
5  Q  And what -- I guess how do you decide on this
6    initial screen? Because that's a phrase that
7    you've used on a couple of occasions, whether
8    it's something within your purview or something
9    that is not.
10 A  Well, I'm a liability expert. So if they're
11    looking for a causation, I refer them to somebody
12    else or they have to find someone else, but I
13    think he knew what my expertise was. I would
14    look to the circumstances. First of all, is it a
15    nursing home, what kind of facility it is and
16    secondly, what happened. Whether it was a death
17    issue, whether it was an injury issue, and then I
18    would zero in on the timeframe. What happened.
19        I'm always curious if there's any
20    violations either involving the resident with a
21    complaint survey or any period of troubled
22    compliance during that period of time, and then I
23    just look at the circumstances themselves. If
24    it's a fall's case, if it's a wound case. I
25    mean, for example, I've had people call me on

Page 52

1  awful wound cases with gangrene, only to find out
2  after I took it that the resident was totally
3  noncompliant. Maybe a younger resident. Well,
4  you know, I can't sort out liability issues when
5  I can't decide what the facility could or
6  couldn't do.
7        So based on the kind of case it is,
8  whether it's falls or elopement or medication
9  errors or things that are within my purview as an
10  administrator, I'll look to see what those
11  circumstances were, where more likely than not it
12  appears as though there might be a problem where
13  I can go to the next stage, where just by
14  description of the circumstances it appears that
15  a standard could have been breached. That's what
16  I look for, and again, there are -- like the one
17  I had this week. One fall, nowhere -- no risk
18  factors. None whatsoever. It was very clear to
19  me that this wasn't going to work.
20 Q  What documents were you originally provided?
21 A  I believe everything that's here, aside from
22  whatever research I've done.
23 Q  So you believe that with the initial letter you
24  received every piece of information from the
25  plaintiff's counsel?

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 53

1  A.  No.  There's a lot of things I didn't get that I
2  requested specifically in my report that are
3  missing in this case.  I listed them in my report
4  on Page 20, but other than that, I did do some
5  research and so I would think any of the Internet
6  materials that you see are those that I found
7  myself.
8       I did make it clear though that there
9  are some issues and things missing.  They don't
10  affect my opinions.  I mean they could
11  potentially.  It could adjust them either way,
12  but I don't think that would be the case, but
13  there are some -- there's definitely some things
14  missing that I normally get.  I realize I may not
15  get incident reports or internal investigations,
16  but I'm missing narrative nurse's notes and so
17  there are some things I'm missing
18  Q.  I understand, but my question is a little bit
19  different.
20  A.  I'm sorry.
21  Q.  Let me ask it this way.  All the documents that
22  you received from plaintiff's counsel did you
23  receive with the initial letter?
24  A.  I believe so.  Yes, sir.  That's what I recall.
25  Q.  All right.  And can you itemize what providers

Page 54

1  you received records from?
2  A.  The nursing home itself, and I'd have to look at
3  the actual hospital stays.  Whenever the hospital
4  stays were.  That particular hospital I received
5  I really think just the medical records of the
6  nursing home itself, Crittenden, and I think
7  Crittenden Hospital.  I don't always request all
8  the records from the hospital, but I have to have
9  the summary records, H&P, consults, ER, and a
10  Discharge Summary.  I don't recall receiving any
11  expert reports.
12       I don't have -- actually have a
13  Complaint.  I don't have the copy of the
14  Complaint, so I'm not sure what's being alleged.
15  I think I got the surveys on my own.  That's it.
16  Really I think it's just the hospital/nursing
17  home records that I recall.
18  Q.  And I think I might have saw in one of the
19  letters that you also received Dr. Burkhardt's
20  records?  Does that ring a bell?
21  A.  To the extent of his practicing at this facility.
22  I don't know that I got his clinic records.  I'd
23  have to go back and look.
24  Q.  Why don't you check and see.
25  A.  Maybe I did.

Page 55

1  Q.  I just want to make sure I have a complete
2  listing of what you have.
3  A.  Death Certificate too.
4  Q.  Okay.
5  A.  I can't distinguish if some of these hospital
6  records might have found themselves in his file.
7  Sometimes doctors have them, but I'm struggling
8  to see any records that look like they might only
9  be from his clinic, if he's got a clinic.
10  Q.  Okay.  So based upon your review of the materials
11  you were provided, you have received the nursing
12  home records from Crittenden?
13  A.  Yes, sir.
14  Q.  The Crittenden Hospital records or at least
15  excerpts therefrom?
16  A  Right, which would -- just sort of like on
17  bookends.  Maybe before he came in, during, and
18  then the one after.  Of course, he died at the
19  last one, and even if I got them in the distant
20  past, I don't look at them beyond that.  It's
21  outside my scope.
22  Q.  And then the Death Certificate?
23  A  Yes, sir.
24  Q.  Does that encompass then the materials you were
25  provided by counsel?

Page 56

1  A.  I think so.
2  Q.  Then you referenced Page 20 of your report where
3  you requested certain records?
4  A.  Yes, sir.
5  Q.  Then let's go through those one by one, because
6  some of this material you may have garnered on
7  your own at some point or you may not have
8  received it at all.  So let's go through this.
9  "All Incident Reports regarding Mr. Cole."  Have
10  you received that?
11  A.  No, sir.
12  Q.  Internal investigation(s) and/or evidence that
13  Ms. Cole's allegation of abuse was reported to
14  OIG?
15  A.  No.
16  Q.  All MDS?
17  A.  When I looked at the seven-month stay there, it
18  seemed to me that there were some missing,
19  because, as you know, either you would have them
20  on a quarterly basis or at the end really
21  could be a significant change MDS, but it
22  seemed to me that I did not have them throughout
23  the stay.
24  Q.  What I need to know then is what MDSs you have.
25  A.  I would have to go through and dig and see.

MORETTI GROUP   800-536-0804
Court Reporting and Videoconferencing

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

---

Page 57

1  Q. That's fine.
2  A. You want me to do that now?
3  Q. Please.
4  A. I have gone through all my records. I can't find
5     one.
6  Q. Okay.
7  A. I normally refer to them in my report, which I
8     didn't.
9  Q. So you have no MDSs at all?
10 A. No, and that's an important document for me.
11 Q. Presumed that it would. Did you request it from
12    counsel?
13 A. Through this report I did. Yes, sir.
14 Q. And what were you advised?
15 A. I don't recall. I haven't received it.
16 Q. I mean I'm presuming you requested all this
17    information on Page -- I'm sorry, Paragraph 59,
18    Page 20 of your report?
19 A. I did.
20 Q. And what were you advised?
21 A. I don't recall what the response was, sir.
22 Q. And speaking of the report, you have authored
23    a report. It's not dated. Do you know what
24    date you prepared the report?
25 A. It's not signed, but I know that -- I knew you

---

Page 58

1     were going to ask me that. In my computer it was
2     completed or issued on -- the report was done on
3     12-29-13.
4  Q. Any reason why it's not signed? Any reason why
5     the report is not signed and dated?
6  A. That's a good question. Normally I have in the
7     past, but I noticed I didn't in this case. I'm
8     not sure.
9  Q. Don't have an explanation why?
10 A. I don't. Well -- I'm sorry.
11 Q. Would you agree with me that you make it a habit
12    to sign and date your reports?
13 A. I do when I'm told to. I sent the report and my
14    practice is to wait for someone to sign -- want
15    me to sign it and I'll usually sign it and send
16    it.
17 Q. Is there any significance to the fact that you
18    didn't sign this report?
19 A. Not that I can think of. There were no
20    corrections made and no discussions regarding the
21    report, but there are some attorneys that prefer
22    that I don't sign it until I talk to them and
23    so I'm not sure why, sir.
24 Q. Did counsel that retained you in this case tell
25    you not to sign it --

---

Page 59

1  A. No.
2  Q. -- or request that you do sign it?
3  A. To me, it's a mystery. I noticed that in my
4     files.
5  Q. Does your report contain all the opinions that
6     you intend on expressing at the trial of this
7     action?
8  A. To the extent of the information that I have and
9     to the extent that some of this might require my
10    narration, yes, sir. There is a -- you know,
11    some records missing and if I receive them, I
12    might withdraw opinions, I might add, but
13    subject to what I have as of this point in time,
14    I think it is reflective of that. Yes, sir.
15 Q. And that's the nature of my question. As you sit
16    here today, based upon the materials that you
17    have reviewed and your experience and training,
18    does this report contain the full scope of your
19    opinions and the basis of those opinions?
20 A. It does. I've written some notes on this. I'm
21    still struggling with the area of neglect,
22    because I wrote an article recently that was
23    published about negligent retention and I'm
24    really believing that they shouldn't have kept
25    him the second time, because they weren't capable

---

Page 60

1     of caring for him. So I'm struggling with
2     whether I'm going to offer that opinion that
3     there was a negligent retention here, but other
4     than that, I think it reflects everything.
5  Q. Well, I need to know today whether you have an
6     internal struggle or not whether you intend on
7     expressing opinions --
8  A. I would say yes. It's not in here and this
9     article was published after this report, but my
10    belief is that they shouldn't have kept him the
11    second time they came back, if they weren't
12    willing to do what was necessary.
13 Q. And the second time that he came back meaning
14    following his hospitalization in July?
15 A. Right. He was hospitalized for severe
16    dehydration and other issues and I just felt like
17    either you step up and provide the care or as my
18    article says, tell the wife that she needs to
19    find somewhere else. To do neither is negligent
20    retention, as defined in my article, which I gave
21    to you.
22 Q. So the only additional opinion that you will
23    offer that's not within your report is that he
24    should not have -- that the facility should not
25    have kept him when he returned in July?

---

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

---

Page 61

1  A  Unless they were willing to provide more care and
2     services, particularly bedside care, than he
3     received before, and I just saw a continuation of
4     the same problems during the second stay that I
5     saw during the first as an administrator. All
6     my opinions are as an administrator.
7  Q  Sure. All right. So other than the negligent
8     retention issue, are there any other opinions
9     that you plan on expressing that are not
10    contained within your report?
11 A  No. On the one that I've written some notes,
12    there's some embellishments, but it's just for
13    my purposes of today.
14 Q  Sure. It didn't seem like anything new --
15 A  No.
16 Q  -- was contained in your handwritten notes?
17 A  No. That's the only thing, sir.
18 Q  All right. Let's go back to the records
19    requested. The next line is Narrative Nurse's
20    Notes -- I'll let you get there. Sorry.
21    Narrative Nurse's Notes from March 9, 2012 to
22    July 4, 2012 and July 9, 2012 to July 28, 2012.
23 A  Those are things that are not even privileged. I
24    don't know why I don't got them. I just don't
25    know why I don't have them. I don't have those

Page 62

1     records.
2  Q  And I think you told me earlier Narrative Nurse's
3     Notes are a pivotal piece of information in a
4     patient's chart?
5  A  They are. I don't think I need them -- I don't
6     need them, because I think in his last stay --
7     most of my opinions surround really the last four
8     or five days of his stay, but certainly, those
9     first nurse's notes go a long way to explain why
10    he was admitted with severe dehydration and other
11    issues. I never got them and that would be
12    something that, you know, they have to have them,
13    because they have to maintain those for seven
14    years. So -- seven to ten years. I don't know
15    where they are.
16 Q  Did you ask counsel?
17 A  I made it clear that I needed records and that
18    this list reflected my needs, sir.
19 Q  And, in fact, you have even got it underlined,
20    don't you?
21 A  I do, because that's an important set of records
22    for me, sir, or for any expert. I can't
23    imagine any expert saying that these were not
24    important records.
25 Q  And those notes could certainly have an impact on

Page 63

1     your opinions in this case, couldn't they?
2  A  They could. I doubt it, but they could. I mean
3     there are times where I receive records then I
4     withdraw some opinions. They could.
5  Q  How could you say you doubt it without you even
6     seeing them?
7  A  They could. Well, because I'm saying there are
8     other records that I can look at in the medical
9     records, such as the treatment records and other
10    kind of records, that they have that will give
11    you some ongoing description of what happens, but
12    still the Narrative Nurse's Notes are the best
13    diary of that, but you can certainly look at
14    other records to get a sense of what was going
15    on. Physician orders and so forth, but nothing
16    fills in the gaps faster and better than
17    Narrative Nurse's Notes.
18 Q  And his admission at Atrium was for about seven
19    months, correct?
20 A  Yes, sir.
21 Q  And you don't have approximately five months of
22    the nurse's notes, right?
23 A  That's true.
24 Q  And the several hundred cases that you've
25    reviewed, has there been an occasion where you

Page 64

1     haven't received approximately five month's worth
2     of nurse's notes?
3  A  Oh, sure. Sure. That happens. You know, it
4     depends. If there were no nurse's notes for the
5     last three or four weeks of his stay, I wouldn't
6     be able to render any opinions and a lot of my
7     opinions surround really what happened to him at
8     the end, but certainly it goes to show a pattern
9     of conduct and kinds of things and I do look at
10    that all along and, of course, we do have that
11    first hospital discharge, where he's sent there
12    in a very alarming state. So, yeah, they're
13    important.
14 Q  Do you know in this case whether the notes exist
15    at all for the time period requested and you just
16    weren't provided them?
17 A  If they don't exist, and that was confirmed with
18    me, that would be reckless and irresponsible,
19    because he was skilled under those and you know
20    that they have to do that every day for skilled
21    care. I mean that --
22 Q  I'm not suggesting that they don't exist. My
23    question -- I guess that's what I'm asking you.
24    Are you operating under the impression that they
25    don't exist --

Page 65

1 A. No.
2 Q. -- or they exist and you just weren't provided
3 them?
4 A. I never presume that they're destroyed or lost or
5 whatever. I presume I just didn't get them for
6 some reason. My practice is always -- and I
7 have told people, when I see missing records,
8 there's usually two reasons. Poor recordkeeping
9 or there was an investigation by the state. They
10 pulled them out and never put them back in after
11 the state came in and that's usually what I see,
12 but I don't know that to be the case here.
13 Q. All right. The next one, "All CNA ADL records
14 especially food/fluid consumption."
15 A. If they exist
16 Q. Do some facilities not keep those records?
17 A. Every facility that I've came across in Kentucky
18 uses ADL records. Some do not always extend them
19 to the food and fluid consumption or maybe it's
20 just food consumption or it's only done under
21 certain circumstances. I usually see them, but
22 I'm not sure exactly what the scope of what they
23 have is.
24 Q. But would you agree that the scope of some of
25 those ADL records depends upon physician order?

Page 66

1 A. No. You can -- you can track food and fluid
2 consumption every day with residents without a
3 physician's order. Yeah, but in terms of what
4 the aides do -- and I put CNA here. In terms of
5 the CNAs, generally speaking, they don't need any
6 physician's order at all and they have, in fact,
7 usually a matrix that they will fill out and
8 actually a nurse can do it too.
9    There's no invasive reason why you can't
10 do I&O, it's just they don't like the orders
11 because they don't like doing them, but I only
12 usually see I&O when it's ordered by a doctor.
13 Q. The "Building floor plan."
14 A. Don't have that.
15 Q. All right.
16 A. That's helpful for census and then where his room
17 is in proximity to the nurse's station.
18 Q. Then you mentioned the census per wing. You
19 don't have that either?
20 A. No. It kind of goes also down to the bottom
21 bullet, so I can do staffing. I wanted to see
22 what the ratios are and then look to see if they
23 complied with what the state requirements are.
24    The thing is is that I don't have that,
25 so I don't know. Well, there is no state

Page 67

1 requirements per se in Kentucky with staffing,
2 but I wanted to see what the ratios were.
3 Q. Would it be fair to say that you're not going to
4 render an opinion on the staffing issues in this
5 case?
6 A. There's two standards for staffing. One's
7 numbers, one's sufficiency. I would to the
8 extent of sufficiency since that's also a Federal
9 standard, where it doesn't matter how many people
10 are in the building. It's how many weren't
11 touching him, but not in numbers, no. No,
12 without this information, it would not be
13 numbers. It would only be sufficiency regardless
14 of numbers. You can have a ton of people in your
15 building and neglect somebody that needs care
16 based on staffing.
17 Q. And when you say sufficiency, define that for me
18 A. Well, for example, there was a facility that I
19 took over for the state of Michigan years ago
20 under OBRA and they had 4.2 staffing. In this
21 state you only need 2.25. They were cited for
22 Federal 353, sufficient staff, because there were
23 a lot of people in the building, but they weren't
24 caring for anybody.
25    I've had another -- I had a case where I

Page 68

1 testified in West Virginia where the facility was
2 well above state staffing requirements, but when
3 the person choked to death in the middle of the
4 day in the dining room on that particular unit,
5 both of the nurses and five of the seven aides
6 were in the break room. So were they under the
7 roof? Yes, but they may as well have been at
8 McDonald's and that's an example of sufficiency
9 regardless of numbers when you have circumstances
10 such as that.
11 Q. All right. So you will not testify that there
12 was insufficient numbers when it comes to
13 staffing at this particular facility?
14 A. Not overarching. Not sufficient numbers caring
15 for Mr. Cole, but not where I reference numbers
16 per se. No, sir. That's correct, and unless I
17 get this other data where I can look at ratios
18 and compare it to what other facilities would --
19 I have to say also that I made a reference in
20 this report that this facility was rated at One
21 Star for staffing. That's an error. They were
22 rated at Two Stars. So where you see that,
23 please make that correction. It's still not a
24 good rating, but they were rated at Two Stars,
25 not One Star.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 69

1  Q   Needless to say, you don't have the information
2      necessary to do a staffing analysis specifically
3      as it relates to numbers during the period of
4      time in which Mr. Cole was a resident at the
5      facility?
6  A   I could not arrive at ratios or HPPD. No, sir.
7  Q   And, therefore, cannot say instead of on this
8      particular date they had two nurses working and
9      then should have had three or they had three
10     aides and should have had four? You're not going
11     to venture down that road?
12 A   No. I can -- I haven't done this, but I can go
13     into the Medicare.gov archives and I can find out
14     what their quarterly numbers were they reported
15     to CMS during his stay. That takes a lot of
16     work. I've done that at times on-line, but that
17     doesn't necessarily give me, for example, the
18     staffing numbers the last weekend he was there
19     and so forth and I just decided not to do that.
20 Q   All right. Fair enough. "Nursing policies and
21     procedures." We referenced that. You requested
22     it, but don't have it?
23 A   And I know they have them. So they have to have
24     them.
25 Q   Right. Facility management staff. What

Page 70

1      information are you seeking there?
2  A   Well, in particular, there's a lot of issues
3      that occurred in the last weekend. I'd like to
4      see beyond the Director of Nurses how the
5      department is structured. Whether they have any
6      supervisors on the weekend, any unit managers on
7      the weekend. A lot of these facilities -- they
8      empty out and all you have is floor nurses on the
9      weekends.
10     I would like to see that structure, so
11     that I can see who in an accountable managerial
12     role is around on Saturday or Sunday to intercept
13     and deal with some of these issues other than
14     just the floor nurse. That's what I am really
15     interested in.
16 Q   All nursing in-service records generated during
17     his stay?
18 A   Right.
19 Q   All employee meeting minutes generated during
20     his stay. Resident Council meeting minutes
21     generated during his stay. You don't have any of
22     that?
23 A   No, sir.
24 Q   Profit and loss income statements. You don't
25     have that?

Page 71

1  A   No. I usually get the Cost Reports though.
2  Q   Atrium management contract. Don't have that?
3  A   No, sir.
4  Q   And you mentioned -- well, let me ask you this.
5      Do you know or are you familiar with Atrium?
6  A   There was a company that I worked with years ago
7      -- gosh, 2003 -- that was Atrium that was
8      operating in Ohio and Indiana. I don't -- and I
9      had another Atrium case in western Michigan about
10     two years ago and when I researched that, the
11     owners that I was familiar with from Georgia
12     don't appear to be involved any more. It appears
13     to me that they were sold.
14     So anything that I see appears to be a
15     different Atrium that I'm accustomed to, and
16     that's the only research that I've done, but
17     there was a company years ago by that name that
18     my company worked with. I don't work for them,
19     but we used him as a management company.
20 Q   Do you know any of the individuals that worked
21     for the Atrium corporation?
22 A   I don't -- I just knew the two principals that
23     they had from when I was there in Georgia, but in
24     looking at the names -- and they profile it on
25     their website. Nice website. None of those

Page 72

1      names at all are familiar to me, and again, the
2      only connection I would have would be to the
3      owners that I am aware of back when I was -- and
4      I don't know. I just don't -- in my research,
5      they're still not the owners of that, but I don't
6      know that to be the case.
7  Q   And who were you familiar with?
8  A   Oh, trying to think of their names. There were
9      two gentlemen. They were based out of Georgia.
10     One was an accountant. I can't remember their
11     names. I'm not really good with names, but if
12     you mention their names, I would know who they
13     were, but in my research, which I did before
14     accepting this other case in Michigan, my
15     research was that there were no references at all
16     to any principals -- management or whatever from
17     Georgia. That they were based out of Ohio. So I
18     got the impression the company was sold. That's
19     all I know.
20 Q   All right. And then the case that you have
21     reviewed in western Michigan involving Atrium --
22     were you retained on behalf of the Atrium
23     facility or the resident?
24 A   Plaintiff.
25 Q   Okay. The plaintiff. All right. Have you

**MORETTI GROUP  800-536-0804**
**Court Reporting and Videoconferencing**

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 73

1    reviewed any other cases involving an Atrium
2    facility?
3  A. Not that I recall. I was trying to recall if I
4    did. I think that's it, sir.
5  Q. Then the 2012 Medicare and Medicaid Cost Reports?
6  A. Yes, sir.
7  Q. What information would you be looking to glean
8    from those?
9  A. It tells me a lot, especially Medicare.
10   Medicare, if you look at the last page, will tell
11   you net income. Medicare will tell you
12   management fees, Medicare will tell you whether
13   there's any agency use, if they're making a lot
14   of money and they have very, very low staffing or
15   they're losing a lot of money. It tells me a
16   great deal about how the facility is managed, and
17   so I can usually get a lot from it.
18 Q. All right. And then we mentioned the daily
19   assignment sheets. Staffing sheets. You don't
20   have that?
21 A. The data necessary to calculate HPPD. No, sir, I
22   don't, or ratios. I don't.
23 Q. All right. Is there any other information that
24   you requested, whether or not it's on this list,
25   as you've gone through the case that you would

Page 74

1    like to have?
2  A. The only thing I can think of is Ms. Cole
3    narrated on some of my medical records, which at
4    first I wasn't sure who did that, and if her
5    allegations are true -- and I'm not -- they're
6    simply allegations to me at this point, but they
7    seem to be ongoing. They should have reported
8    those allegations on her internal complaint file.
9    Intake, and I realize that that's not always
10   given up either, but to the extent that those are
11   way out there in terms of what she has written on
12   here, my curiosity would be, even if you don't
13   want to give them to me, when were those
14   generated, so that I can see that she had that
15   interaction, because she claims she talked to the
16   administrator. I would just be curious when she
17   did. What the date was.
18       So, again, those are circumstances I'm
19   very interested in since she's sort of a
20   principal involvement -- has some principal
21   involvement in this case.
22 Q. Did you interview or speak with Ms. Cole?
23 A. No. No, sir.
24 Q. You have done that on occasion, haven't you?
25 A. Sometimes I have. Sure.

Page 75

1  Q. Where you have interviewed the spouse or the
2    children or the responsible party?
3  A. I did where I felt that maybe there's no diary
4    that was done, there's no notes that were done.
5    There's no paper trail. I usually only do it
6    when there's no paper trail just to get some
7    sense of their involvement, but she created
8    quite a little paper trail here.
9  Q. Have you reviewed her deposition?
10 A. I have not reviewed any depositions, sir.
11 Q. Is that something that you had asked for? Were
12   any depositions taken?
13 A. That's a good point, and if I would have thought
14   of it, I would have put any other depositions
15   that have been generated. Yes, sir. I would
16   have put that. I'm always interested in getting
17   those from both sides.
18 Q. Were you then provided any information in
19   response to any additional requests that you had?
20 A. I'm not sure I understand the question.
21 Q. Sure. You indicated that at the time you were
22   contacted, you received a set of medical records.
23   You reviewed the records and then you have a list
24   of information that you have requested. My
25   question is, have you received anything beyond --

Page 76

1  A. No.
2  Q. -- what you were originally provided?
3  A. I have not. When I complete my review, I believe
4    that -- I believe I touched base with
5    Mr. Troutman, but I don't recall for sure and if
6    I did, I can assure you that I would have had in
7    front of me a list of those records, which I
8    would have then told him I will include as part
9    of my report. So I'm sure that that issue came
10   up even prior to my generation of this report.
11 Q. And you just simply don't recall what response
12   you were given relative to your request?
13 A. No, I don't, because it's been almost a year
14   since I've done this report and I don't usually
15   keep notes, and so -- or at least I don't have
16   any in this case.
17 Q. Okay. We'll mark as Exhibit 3 your report that
18   contains your notes.
19 A. Okay. Sure.
20       (Deposition Exhibit No. 3 marked for
21       identification)
22   BY MR. JOHNSON:
23 Q. And then we'll mark as Exhibit 4 --
24 A. I'm going to take this page off.
25 Q. Exhibit 4 is a copy some separate handwritten

Page 77

1   notes.
2 A.  Handwritten notes that would have formed sort of
3   a basis of my opinions. Not necessarily in any
4   order and some may not even reflect opinions.
5 Q.  All right.
6        (Deposition Exhibit No. 4 marked for
7        identification)
8 BY MR. JOHNSON:
9 Q.  Tell me this before we dive into your note's
10   section. There appears to be some research that
11   you may have done on your own in this case and/or
12   obtained some additional documents.
13 A.  There is and I -- forgive me again. The number
14   of violations on average in Kentucky -- I forgot
15   to bring that with me. I can get that for you.
16   That's pretty easy to get, but what I did
17   research was I researched -- I have an extensive
18   library of staffing in every state going back ten
19   years. So whenever I get -- whether it's
20   staffing violations or other types of violations,
21   I can cross-reference them to what other
22   facilities had in that state during that year,
23   but at any level and Medicare has that available,
24   but what I did also is I want to make sure I
25   understand the community in which I'm in, so I

Page 78

1   did some research on Crittenden County, Kentucky,
2   which actually looks like a really nice area on
3   the Ohio river. Small population. Ninety-three
4   hundred.
5        Unless I'm wrong, this is the only
6   nursing home in the county. So it's a rural
7   county. I think there's some Amish people there
8   too. Just pulled some information on the
9   facility. They actually received a quality award
10   in 2012, which is interesting, since they got
11   three Immediate Jeopardy violations, but I pulled
12   that. Got some information about them and then
13   their background.
14 Q.  Who generated that award or granted that award?
15 A.  That would have been the American Health Care
16   Association. That's their symbol for that. I'm
17   part of that too. I'm thinking that they got
18   that before the three Immediate Jeopardy
19   violations. Otherwise, I'm not quite sure why
20   they would be able to do that, because that
21   doesn't meet the criteria.
22 Q.  All right. We'll mark that as Exhibit 5.
23        (Deposition Exhibit No. 5 marked for
24        identification)
25

Page 79

1 BY MR. JOHNSON:
2 Q.  And you mentioned that you have an extensive
3   library on staffing in particular states. I
4   guess did you bring that with you today?
5 A.  No. Medicare generates a lot of data and they
6   have a compendium that you can do off line that
7   that will show you. For example, in the
8   compendium, it will show you how many violations
9   of any kind every facility had in any state in
10   any given year. So I can tell you how many
11   Immediate Jeopardy were in Kentucky in 2012. It
12   will then tell you the average number and it will
13   also segregate them by profit versus nonprofit.
14        CMS also generates, which sometimes
15   American Health Care Association publishes and
16   other organizations -- they'll publish also
17   staffing data, which is used to determine the
18   Star Rating System. A lot of people think that
19   the Star Rating System is based solely on
20   numbers. It is not. It is based on numbers and
21   acuity, and if you have even what's a decent
22   number, but your acuity is really high, their
23   calculations can put you at a One Star. So I
24   look at that as well.
25        I look at, you know, what staffing

Page 80

1   levels are and what the average would have been
2   in Kentucky during that time. Now, again, I'm
3   not offering opinions on HPPD and ratios at this
4   point, because I don't have that data, but if I
5   got it and I calculated it, then I could quickly
6   compare it to other information I have. The data
7   that I have used here is going to be
8   Medicare data in terms of comparison of surveys
9   and number of violations per year with the
10   average facility in Kentucky.
11        So in terms of staffing per se, I'd have
12   to have some numbers in order to do a comparison.
13   The one thing obviously is they're under -- under
14   average. Two Stars are not a good Star Rating.
15 Q.  What format is the staffing information that you
16   looked at relative to this case? Is it a
17   printout? Is it something that you looked at
18   on-line that shows the HPPD per day in Kentucky?
19 A.  I didn't look at that, because I have to have
20   numbers to compare it to, but with regard to
21   surveys, the Medicare -- it's called a
22   compendium. They will take usually four or five
23   years with every state, every type of violation
24   and they'll compare it in each state how many
25   facilities had Immediate Jeopardy violations

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 81

1   How many overall violations did somebody have   I
2   think they had eight in this facility versus the
3   average of five and a half.  How many facilities
4   had harm violations.
5       So I tend to look at the gravity of the
6   violations versus what the average facility in
7   Kentucky would have.  If I had staffing, I could
8   definitely make those comparisons too.  If it was
9   a state with numbers, then I would have used
10  those numbers as well.
11 Q.  I mean it sounds to me as if you looked up
12  something specific on the Medicare gov site as it
13  pertained to this facility.
14 A.  I did.  If you go to Medicare gov -- what's the
15  name of the site?
16 Q.  Nursinghomecompare?
17 A.  Well, I got -- you can get that from
18  nursinghomecompare.  There's also -- the Star
19  Ratings -- they have an archive where you can
20  actually go back and I can find out in any month
21  of any year for this facility what its staffing
22  was reported and other kinds of data that they
23  had in each of the Star areas and that's what I
24  went to was Medicare gov.
25      It's not always an accurate site.  Some

Page 82

1   providers don't like it, but what I tend to look
2   at is I look at the ratings, I look at the
3   performance of the building.
4       Obviously, if you've got One Star and
5   you're deficiency free, I'm not sure that the One
6   Star is necessarily an indicator and I tend to
7   look at extremes.  I look at Five Star facilities
8   and I look at One Star.  I don't put a whole lot
9   of emphasis in-between.  Maybe with the exception
10  of staffing at Two, but I look at the extremes
11  and again, it's just a piece of data that I look
12  at to help me.  I don't rely on it entirely.
13  It's just a piece of data.
14 Q.  And is there anything that you printed out from
15  that site?
16 A.  I did.  Where did it go?  Is it over there?
17  Let's see.
18 Q.  It's just your report.
19 A.  I know that I saw you look at that somewhere.
20  It's -- maybe it's here.  Actually, all this data
21  came from that site, including I printed out some
22  surveys.
23 Q.  Okay.  And I assume any handwriting on those
24  documents would be yours?
25 A.  Yes, sir.

Page 83

1 Q.  Let's mark this as cumulative Exhibit 6.
2       (Deposition Exhibit No. 6 marked for
3       identification)
4   BY MR. JOHNSON:
5 Q.  Is there any other outside research that you have
6   done relative to the case?
7 A.  I did look at the Atriumlivingcenters.com website
8   again to see if there was any association at all
9   to both and to my -- I just don't see that it
10  is, but --
11 Q.  And do you intend to offer any opinions or
12  comments relative to the information on the
13  Atrium website?
14 A.  I don't think so, sir.
15 Q.  Okay.  I will just give that back to you then.
16      Thank you.  You mentioned one article that you
17  authored was the "Negligent Retention" article?
18 A.  Right.  It's a rather long one.
19 Q.  When did you author this?
20 A.  This one was published this year on one of the
21  on-line journals in two months, because it was so
22  long, and in my CV, it was published -- that's on
23  their paper, because it's so long.  May and
24  August of this year, "Negligent Retention Parts I
25  and II."

Page 84

1 Q.  What was the -- was it published in a journal?
2 A.  Yes.
3 Q.  What was the name of the journal?
4 A.  They have a magazine and an on-line magazine as
5   well.  It's called "Advance For Long-Term Care
6   Management."  Just kind of an extensive website.
7 Q.  So was it published on-line and then published in
8   the magazine?
9 A.  No.  They said it was too long for the magazine,
10  so they published it on-line in two months,
11  because it's so long.
12 Q.  Is that a peer-reviewed --
13 A.  No.
14 Q.  -- journal?
15 A.  No.  I don't --
16 Q.  Peer-reviewed magazine?
17 A.  No.  I did make it into a very extensive
18  PowerPoint for a six-hour presentation at the
19  community college, because I presented that in
20  June of this year to long-term care
21  professionals, but the essence of that article
22  was really what my PowerPoint was.
23 Q.  And you certainly understand what a peer-reviewed
24  journal is?
25 A.  I do.

Page 85

1 Q. And peer-reviewed article?
2 A. Yeah. For my purposes, it's not necessary for
3    the work that I need to do in the industry. So I
4    don't find it important.
5 Q. Are there peer-reviewed journals within the
6    industry?
7 A. You could do a peer-reviewed journal probably
8    within the American College of Health Care
9    Administrators, if you wanted to, but for my
10   purposes, I'm not a professor. I want to get
11   that information out, I want to help the
12   industry, I want to do some teaching. So it's
13   not important. There's no benefit to me to go
14   through that rigorous state. Anybody I ever talk
15   to says it's right on, but I mean I just have not
16   decided to go through those hoops.
17 Q. What is the purpose of an article being peer
18   reviewed?
19 A. My understanding is is that by going through that
20   article, it's scrutinized in terms of whether
21   those individuals who are known to be experts in
22   the industry find that it's accurate and
23   reflective of the principles that I am making in
24   there.
25 Q. Have you authored any publication that has been

Page 86

1    published in a peer-reviewed journal?
2 A. No.
3 Q. Are all articles that you have authored listed on
4    your CV?
5 A. And in that list. Yes, sir.
6 Q. I'm sorry. And in what list?
7 A. You have them all there, but they're also listed
8    in my CV.
9 Q. So this is the compilation of all articles that
10   you have published?
11 A. Yeah. I think there's five, six, or seven.
12   Something like that.
13 Q. Okay. Fair enough. Thank you for doing that.
14   And you said this one was published in 2014?
15 A. This year in two months and that's not the actual
16   article. You can pull it up on-line real easy.
17   It's just that it's easier for me to give it to
18   you that way rather than all chopped up.
19 Q. Are there any sources that you cite as an
20   authority in support of the article?
21 A. No. That and the other article I recently wrote,
22   "Preventing Neglect" -- and the "Preventing
23   Neglect" one after this -- I actually taught that
24   to the Missouri Health Care Association. No one
25   that I know of in the country has an article even

Page 87

1    close to this. These are concepts that honestly,
2    if I hadn't done my expert work in the last ten
3    years, I wouldn't even have the ability to come
4    to these conclusions.
5        When you see cases over and over again,
6    you see certain circumstances that I would never
7    see as a corporate executive or an administrator.
8    So I don't -- I mean some of the definitions of
9    abuse or neglect I could get from anywhere, but
10   in terms of the principles, I could not find in
11   my research anybody else that I would refer to.
12       Now, in my PowerPoint, I list the
13   standards of ethics as my research, which I did,
14   for social workers and nurses based on those
15   associations, administrators, but in terms of
16   actual data, I don't know anybody else that's
17   ever covered these topics before, which is why
18   people like me talk about it.
19 Q. So the answer will be no, there's no citations in
20   support of your findings in this publication?
21 A. No, because the concept of negligent retention
22   has never been used in the context that I'm
23   using it for. It's only been used with regard to
24   personnel circles and I believe that it has a
25   definite relevance to long-term care facilities

Page 88

1    and the article only refers to two types.
2    Assisted living and nursing home.
3 Q. And do you have a compilation of data or research
4    that you can provide to support your findings in
5    this "Negligent Retention" article?
6 A. Not in the formal sense of what I have done like
7    in other -- no. It would just be my brain trust.
8    Again, it's used for teaching purposes and
9    lecturing and I had no interest to pursue it
10   beyond that.
11       MR. JOHNSON: We'll mark then Exhibit 7
12   the compilation of articles that you have
13   authored.
14       (Deposition Exhibit No. 7 marked for
15       identification)
16   BY MR. JOHNSON:
17 Q. And you previously mentioned that you will
18   reference negligent retention within your
19   opinions in the case. Do any of the -- or sorry.
20   Will you rely upon any of the other articles to
21   support your opinion?
22 A. Yes. The one that you have right now is actually
23   in my report.
24 Q. "Preventing Neglect?"
25 A. Yes, because I came up with a template of when

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

---

Page 89

1  neglect or abuse is more likely to occur.
2  Weekends being a huge red flag.
3  Q  All right.  And again, did you cite any source in
4  support of that opinion or --
5  A  No.
6  Q  -- do you have any data or research that you
7  can --
8  A  I've got some articles at home that have been
9  written that hospitals are actually worse than
10  nursing homes, but I mean in terms of empirical
11  data, if I were going to peer review it, no,
12  because it's one of those primary areas where
13  there's virtually no research that's been done on
14  that.
15  Q  Tell us then how the notes which we have marked
16  as Exhibit 4 come to exist.
17  A  I usually -- and it's a loose process.  I have
18  two sections of my notes.  The first section is
19  just anything I review and when I review it and
20  how I review it.
21      I tend to -- when I start to want to
22  prompt myself to research something or if I think
23  there might be an opinion I have, I begin to
24  formulate them and put them in the back section.
25  That's not to say that some in the front section

---

Page 90

1  don't find themselves in my report, but I tend to
2  consolidate my thoughts in the back section and I
3  tend to say, "I need to research this.  I need to
4  look at that.  Consider this, consider that."  So
5  the back tab tends to be more of a consolidation
6  of my thoughts and opinions and I rely more
7  heavily along that back section in producing my
8  report than I would the front section.
9  Q  All right.  So your handwritten notes come into
10  existence first based upon your review of the
11  record and then you will generate your
12  typewritten report?
13  A  Right, and I generally will as a course of
14  preparing my report rely on those records and
15  then I will also extract from all my records what
16  I call my review file and that's a set of
17  documents that I have tabbed, highlighted,
18  whatever and a lot of these documents have found
19  their way into my report too.
20  Q  And does anyone else write on your notes other
21  than you?
22  A  No.  No one even sees them but me.
23  Q  Looks like different handwriting on this
24  particular page.  Is that yours as well?
25  A  I print sometimes because my handwriting gets bad

---

Page 91

1  and the reason I print is I want to make sure I
2  spell it right and then I actually use cursive
3  too.  So it's basically I want to make sure that
4  when I go to reference the facility that I don't
5  have to go back and figure out a name or -- it's
6  just my practice.  That's all me.
7  Q  Okay.  If you would go to the second page of your
8  notes.
9  A  Yeah.  Sure.
10  Q  And at the top it looks like "second stay" and
11  then in parenthesis "NN?"
12  A  Nurse's Notes.
13  Q  Nurse's Notes.  Okay.  And so you make reference
14  that you're missing the notes from 7-9 through
15  7-28?
16  A  Yes, sir.
17  Q  All right.  Let me back up a little bit, because
18  obviously, you went out to the hospital in the
19  earlier -- early part of July.  Are you going to
20  testify that --
21  A  I'm sorry.  Went out to the hospital?
22  Q  In early July?
23  A  I've lost you.  I went out to the hospital?  You
24  mean he did?
25  Q  He did.

---

Page 92

1  A  I'm sorry.  You said "you."  I'm sorry.
2  Q  Let me rephrase it then.  The medical records
3  will reflect that Mr. Cole went to the hospital
4  in early July.  Are you going to render an
5  opinion that anything -- I'm sorry.  Any actions
6  or inactions of the facility staff caused that
7  hospitalization?
8  A  I'd have to look at my report, but as an
9  administrator, again, if I had a surveyor in
10  front of me saying, "Lance, tell me what happened
11  here" and I'd have to go back -- I would
12  essentially research like I did here in my
13  report.
14      What always concerns me as an
15  administrator is when I see the hospitals
16  embellish or use certain terms like "severe
17  dehydration" or "sepsis," because as an
18  administrator, I know that's an extreme form of
19  someone's condition.  So I would go back in time
20  and I would look at the documentation to see if
21  it was appropriate in terms of the standards I'm
22  held to.
23      That's the big concern I have in that
24  first one is that severe dehydration and again,
25  going back to the records that I would have

---

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

---

Page 93

1  expected to see, to show the surveyors we did our
2  jobs. ADLs. You know, ADL sheets, fluid intake.
3  That you could track by shift by day that these
4  things were being done. That's what I would
5  expect to see and so that is a problem that I
6  saw. Of course, he had sepsis on the first one
7  too, but those I could look at from the
8  standpoint of other records.
9      I believe he had some falls in there too
10  and I think I've talked about some of those
11  falls in terms of I didn't see any greater level
12  of supervision from fall to fall.
13 Q. I don't know that you answered my question, so
14  let me ask this again.
15 A. Oh, okay.
16 Q. Are you going to come to court and testify that
17  any action or inaction of the facility's staff
18  was a substantial factor in causing Mr. Cole to
19  be admitted to the hospital in July of 2012?
20 A. I would say as a nursing home administrator, the
21  records do not reflect that the staff acted
22  properly in their vigilance with regard to the
23  standards this facility is held to. It's not
24  there. The paper trail is not there to support
25  that.

---

Page 94

1 Q. I understand you believe that they didn't act
2  properly even though you don't have the nurse's
3  notes for that period of time, but my question
4  was, were their actions a substantial factor in
5  causing the hospitalization in July?
6 A. I think that you're asking me to look at if their
7  clinical issues -- there's no documentation that
8  reflects that they did act appropriately and
9  that's a standard I would be held to. If you're
10  asking me did they clinically act properly, that
11  would be jumping -- I would not be able to defend
12  how he was cared for based on my standards and
13  these records, no, but in terms of drawing
14  individual opinions with regard to the practice
15  of nursing or other individuals, that would be
16  leaping in a different direction.
17 Q. So let me ask you this. Based upon the
18  diagnoses that he had at the hospital -- well,
19  let me back up. Are you aware of what his
20  diagnoses were at the time he was admitted to the
21  Crittenden County Hospital on July 4?
22 A. You're asking me -- I have a Discharge Summary.
23  Lists them all. You're asking what he came in
24  with?
25 Q. We can use the Discharge Summary. On the

---

Page 95

1  Discharge Summary was he diagnosed -- was one of
2  the diagnoses --
3 A. Sepsis.
4 Q. Sepsis?
5 A. Aspiration pneumonia, acute renal failure, severe
6  dehydration. You know, as an administrator, I
7  know that there's a litany of diagnoses, but
8  they're more chronic in nature. So I tend to
9  look at what would just be those that would be
10  introduced that wouldn't normally never be there.
11  In other words, he's always going to have GERD or
12  coronary artery disease. I can list all of
13  those, but I'm looking for the primary. Those
14  that relate to his stay. That's what an
15  administrator would do and that's what I'm
16  seeing is sepsis, aspiration pneumonia, acute
17  renal failure and severe dehydration.
18 Q. Are you aware that pre-existing comorbid
19  conditions can contribute to acute medical
20  conditions?
21 A. Yes. In fact, that's in my article. A lot of
22  facilities use that as a defense, but -- and I
23  realize that that's the case, but again, as an
24  administrator, I'm held to the standards. Is
25  that paper trail justified that the staff met the

---

Page 96

1  standards and this happened anyway? Do I
2  recognize that they're there? Yeah. Are they
3  used for a crutch a lot? Sure, especially by
4  doctors and nurses, but I do recognize that
5  they're there. Sure.
6 Q. I mean are you of the opinion that every time a
7  patient develops sepsis that that is caused by
8  lack of proper care?
9 A. No. No. It depends on the circumstances,
10  especially if someone is considered terminal. If
11  they're in hospice. If the medical records show
12  a vigilant shift to shift, very frequent,
13  everybody is on board, everybody knows what's
14  going on, no. Absolutely. It can happen.
15 Q. And the same question relative to
16  aspiration pneumonia. Are you of the opinion
17  that every time a patient in a long-term care
18  facility develops aspiration pneumonia that that
19  was caused by improper care?
20 A. No. There's no absolutes, sir, and again, I have
21  to look at it from my perspective. I realize all
22  those conditions exist and the C.F.R. even
23  recognizes some comorbidities as a way of not
24  citing a facility, but in the final billing,
25  comorbidities do not carry the day. In my world,

---

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 97

1    it's the documentation that carries the day.
2  Q.  And I take it from your earlier testimony that
3    you're not going to come to trial and testify as
4    to what the cause of Mr. Cole's sepsis was in
5    July 2012?
6  A.  I'm not qualified to do that, sir.
7  Q.  And then if we come to the end of the trial,
8    we're trying to wrap this particular segment up,
9    you're not going to come and testify as to what
10   Mr. Cole's cause of death was, are you?
11  A.  I think only a doctor is qualified to do that,
12   sir.  No, I would never do that.
13  Q.  All right.
14  A.  Are we back on this or --
15  Q.  Yes.  Thank you.  And it looks like you have on
16   these particular notes a date to the left-hand
17   side and then just a little snip-it of
18   information out to the right; is that a fair
19   description?
20  A.  Sure.
21  Q.  All right.
22  A.  Are we talking about on the second page?
23  Q.  The second page and running through --
24  A.  Those are nurse's notes.
25  Q.  Correct.  All right.

Page 98

1  A.  Much of which are skilled notes too.
2  Q.  And then once we get through the skilled note
3    section, there is another section of your notes
4    that looks like it's entitled, "Analysis?"
5  A.  Let me look.
6  Q.  Sure.
7  A.  These are just my notes, but I do -- forgive me.
8    They make sense to me.  The Analysis really gets
9    into again if I was the administrator and if a
10   surveyor came in and said, "Lance, you know, this
11   person was admitted to the hospital, died within
12   hours, had sepsis.  Hospital records reflect some
13   really nasty situation here.  Show me that it
14   wasn't your fault" -- I mean the facility.
15     So this is the period that I would have
16   conducted that analysis or I would have charged
17   my staff to do it.  I would have made them go out
18   and get all of this for me, so that we could
19   track hour by hour that we were on top of things,
20   no big gaps, right people were notified, doctor
21   was fully aware of everything.  Not just at the
22   moment, but the day before.  So this is kind of
23   the analysis that I would conduct or have my
24   staff to convince this surveyor that, "No, we
25   were on top of it.  It happened" -- "but it

Page 99

1    happened."
2  Q.  And is this analysis that you've done and just
3    described just for the October 5 through
4    October 8 --
5  A.  Yes.
6  Q.  -- time period?
7  A.  It is.
8  Q.  Obviously, I can read your notes and read your
9    report, but run me through verbally what your
10   analysis is of that time period and what your
11   opinions are in that regard.
12  A.  Sure.  I will refer to a couple things here.  You
13   know, OBRA, as you know, is outcome-oriented
14   It's not good intentions or whatever.  It's
15   outcome.  So I would start with the outcome.  He
16   goes to the hospital and I'd look at the
17   diagnoses, which sepsis, pneumonia, dehydration,
18   MRSA, which was diagnosed the day before, C diff.
19   All kinds of stuff, and then she died not long
20   after her admission.  So then -- or he did
21     So I would go back and I would look at,
22   first of all, the period, and one of my
23   articles -- the absolute worst condition changes
24   I ever see in any nursing home are always
25   culminating on a weekend.  I can't tell you -- I

Page 100

1    would say almost always it happens that way.  And
2    why?  Because who is not working on the weekends?
3    Staffing problems and this is a classic that fits
4    right into my article and actually, an example
5    in my article goes into this, but what I decided
6    to do was to start with Friday.
7      Now, you can see he's starting to refuse
8    breakfast, and the doctor was aware of some of
9    these circumstances, but I don't see anything
10   that the doctor was aware of the collective
11   amount of things that were going on.
12     As an administrator, I'm convinced that
13   if the doctor was in the building Saturday or
14   Sunday, the nurse practitioner, they would have
15   just sent him out based on what I'm seeing in
16   here, but they did call the doctor on -- he
17   starts to not eat much for lunch on Friday, 10-5.
18   They have him on antibiotic therapy.  He's
19   described as very weak.  They're trying to
20   encourage fluids on nurse's notes, but I'm not
21   seeing any documentation that it's actually being
22   done and recorded by the aides.  I&Os were very
23   poor during this weekend period.  His lungs are
24   wheezing.  You know, a surveyor would look at
25   that as the aspiration issue.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 101

1    He's acting strange. He's hitting
2 himself in the head. This is on Saturday now. I
3 don't know that the doctor was ever told about
4 that. I don't see anything in the notes. He has
5 a skin tear on his shoulder from a fall that day.
6 He's got positive MRSA with respiratory
7 precautions, and they were proper to put him in a
8 room by himself, but I think that was the worst
9 possible thing that could have happened to him in
10 this facility, because when you put someone in
11 isolation, you almost have to have a specialized
12 assignment for that aide to watch that person
13 when they're high risk for falls and other kinds
14 of problems.
15    Now, to the credit of somebody, they
16 asked the doctor for a Q15-minute check order.
17 An actual physician order, but there's no
18 evidence that that was ever carried out, and I
19 think that was a great order to have in place
20 once he's in isolation, because he has a history
21 of falls, he's getting really sick, but all the
22 way through the time he leaves, there's no
23 evidence either in the nurse's notes or -- and
24 typically, in a facility like this, where you
25 have a physician's order, because it's a

Page 102

1 physician's order, it's not a casual compliance.
2 It's you got to do it. So there should be a
3 checklist and matrix that at least the aides
4 would fill out, and I'm not looking for
5 perfection, but actually eyes on and I would
6 hope with the nurses eyes on every 15 minutes.
7    So he's in isolation now on Saturday and
8 they're still saying they're encouraging fluids,
9 but again, I'm not seeing that documentation. On
10 Sunday, again, here we have three sets of notes
11 and what bothered me on Sunday -- I think that's
12 a critical day -- is here the day before you've
13 got all these things going on. You got the
14 doctor asking for 15-minute checks and as an
15 administrator, what I'm worried about here is
16 they're actually on Saturday and Sunday -- and
17 these are good forms. They're using a Condition
18 Change Form.
19    The Condition Change Form -- and I bet
20 if I get their policies and procedures will also
21 trigger special charting and special monitoring,
22 but instead of me seeing them on Sunday -- and
23 again, these are internal standards -- I'm seeing
24 huge gaps in nurse's notes, and so what that's
25 saying to me, without anything in-between,

Page 103

1 they're not monitoring him, and on Page 15 of my
2 report, you start out on Sunday at 2:00 a.m. and
3 there's a nurse's note again with the backdrop
4 condition change, Q15-minute checks, he's not
5 eating, he's acting strangely, he's hitting
6 himself. Next note seven hours later at 2:30.
7    Now, 2:30 is a really critical date
8 again from my perspective as an administrator,
9 because they call the doctor again. Again, the
10 doctor responds by giving him an IV. So
11 someone's really concerned, but again, I don't
12 know a doctor ever recognized the gravity of what
13 was happening with all these prior shifts. The
14 fall before, hitting himself, wheezing
15    Again, as an administrator, I would
16 imagine this doctor, if he was there, would say,
17 "Send him out," but that's not done. The doctor
18 responds.
19    Here's the critical part. With all of
20 this happening with an IV, Q15-minute checks, we
21 now go seven more hours, and I think I saw one
22 note by a nurse in there. Not a nurse's note,
23 but some other note in the record in-between
24 there, and then when he goes out, he's really in
25 trouble, and again, I'm not a clinician, but when

Page 104

1 you're -- when you go into the room and he's not
2 breathing well, he's cyanotic, he's sent to the
3 ER and he dies not too long after, as an
4 administrator, I'm saying, "Okay. I know that
5 happened, surveyor," but I'm going back and he
6 went out at 10:30. We saw him at 10:00, we saw
7 him at 9:45. I go all the way back. The
8 surveyor is going to say, "Well, Lance, there's
9 not much more you could have done," but when you
10 see these gaps, with the backdrop of these
11 physician orders, how sick this guy is, it's a
12 weekend, I don't think the DON is there, the
13 ADON, probably none of those nurse managers,
14 maybe staffing problems -- the whole backdrop of
15 this as an administrator is they really dropped
16 the ball.
17    Now, I'm not saying that -- why he died
18 or how he died, but in terms of me being able to
19 defend that we were on top of his care, the
20 physician was well informed of all that
21 happened -- I couldn't defend this as an
22 administrator. I just couldn't, and that's where
23 my opinions come. I can't say that his death was
24 preventable, but I think a reasonable facility
25 would have acted much differently.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 105

1    When I take this backdrop and I look at
2  during this period they're cited for three
3  Immediate Jeopardy violations, which is the
4  worst possible circumstance, one of which is
5  administration, the other being abuse and
6  neglect, it's also showing me that this facility
7  is very troubled and has a lot of problems with
8  systems.
9    So all of that considered, this period
10  of 10-5 to 10-8 did not show what a reasonable
11  facility should have done under the same or
12  similar circumstances, did not show that the
13  physician was updated and aware of all of these
14  issues, did not show that he was in a special
15  assignment because he's in an isolation room,
16  that the aides were checking him every 15
17  minutes or the nurses were checking him every 15
18  minutes. So there's a lot of breaches here of
19  the standards that I would be held to. That's
20  kind of my narration of it. Sorry to be so
21  longwinded.
22 Q.  That's fine. Did any of the IJ violations
23  involve Mr. Cole?
24 A.  Not personally. I don't know that they knew
25  about this particular weekend and circumstance.

Page 106

1    Indirectly it did, because if you look at the
2  allegations that the wife is making and a lot of
3  his -- in terms of potentially being abused by
4  another resident and a lot of other injuries of
5  unknown source, that is a direct problem at this
6  facility during this period. They just don't
7  know how to address it, investigate it, report
8  it. To that extent, it's a big problem for him,
9  but to the extent that he is a listed resident,
10  this would be a discharge chart. So this could
11  have escaped and probably did their radar,
12  because it wouldn't be out there. They could ask
13  for it and then -- you know, but I don't know
14  that they knew this happened.
15 Q.  They being the survey team?
16 A.  Right.
17 Q.  When was the physician notified over the course
18  of the weekend?
19 A.  Well, I think that sometime on/or before -- going
20  to Sunday, the last day -- on/or before 2:30,
21  because you've got the IV therapy starting around
22  there, but again, in that note, I don't see what
23  a nurse would do in policies and procedures
24  that, "Well, okay, we want to start an IV, but
25  let's give you a backdrop of what's happened in

Page 107

1  the last day or so." I didn't see that. The
2  fall, the bizarre behavior, hitting himself, that
3  he hasn't been consuming fluids for a real long
4  time.
5    The day before I'd have to check on the
6  order. On Saturday there was -- there was an
7  order to put him in isolation and then the order
8  for Q15-minute checks.
9 Q.  And an order -- for such an order to be given,
10  would you agree that a physician would have to be
11  contacted?
12 A.  I don't know. I don't know that you necessarily
13  have to have a doctor's order for isolation. You
14  probably should, because it's really a violation
15  of his rights, but that's the proper thing to do.
16  They did the proper thing to call him, because
17  apparently this MRSA was respiratory.
18    Now, the time -- I can only tell you
19  that the nurse's notes portray it as probably
20  around 2:00. I don't think the order actually
21  shows that though.
22 Q.  Okay.
23 A.  So the doctor is basically contacted around the
24  same time of day on Saturday and Sunday. I don't
25  think the doctor acted inappropriate at all, but

Page 108

1  I don't think the doctor really knew the gravity
2  of how long he wasn't consuming, what his
3  behavior was, that he was actually falling.
4  Those are the things that I think an attending
5  should have known. It's not in the notes
6  anywhere. Of course, by the time he gets to the
7  hospital, it's a rather urgent situation there.
8 Q.  So you have the physician was notified on Sunday,
9  10-7, around 2:30?
10 A.  Somewhere in there with regard to the IV order,
11  because the IV order would have to -- well, I'm
12  pretty sure -- yeah. I know that there's some
13  note about the doctor on that date, because I saw
14  that the other day and I'm not dismissing the
15  fact the doctor wasn't called. You'd have to
16  have that IV order. Yeah. "Resident having" --
17  arrow down, intake. Notified MD. It's right
18  here, and again, they're using this Condition
19  Change Form, which in any facility I've ever
20  been to, this automatically triggers a very
21  intense level of oversight that is far different
22  than the average resident at large. So, yeah, I
23  think it -- well, she's saying 2:30. I don't
24  know the doctor -- I'm guessing it would be
25  between 2:00 and 2:30 by the time she wrote this.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

---

Page 109

1 Q. And then do you believe that's the only time the
2    physician was notified or contacted on Sunday?
3 A. Well, the Discharge Order.  I have the Discharge
4    Order.
5 Q. On Sunday?
6 A. Yeah.
7 Q. So that would be consistent with the time period
8    that order transferred to the ER?
9 A. Right, and again, I think looking at -- there's
10   only three nurse's notes that I can see on Sunday
11   and between the first and second is five hours
12   and the other two is seven hours and there just
13   is not a whole lot of other stuff in-between
14   there to give the staff credit for monitoring
15   him.
16       The thing that really would get me in
17   trouble, if I were the administrator there, will
18   be the order for Q15-minutes, which is a great
19   order, and I think if they would have done that,
20   more likely than not some of this may not have
21   happened and he would have gone out sooner.  I
22   don't know what would have happened at the end,
23   but that's a huge blunder here.
24 Q. And then what your comments are with respect to
25   the Q15-minute checks is you don't see any

---

Page 110

1    documentation that those were done?
2 A. No, and there is two reasons why you would have
3    to record that.  One, it's a physician's order
4    and a physician order doesn't give something
5    casually.  It's not if you get around to it every
6    15 minutes, and there would be a form I bet, if I
7    were to get their policies and procedures, that
8    they could use.  I'm guessing there might be a
9    Q15-minute form for behavior problems, where you
10   go one-on-one with somebody.
11 Q. Right.
12 A. If not, I would have given them credit for
13   copious, copious, copious nurse's notes that
14   would have complied with it in that matter, but
15   with seven-hour gaps, you can't do it.  I looked
16   for that -- a way to give them -- and the MAR
17   and TAR are not really in effect now, because he
18   is really sick and he's getting an IV.  So you
19   can't look at them as interventions in the room,
20   but being in an isolation room really puts
21   residents at risk, because the staff have to gown
22   up every time they go in there.  It takes a lot
23   of time.  It really requires a specialized
24   assignment.
25       They should have pulled an aide off the

---

Page 111

1    floor or they should have had an aide with fewer
2    residents to just watch him on that Sunday
3    because of the time-consuming issues of him being
4    out of line of sight in that room, being very
5    sick, having to gown up and then the order for
6    Q15 minutes.  It just it created a whole
7    different scenario that it's like business as
8    usual with them and that's what bothered me.
9 Q. Let's take the converse of what you mentioned
10   earlier with respect to your opinions that for
11   periods of time in review of this case, you
12   didn't have nursing notes, but you could tell
13   what was going on with the patient even in the
14   absence of those notes.
15       So can you tell during this weekend
16   period of time what other care the patient is
17   receiving, even though there may not be entry
18   within the nursing notes?
19 A. I looked at the TARs and the MAR, which is a good
20   indicator, and the ADL sheets, but if you look at
21   the I&O, that's another problem.  They didn't do
22   an I&O very frequently either.  I think it's just
23   two entries before they did -- or one entry
24   before they did the IV.  Because he's on the IV
25   on Sunday, he's not going to have his meds.  He's

---

Page 112

1    not going to have -- so the ways that I would
2    give them credit for that I'm not seeing.
3       Now, if it was during the week, which is
4    again -- the fact this happened on a weekend is
5    not a surprise.  You might have people like
6    therapists that could check in that room.  You'd
7    have other individuals that might be able -- you
8    could rely on their documentation, and he was
9    skilled, by the way, until he died, because he
10   was still under skilled ST and that's clearly not
11   skilled documentation, but so I looked everywhere
12   and I just couldn't find what would give me ways
13   to credit them for the intervention.
14       The problem is the Q15-minute thing is
15   a big problem and somebody had great wisdom in
16   asking the doctor for that, because I can tell
17   you, most doctors never do it.  They don't do it,
18   because they don't want to impose on the staff
19   something that's not reasonable.  So it's my
20   opinion that that was probably recommended by a
21   nurse and I thought it was probably a good idea.
22   It just was not carried through.
23       I'm not even sure the nurse on Sunday,
24   to be honest with you, or those nurses even knew
25   the order was written the day before, because

---

MORETTI GROUP   800-536-0804
Court Reporting and Videoconferencing

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 113

1  it was never carried out in a fashion -- usually
2  in the nurse's notes they would say, "Monitor
3  Q15 minutes in accordance with an order from
4  Saturday." I didn't see that either. I might
5  have given them credit for that too, but it's not
6  even mentioned in the narrative nurse's notes on
7  Sunday, which makes me believe they didn't even
8  know about it.
9      What bothers me about that is that it
10  probably was a standard protocol for isolation
11  precautions. So maybe there's some training
12  issues there, but again, from a procedural
13  standpoint, from a standard standpoint, lots of
14  breaches here that I would be held to as an
15  administrator, but I just looked. I mean I
16  looked. There's no restorative records that
17  show that he was in there, and here's the problem
18  too.
19      Once he's in isolation, he's now going
20  to -- they're going to limit who is going to be
21  in that room, because you got to gown up and the
22  staff are saying, "I don't have time for that."
23  It's not like dietary can go in there. They're
24  not going to go in there.
25      So it's a scenario where I would call it

Page 114

1  the perfect storm, but it's one that they could
2  have predicted, and again, these are all as an
3  administrator. I'm not a clinician.
4  Q. Sure. Do you know what other dates and times
5  over that weekend the physician or extended
6  provider was contacted?
7  A. I can only rely on the records. I gave them as
8  much credit as I could. I can only see three
9  periods of intervention. Saturday with the
10  result of the MRSA respiratory and isolation,
11  Sunday with the IVs, because he's, you know, just
12  not doing well. Maybe that would have been
13  better to do on Saturday, but I'm not a
14  clinician, and then the discharge order obviously
15  would have to come from the doctor unless -- the
16  nurses could do it, you know, under the
17  circumstances, but I believe he was contacted.
18  Q. Does that then conclude your opinions relative to
19  his last weekend there at Crittenden?
20  A. I think we're going out of sequence with my
21  report. Can I just look real quick?
22  Q. Absolutely.
23  A. The other thing too -- and I don't know all of
24  the motivation. I believe it was a nurse who
25  asked for the Q15-minute checks. If I had to

Page 115

1  offer a hunch, it was more than simply that he's
2  sick and he's in isolation. He had a history of
3  falls. He was a very high fall risk. Now, he
4  only had I think a couple of skin tears. Nothing
5  major, but when you isolate someone in a room,
6  he's out of line of sight. That's another reason
7  why you have to watch him, because he could have
8  fallen and a number of injuries could have
9  occurred. So it's my belief that that was a good
10  idea from his fall risk standpoint. He's clearly
11  a high fall risk and he was exhibiting unsafe and
12  even bizarre behavior the day before. Even
13  self-harm behavior, which is the first time I
14  think I saw that.
15      He was supposed to be skilled care and
16  there should be a lot more notes than that even
17  for skilled care, which means if he's skilled
18  care, he couldn't have been terminal on that day.
19  Q. Let me ask you this. Do you think that Mr. Cole
20  was seen more frequently take, for instance, on
21  October 7 than what is documented in the nursing
22  notes?
23  A. There's always a level of intervention that's
24  never documented, but most of that has to do with
25  non-risk issues, and the reason the policies and

Page 116

1  procedures are very important to me is that I can
2  almost assure you that there is a specific policy
3  and procedure that when a condition change is
4  triggered and they use the form, that it will
5  also trigger a protocol of observation and
6  reporting and that's what I expected to see and
7  it -- I didn't, and that's what bothered me, is
8  that they're actually identifying he's got these
9  problems, but then don't do anything.
10      They're identifying he's got MRSA,
11  they're identifying that he's -- you know, looks
12  like he needs IVs. They're identifying all
13  these, but they're not -- if I were to look at
14  other residents on that day, I bet their
15  documentation wouldn't be any better or worse.
16  It would be the same.
17      I would really expect to see a lot of
18  the documentation and I'm kind of curious to see
19  what the ratios were on that unit. So that
20  surprised me a lot. He's also skilled and so
21  you're supposed to document with sufficiency to
22  qualify him as skilled. Didn't see that.
23  Q. Now, take, for instance, on October 7, the nurse
24  has documented that -- or the nurse has an entry
25  for 2:00 a.m., correct?

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

---

Page 117

1  A. Yes, sir.
2  Q. And then the next entry is at what time?
3  A. Two-thirty. Two-thirty I believe. Well --
4  Q. There was one at 7:00 a.m., wasn't there?
5  A. I thought that was 2:00.
6  Q. But don't they use military time?
7  A. They could, yeah, and that could be 7:00. I
8     could not distinguish that, and then the next is
9     2:30, and the critical gap to me when they really
10    were on notice is calling the doctor at 2:30. I
11    don't think in this note it reflects everything
12    that's gotten to this point with the behavior
13    before, and then not monitoring him until
14    essentially -- well, there's no additional
15    records until, you know, in the evening. So
16    that's the one that I -- and that's why I circled
17    it like this in my records.
18        You can give them even the benefit of
19    the doubt earlier, but you can't do it with that.
20    That's a problem
21  Q. Do you believe or do you have an opinion that the
22    patient was seen between 2:00 a.m. and 7:00 a.m.
23    on October 7?
24  A. I don't know. I would say that usually the aides
25    would see somebody before shift change. So I

Page 118

1     would hope that you would at least have an aide
2     in there at 6:30 before the dayshift comes on.
3     Whether a nurse saw him or not, I don't know, but
4     an aide should have seen him, although she's not
5     -- or he's not necessarily qualified to -- and
6     the other problem with that nightshift is that
7     he's not up either. So if he's sleeping or
8     appears to be sleeping or even lethargic and
9     appears to be sleeping, I don't necessarily know
10    until he's aroused that they're going to identify
11    that unless they're taking vital signs, which
12    they were very sparse too. So it's because of it
13    being at nighttime, I'm not really sure.
14        I would say -- if I had to guess, I
15    would say an aide probably saw him before shift
16    change, but I don't know whether he was awake and
17    I don't know -- when I say saw him, maybe just
18    line of sight there he is. So I don't know. I
19    don't know. I mean that would be the protocol I
20    would have expected, but a nurse, I don't know.
21  Q. Do you have an opinion as to whether Mr. Cole was
22    seen between 7:00 a.m. and 2:30 p.m. on the 7th?
23  A. I see very, very -- I don't know. It's
24    speculative to me. I would say again that you
25    might -- I would say an aide probably was in

Page 119

1     there because he's incontinent, although I don't
2     know how dehydrated he is. He might not have
3     much, but my main concern was not whether he
4     was seen by an aide. Whether he was assessed by
5     a nurse, because a nurse would be able to
6     determine that. An aide more likely than not
7     probably saw him, although there's no
8     documentation, but my concern would be a nurse.
9  Q. Do you know if a nurse saw him between 7:00 a.m.
10    and 2:30 p.m. on the 7th? Yes or no or "I don't
11    know."
12  A. I don't recall that being the case.
13  Q. So is it your testimony no, he did not?
14  A. I would have gone back and looked and I don't
15    recall seeing something that would have told me
16    that. No.
17  Q. But you don't see documentation of that?
18  A. That's right.
19  Q. All right. But again, there are levels of
20    intervention that may be provided that aren't
21    documented, correct?
22  A. In a normal state, but not on a condition change,
23    no. Condition change protocols -- they change
24    everything. Everything is different now and
25    again, you have the 15-minute check process.

Page 120

1     There's no doubt that was never done on Sunday.
2     I don't think it was done after the order was
3     written, but there's no doubt that was never
4     done, because that would have to be recorded and
5     I don't even see the nurses reflecting that they
6     did it. I don't think the nurses on Sunday knew
7     it was even in effect and that might be why the
8     doctor assumed that they're on top of things
9        He wrote an order the day before for
10    Q15-minute checks. He's probably thinking,
11    "Well, if you're seeing him every 15 minutes, you
12    must know what's going on," and I'm not trying to
13    make an assumption for a doctor, but he notes the
14    orders he wrote the day before. A reasonable
15    doctor would have assumed that they followed his
16    orders and that that level of supervision would
17    be something that a doctor would rely on in my
18    opinion. He wrote the order for them.
19  Q. Does that then encompass the full scope and basis
20    of your opinions for that weekend of 10-5 through
21    10-8?
22  A. Let's look real quick.
23  Q. Sure.
24  A. It's not in my opinions, but somewhere I thought
25    I should have written this down. Their problem

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 121

1  too is he fell the day before and when you fall,
2  as you probably know -- and I'm sure I'll see it
3  in the policies and procedures -- there would be
4  at least a 24 to 48 to maybe 72-hour period of
5  post-fall evaluation. That would trigger more
6  evaluation. I didn't see that either, and I
7  didn't see any references on Sunday to a fall.
8  So they're not documenting post-fall either.
9  Let's see. Let me go through my notes.
10 Q. Sure.
11 A. I'm characterizing that period as neglect, but I
12   think you already can see that. That's on
13   Page 11.
14       As an administrator, if he was in
15   hospice or he was terminal or it's in the
16   records, I would have to look at that. He
17   wasn't. He was on skilled care. If I see his
18   MDS, it will say in there whether he was end of
19   life or not, which I'm doubting that he was,
20   because you couldn't have an end-of-life, if he's
21   getting skilled therapy.
22       He's a fall risk. We talked about that.
23   He's completely dependent on them. Can't
24   communicate. I saw nothing in these records to
25   reflect that any member of management, i.e.,

Page 122

1  referenced DON, ADON, calling an ADON, DON -- I
2  saw none of those in here as though they were on
3  top of things.
4 Q. Does the administrator typically document in a
5   patient's chart?
6 A. Pardon me?
7 Q. Does the administrator typically document in a
8   patient's chart?
9 A. Typically not. I would document sometimes in the
10   Social Services' notes with issues I had with
11   families, but other than that, no. I would
12   sometimes document in there. The records do not
13   reflect with the aides meal-to-meal feeding
14   assistance despite his dependency issues.
15       There is a lot of conflicting directives
16   of what his status is, even going into this
17   weekend. It's all over the map, and I even
18   charted it. It depends on what you look at, and
19   that's on Paragraph 47. Some say he needs
20   assistance, some say he doesn't. Nobody is on
21   board with that, and that would be something that
22   would get me in a lot of trouble with the
23   surveyor with intake issues. They should all be
24   on the same page, and he was totally dependent on
25   them.

Page 123

1  I didn't see any CNA food consumption
2  records during that period. No restorative care
3  during that period. Talk about the 15-minute
4  checks. Didn't really see the wife contacted
5  during that period, and I'm not sure the notes
6  reflect that she was there. So I'm not quite
7  certain about that, but I didn't see that they
8  contacted her.
9 Q. Yeah. There seems to be a couple of notes where
10   it says family notified.
11 A. Oh, was there? Okay. I didn't recall seeing
12   that. I'll give you credit for that.
13 Q. On the Condition Change Forms.
14 A. Oh, okay. I'm sorry. Let's see. The
15   intake/output sheets I think that were in effect
16   were only done once a day or something during
17   Saturday and, of course, the IV would kick in,
18   but you would still want to know some output. I
19   think that's it for that period of time.
20 Q. Then you mentioned falls on a couple of
21   occasions?
22 A. Yeah, he had the falls and he didn't have any
23   injuries. I was kind of surprised.
24 Q. That's what I was going to ask you. Did he have
25   any injuries as a result of any of the falls?

Page 124

1 A. He had a skin tear on one of those. Nothing
2   severe. I'm kind of surprised, because on
3   Page 17 where I get into falls, they violated the
4   care plan in terms of, you know, there was an
5   occasion where they left him in his wheelchair
6   alone and where he's left in the room with a lap
7   belt. That happened on 10-6. I guess it's just
8   lucky that he didn't do something. Strangle
9   himself with that or have a problem, but they
10   weren't following the care plan.
11       The thing that I take from the falls
12   more than any injury is to me it reflects the
13   overall lack of supervision that he received
14   despite being a high risk resident in so many
15   ways. The falls is just another example of just
16   way poor supervision. They're put on notice.
17   They know he's a high fall risk. He falls the
18   day before he goes out. I still didn't see them
19   watch him more closely then and again, that might
20   be one of the things that prompted the
21   Q15-minutes, but they weren't following the care
22   plan, and so I guess the thing that I would take
23   most of out of the falls would be poor
24   supervision, which again, they were rated very
25   low with staffing.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 125

1  Q.  You would agree with me that not all falls are
2      preventable, correct?
3  A.  Sure.
4  Q.  And you would agree with me that interventions
5      were implemented in an effort to prevent falls or
6      prevent injuries from falls for Mr. Cole?
7  A.  Some. That's one of my opinions. They -- this
8      facility relies on passive versus active and
9      that's just my definition. I'm writing another
10     article on falls.
11         They use passive, which is equipment and
12     what I call stuff. Alarms, low bed, lap belt.
13     Whatever. With the exception of once or twice by
14     the nurse's station, I did not see any active --
15     active would be hands -- or eyes on, could be a
16     patterning program. They could be watching him
17     every hour instead of two hours, and I had a
18     whole list here in my notes somewhere.
19         They used -- from fall to fall, all they
20     used is passive. They did not actually -- and
21     perhaps when I look at his room, I'm hoping it's
22     not the furthest from the nurse's station, but I
23     did not see active interventions where they're
24     actually putting him in a special assignment with
25     the aides, where the aides maybe have less

Page 126

1      residents. Maybe some of those are high risk. I
2      didn't see where they were supervising him any
3      differently than any other resident who was high
4      risk.
5         The interventions I give them credit
6      for. They did -- they didn't always use them
7      according to the care plan like the lap belt, but
8      they did have passive interventions, but that's
9      not taking credit for the things that they needed
10     to watch him too, because this standard under
11     OBRA is both assistive devices and adequate
12     supervision. I give them -- yes, you passed the
13     assistive devices, except for the care plan
14     problem, but on this adequate supervision, no.
15         It didn't get any better and I would
16     have looked for some movement from fall to fall
17     to fall, and the thing that bothered me the most
18     about his falls -- the last fall on Saturday when
19     he's trying to -- he's trying to harm himself,
20     he's falling. He's already a really sick guy.
21     Just from the standpoint of his pattern of falls
22     and he's really sick, they should have watched
23     him more closely just for that alone.
24         So I think, you know, again, they just
25     failed it. I don't see where he got any better

Page 127

1      supervision than anybody else did that wasn't
2      high risk and that's where I come from with
3      regard to the falls.
4  Q.  Well, what other charts have you reviewed during
5      this period of time from the facility that helps
6      you say I don't think he got any better
7      supervision than anybody else who wasn't at risk
8      for falls?
9  A.  That's a good point. I'm just saying it was so
10     cursory as I see it, that that would be alarming,
11     if this is a good level of supervision. I would
12     look for the key words in these narrative nurse's
13     notes or forms that would show me that he's being
14     treated differently for the risk for the fall. I
15     didn't see it anywhere. I tried to give them
16     credit for it. Special assignment. You know, I
17     just didn't see it, and so to me, he got treated
18     like everybody else did. I don't know that to be
19     the case.
20  Q. That's what I was going to say. How can you sit
21     here and say that? Tell me the names of the
22     other resident charts that you have seen during
23     this residency that can allow you to say that.
24  A. I can't. I can tell you they were cited a couple
25     months earlier in July for accidents again and

Page 128

1      so -- and he wasn't in there. So this is a
2      problem that they have. That was on 7-18-12. It
3      was I think a D or an E. So I know this is a
4      problem issue with them. They're just not
5      watching people. They got cited for that, like I
6      said, earlier.
7  Q.  And they just got lucky that they didn't have any
8      injuries as a result of the falls?
9  A.  I think so. Especially that lap belt. Yeah, I
10     do. Especially not supervising him in his room.
11     I mean the interesting thing about this facility
12     is there are nurses here that really know what
13     needs to be done. They come up with a care plan
14     and Q15-minutes. It's just somehow it never gets
15     disseminated to everybody else and that's the
16     problem. They had some good ideas and they
17     really were on top of what the problem was and
18     how to solve it, they just never carried it
19     through. So I give them credit for that.
20  Q. Well, would you agree with me that the fall
21     interventions that were utilized are approved
22     interventions?
23  A. By?
24  Q. I mean by the industry.
25  A. Yeah.

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 129

1 Q  I mean they're known and accepted interventions
2     in order to prevent falls?
3 A  Most of them don't require a physician order.  I
4     have to look at some.  You know, he had
5     Risperdal too, but I think that was more for
6     sleep than behavior.
7 Q  And you would also agree that interventions and
8     new interventions were utilized following each
9     fall?
10 A  Passive only.  Yes.
11 Q  All right.
12 A  Kind of leaves me with just my administration
13     section.  Can I have a couple minutes, sir?
14 Q  Yeah.  Let's take a break.  We're going to shift
15     gears I believe.  The last section we have is
16     Administrative and then we'll wrap up.
17 A  Okay.
18         (Break taken)
19 BY MR. JOHNSON:
20 Q  Mr. Youles, there is one last I think area or
21     section of opinions that you have, if you want to
22     go ahead and provide those for us at this time.
23 A  When I look at a facility, one of my areas is
24     administration and when -- back about ten years
25     ago, I was retained by the Attorney General's

Page 130

1     Office in Indiana and I was one of the experts
2     they retained, because in Indiana back then when
3     an administrator received a substandard quality
4     of care survey, which is an H or greater -- you
5     probably know what those are -- they
6     automatically come up for review for their
7     license to determine if they should be
8     disciplined.  Nothing happens.  In other words,
9     look at the survey, look at what the state did.
10     Was the administrator responsible, and I had
11     about six cases and one deposition where that's
12     all I did.  Based on the criteria that was given
13     to me is to evaluate their conduct.
14         This administrator, Ms. Workman, is
15     very troubled obviously.  She's got three
16     violations that occur after Mr. Cole's stay, but
17     they're during his stay that these are issues.
18     Two of -- the first two relate to not
19     identifying, reporting, and addressing resident
20     abuse and neglect in a proper manner, but the
21     thing that is the ultimate indictment of anybody
22     in my profession is when you get Immediate
23     Jeopardy with F490, which is administration, and,
24     you know, when I look at a lot of the failures
25     that I saw with regard to Mr. Cole's case, and I

Page 131

1     look at the allegations that were allegedly made
2     by his wife that were never apparently
3     investigated, these all come back to the
4     administrator.  The bucks stops with them.
5         They may rely on clinicians and so forth
6     and practitioners, but a lot of the problems that
7     I saw, including the timing of the condition
8     change on weekends -- you know, the Star Ratings
9     for this facility.  One Star for surveys, One
10     Star overall, Two Stars for staffing, and I got
11     that wrong.  It's just a very poorly operated
12     facility and it all comes down to the
13     administrator and they cited the administrator.
14     They're sending a message to Ms. Workman, "You're
15     not managing this place properly."
16         I looked to see if this was IDR or
17     appealed.  I didn't see it changed.  I know they
18     got some pretty nasty fines.  I haven't looked
19     them up.  When you get Immediate Jeopardy, they
20     contact all the doctors and inform them that
21     this happened.  "Be careful with your residents."
22     They probably lost their certification process
23     for training aides.
24         So, you know, the backdrop of this
25     survey is a lot of the problems I saw with

Page 132

1     Mr. Cole and it all comes back to I think poor
2     management, and that's kind of my summation of
3     this section.  Obviously the management company
4     is responsible also to make sure she's doing her
5     job and they're drawing a management fee and so
6     forth and so on.
7         This is a pretty nasty survey and there
8     probably weren't too many surveys in Kentucky
9     that year -- I can look them up -- that had three
10     Immediate Jeopardy violations.  Really bad, and
11     so, you know, looking at my peer and looking at
12     the failures I saw, I'm not surprised.
13         I have in here also that the governing
14     body did not act properly.  The governing body I
15     would list as both the owners and the
16     management company.  The C.F.R. lists governing
17     body as F493.  The governing body basically has
18     two responsibilities under the C.F.R.  One to
19     hire an administrator, hopefully competent and
20     capable, and the other to make sure that the
21     policies and procedures of the facility are
22     carried out.  Those were both not done here in my
23     opinion.  That they did not fulfill their duties
24     as defined by the C.F.R.  So I would hold them
25     responsible too, because again, a lot of the

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 133

1  internal systems were not managed properly here
2  and that's what the C.F.R. holds the governing
3  body to.
4      The governing body is defined by CMS
5  obviously different than other people look at the
6  governing body, but that's how I look at it.
7 Q. Who legally is the governing body of the
8  facility? Of this facility
9 A. Well, you're asking me a question as a lawyer
10  As an administrator, I know that where I've seen
11  violations for the governing body, it's only come
12  in two places. Owners and/or management company
13  I've only seen that. So I'm only using the term
14  to which I'm accustomed to and I've seen it
15  applied. With regard to the legal definition of
16  that, I'm not an attorney and I know that's
17  sometimes a little different than what CMS
18  defines it as
19 Q. Can you -- I'm sorry. Do you have opinions
20  specific to the management company relative to
21  Mr. Cole's residency?
22 A. Yes, since I managed management companies. When
23  you're drawing -- and if I got the Cost Reports,
24  I would probably see for a facility this size
25  somewhere between 3 to $500,000 management fee.

Page 134

1  Maybe higher, maybe a million, and they're
2  entitled to that, because part of their fee is to
3  send out regional nurses, a regional
4  vice-president and that's their job. Is to make
5  sure that the policies and procedures are carried
6  out, it's to make sure that systems don't break
7  down, it's to make sure the administrator and DON
8  does their job.
9      So they're in a very important oversight
10  role and they're being paid for it, and so to the
11  extent that we have some pretty severe
12  violations, particularly those involving the
13  abuse and neglect of residents, and the staff
14  don't have a clue what that means -- they had to
15  do some training -- that should never have
16  occurred. That should be something that would
17  have been identified early on either through
18  audits or just through some rounding by the
19  regional staff in my opinion since I've had a
20  regional staff. So, yeah, they're partially to
21  blame here and again, they hire the
22  administrator.
23      There was a turnover here. I'm not
24  quite sure when this happened or whether she was
25  fired because of this. I might have fired her

Page 135

1  because of this, but I think there is a turnover
2  there. There are two administrators during this
3  period of time or maybe there was -- I don't
4  recall what happened to her, but certainly this
5  is -- her performance was extremely poor here,
6  and the C.F.R. holds her personally responsible.
7      It says that the administrator is
8  responsible for administering a facility in a
9  manner that enables it to use its resources
10  effectively and efficiently in order to -- so
11  when you look at O, she's responsible for
12  resident care. The buck stops with her and
13  that's why they didn't cite the DON for these bad
14  surveys, they didn't cite any doctors or aides.
15  When the facility gets in trouble like this, they
16  only look in one direction. It's the
17  administrator, and they did that with her, but
18  again, I see a lot of other problems where she
19  wasn't doing her job elsewhere.
20 Q. Does that cover the issues that you have with
21  respect to the administration component of your
22  opinions?
23 A. Yes.
24 Q. All right. Have we then covered the criticisms
25  that you have of the defendants in this case and

Page 136

1  the basis of those criticisms?
2 A. Well, my opinions. I don't like to use the word
3  "criticisms," but those are my opinions or
4  findings.
5 Q. Okay. Have we covered your findings and the
6  basis of your findings?
7 A. Yeah. If, in fact, Mrs. Cole did, as she said
8  she did, confronted the administrator and
9  alleged that her husband was a victim of neglect,
10  there would have to be an internal investigation
11  and there probably would probably have to be --
12  this would be reported to OIG. So it could be if
13  I find out more -- if they didn't report it to
14  OIG, based on what I know with injuries of
15  unknown source and some other issues, it could
16  be concealment, if they didn't do it and they
17  should have done it.
18      I don't have enough information at this
19  point, but I'm concerned that if her allegations,
20  in fact, were made, that they should have
21  resulted in some actions in some reporting. I
22  don't have enough to go there yet, but that's
23  concerning to me.
24 Q. As you sit here today, at the time in which you
25  authored your report, you did not have enough

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

Page 137

1 information in which to provide an opinion on
2 that topic?
3 A. That's true.
4 Q. All right. Does that then cover your findings
5 and the basis of your findings?
6 A. To the extent of that one paragraph of records
7 that I requested, yeah. If I get more, I reserve
8 the privilege to talk to you again.
9 Q. Yeah, but as we sit here today, based on
10 everything that you had available to you --
11 A. Yes, sir, that's it. That's all I got.
12 Q. All right. If there are any additional materials
13 that you review, whether it changes your opinions
14 or not, if you'd let counsel know, so he can put
15 me on notice of that, please.
16 A. Proper thing to do. I always do, sir.
17 Q. And if any of your opinions change, whether it's
18 based on the materials you have in front of you,
19 if you'd let counsel know, so he can place me on
20 notice of that as well.
21 A. Yes, and I do want to make one more note that my
22 report is not accurate with regard to the Two
23 Star versus One Star.
24 Q. You did mention that.
25 A. Other than that -- I want to make that clear too.

Page 138

1 Q. All right. Did the facility do anything right?
2 A. I think they did a lot of things right.
3 Q. Okay. What are those?
4 A. Okay. I think that there is some good wisdom of
5 some of these nurses to not leave him in a room,
6 to make sure his lap belt is not on when they're
7 not around, and they put it in the care plan.
8 Someone was concerned about him. Someone was
9 concerned about him on Saturday when they called
10 the doctor and they got the Q15-minute. That was
11 a good thing. Someone was concerned, you know,
12 when they ordered IVs.
13 The problem is, if I had to use a term,
14 it's continuity of care. You've got some really
15 good things that happened to him, but in the end,
16 without good continuity of care, it doesn't
17 matter. I'm glad to see that. There's a lot of
18 good things here, but it's not collectively
19 enough to properly care for him and some of these
20 nurses came up with things that if it was carried
21 through, I don't think I'd be sitting here today,
22 but then there's others that for some reason just
23 didn't carry it through, and so, yeah, I saw lots
24 of good things, and, you know, in every case I've
25 ever had I always have.

Page 139

1 Q. Were you aware that Mr. Cole was at another
2 long-term care facility before being admitted to
3 Crittenden?
4 A. I want to say that sounds familiar. I don't
5 think I got those records. I can't recall, but
6 it seems to me that maybe in the admission
7 records I might have recalled seeing something of
8 that nature.
9 Q. And obviously it sounds like you don't know what
10 that particular residency entailed?
11 A. No, and this kind of case is interesting to me,
12 because when you're the only nursing home in the
13 county, it's not like you're giving your
14 staff -- your residents and families a whole lot
15 of choice. That becomes a very difficult problem
16 because some residents can't travel outside the
17 county. So if it's a poor provider, you know,
18 competition doesn't really mean a whole lot.
19 Q. Do you know if Mr. and Mrs. Cole lived in this
20 county?
21 A. I don't.
22 Q. Do you know what other choices they had
23 available?
24 A. I don't. I just know what nursing homes I found
25 that were practicing -- or that were present in

Page 140

1 this county. I know that this nursing home also
2 is an old building. It's been around since 1961,
3 which makes it very old and the fact that it's
4 kind of called the county care facility, which is
5 never usually allowed anywhere in any state, if
6 you're a for-profit, makes me believe that
7 originally it was a county facility and just
8 probably sold to private interests, but it's
9 really rare for me to see a facility called a
10 county care facility when, in fact, it's not a
11 governmental owned.
12 Q. Were you aware of Mr. Cole's combative behavior
13 or behavior issues?
14 A. Yes.
15 Q. What's your knowledge of that?
16 A. At times he would be like that, and it's in his
17 notes. I don't -- I don't think that the staff
18 was acting inappropriately with that. I think
19 there was some adjustments in his meds. It's not
20 an excuse to care for him, although I can tell
21 you, aides will sometimes be reluctant to do
22 any more than they have to, if someone is going
23 to hit them, but I did not see that as an issue
24 at the end of his stay. The last week. To the
25 extent that maybe he was doing some self-harm,

Page 141

1    but, yeah, I did see that early on that there was
2    some of those issues.
3  Q. And can those issues provide challenges in
4    rendering care to a resident?
5  A. They can, and, in fact, my article -- behavior
6    is one of the two things I always hear when
7    people are part of a negligent retention. The
8    other was it's their right to do this, their
9    right to do that, and so my opinion is that there
10   comes a point where you can either manage the
11   behavior issue or go somewhere else.
12       I never saw where it got to a point
13   where they couldn't manage it and there were
14   times where I thought it was managed properly.
15   So I would have liked to have seen more Social
16   Services' notes, but I don't have really any
17   issues with that.
18 Q. And then lastly, you brought with you some
19   Kentucky statutes and regulations?
20 A. Just what I've used over the years and then I
21   updated to make sure that the administrative
22   rules are still the same ones, and I brought the
23   edition of the C.F.R. that would be relevant to
24   this timeframe.
25 Q. The Long-Term Care Survey Manual?

Page 142

1  A. Right. Right.
2  Q. And are you relying upon these rules and
3    regulations as part of your opinions in the case?
4  A. To some extent. I would say almost all of
5    the -- Kentucky has good regulations. In fact,
6    they have a couple different sets for nursing
7    homes, but they're companion pretty much to the
8    C.F.R. and so the bases of those I am, yes.
9  Q. All right.
10       MR. JOHNSON: Let's attach this as
11   cumulative Exhibit 8, and we'll return it to
12   you. It looks like it has been an exhibit
13   before. Let's go off the record for just a
14   second. Make sure we have got all your exhibits
15   put together.
16       (Deposition Exhibit No. 8 marked for
17       identification)
18       (Break taken)
19 BY MR. JOHNSON:
20 Q. Mr. Youles, if you will provide the court
21   reporter the case testimony history --
22 A. I will.
23 Q. -- and that will be marked as Exhibit 2, and then
24   I believe that we have eight exhibits total from
25   your deposition today.

Page 143

1  A. Okay.
2       MR. JOHNSON: Those are all the
3    questions I have. Thanks for you time.
4       THE WITNESS: Thank you, sir.
5       MR. TROUTMAN: No questions.
6       (Deposition concluded at 1:27 p.m.)
7           *   *   *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1           CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3  COUNTY OF OAKLAND )  ) SS.
4       I, Carol L. Martin, a Notary Public in and for
5  the county and state, do hereby certify that the
6  above deposition was taken before me at the time and
7  place hereinbefore set forth; that the witness was by
8  me first duly sworn to testify to the truth, and
9  nothing but the truth; that the foregoing questions
10 asked and answers made by the witness were duly
11 recorded by me stenographically and reduced to
12 computer transcription; that this is a true, full and
13 correct transcript of my stenograph notes so taken;
14 and that I am not related to, nor of counsel to
15 either party nor interested in the events of this
16 case.
17
18 _____
19 Carol L. Martin
   CSR-3532, Notary Public
20 Oakland County, Michigan
21 My Commission Expires: 10-25-2016
22
23
24
25

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

**$**

**$260,000 (1)**
9:1
**$500,000 (1)**
133:25

**A**

**abiding (1)**
41:3
**ability (1)**
87:3
**able (10)**
18:11;19:20;26:20;
29:3;64:6;78:20;
94:11;104:18;112:7;
119:5
**above (1)**
68:2
**absence (1)**
111:14
**absolute (1)**
99:23
**absolutely (4)**
34:1;48:3;96:14;
114:22
**absolutes (1)**
96:20
**abuse (7)**
12:2;56:13;87:9;
89:1;105:5;130:20;
134:13
**abused (1)**
106:3
**accept (4)**
11:1;15:15,17;26:12
**accepted (2)**
15:21;129:1
**accepting (1)**
72:14
**accidents (1)**
127:25
**accord (2)**
40:5;43:21
**accordance (1)**
113:3
**according (1)**
126:7
**accountable (1)**
70:11
**accountant (1)**
72:10
**accredited (1)**
12:25
**accurate (3)**
81:25;85:22;137:22
**accustomed (2)**
71:15;133:14
**across (2)**
28:7;65:17
**Act (5)**

34:2;94:1,8,10;
132:14
**acted (5)**
28:16;35:8;93:21;
104:25;107:25
**acting (3)**
101:1;103:5;140:18
**action (3)**
48:11;59:7;93:17
**actions (3)**
92:5;94:4;136:21
**active (5)**
6:18;125:8,14,15,23
**activities (1)**
32:24
**activity (1)**
9:1
**actual (4)**
54:3;86:15;87:16;
101:17
**actually (26)**
13:24;22:24;28:20;
31:17;36:15;48:7;
49:8;54:12;66:8;78:2,
9;81:20;82:20;86:23;
88:22;89:9;91:2;
100:4,21;102:5,16;
107:20;108:3;116:8;
125:20,24
**acuity (2)**
79:21,22
**acute (3)**
95:5,16,19
**add (1)**
59:12
**additional (5)**
60:22;75:19;77:12;
117:14;137:12
**address (5)**
4:19,22,25;44:11;
106:7
**addressing (1)**
130:19
**adequate (2)**
126:11,14
**adjust (1)**
53:11
**adjustments (1)**
140:19
**ADL (7)**
47:2,3;65:13,18,25;
93:2;111:20
**ADLs (1)**
93:2
**administering (2)**
32:11;135:8
**administration (6)**
46:18;105:5;129:12,
24;130:23;135:21
**administrative (9)**
33:17;34:5,7;46:4,6,
17;47:24;129:16;
141:21

**administrator (61)**
8:15;12:6;27:8;28:1;
29:8,19;30:2;31:14;
32:6;33:6;34:16,20;
35:9,13,20;36:19;
38:16;39:15;44:13;
45:9,17;46:21;52:10;
61:5,6;74:16;87:7;
92:9,15,18;93:20;95:6,
15,24;98:9;100:12;
102:15;103:8,15;
104:4,15,22;109:17;
113:15;114:3;121:14;
122:4,7;130:3,10,14;
131:4,13,13;132:19;
133:10;134:7,22;
135:7,17;136:8
**administrators (14)**
12:17;13:11;32:13;
35:10,16;36:1;38:2,11;
41:6,21;42:1;85:9;
87:15;135:2
**admission (3)**
63:18;99:20;139:6
**admitted (5)**
62:10;93:19;94:20;
98:11;139:2
**ADON (3)**
104:13;122:1,1
**adopted (2)**
46:2,5
**adult (2)**
9:3;21:21
**Advance (1)**
84:5
**Advantage (1)**
43:10
**advertise (2)**
11:6;14:24
**advertised (3)**
11:16;14:18;15:6
**advertising (1)**
16:11
**advised (2)**
57:14,20
**advocate (5)**
28:5,6,7,13,14
**affect (2)**
38:15;53:10
**affiliate (1)**
13:22
**affiliated (1)**
13:20
**again (53)**
8:10;9:18;13:8;32:6;
33:3;35:18;36:17;
42:16;46:14;50:7;
52:16;72:1;74:18;
77:13;80:2;82:11;
83:8;87:5;88:8;89:3;
92:9,24;93:14;95:23;
96:20;98:9;102:9,10,
23;103:3,8,9,9,11,15,

25;106:22;108:18;
109:9;112:4;113:12;
114:2;118:24;119:19,
25;124:19,24;126:24;
127:25;132:25;
134:21;135:18;137:8
**against (1)**
23:14
**agency (4)**
31:23;39:20;40:1;
73:13
**ago (11)**
7:4;9:16;14:15,19;
15:21;22:4;67:19;
71:6,10,17;129:25
**agree (16)**
29:3;33:5;39:17,25;
40:4;45:15,20;46:6,10;
58:11;65:24;107:10;
125:1,4;128:20;129:7
**ahead (2)**
9:23;129:22
**aide (13)**
31:10;32:2;33:1,2;
101:12;110:25;111:1;
118:1,4,15,25;119:4,6
**aides (14)**
31:24;66:4;68:5;
69:10;100:22;102:3;
105:16;117:24;
122:13;125:25,25;
131:23;135:14;140:21
**alarming (2)**
64:12;127:10
**Alarms (1)**
125:12
**allegation (1)**
56:13
**allegations (6)**
74:5,6,8;106:2;
131:1;136:19
**alleged (2)**
54:14;136:9
**allegedly (1)**
131:1
**allow (2)**
16:16;127:23
**allowed (1)**
140:5
**almost (10)**
8:2;22:4;43:14;46:3;
48:4;76:13;100:1;
101:11;116:2;142:4
**alone (2)**
124:6;126:23
**along (2)**
64:10;90:7
**although (5)**
45:2;118:4;119:1,7;
140:20
**always (23)**
14:22;19:14;40:18;
43:12;44:3,9;45:13;

51:19;54:7;65:6,18;
74:9;75:16;82:5;
92:14;95:11;99:24;
100:1;115:23;126:6;
137:16;138:25;141:6
**American (4)**
13:20;78:15;79:15;
85:8
**Amish (1)**
78:7
**amount (3)**
8:19;10:24;100:11
**analysis (7)**
69:2;98:4,8,16,23;
99:2,10
**and/or (3)**
56:12;77:11;133:12
**Ann (1)**
12:16
**answered (1)**
93:13
**antibiotic (1)**
100:18
**anticipate (1)**
33:9
**anymore (2)**
15:15,17
**anyplace (1)**
43:22
**apart (1)**
6:1
**apologize (1)**
24:20
**apparent (1)**
42:21
**apparently (2)**
107:17;131:2
**appealed (1)**
131:17
**appear (1)**
71:12
**appearances (1)**
18:24
**appears (8)**
36:23;52:12,14;
71:12,14;77:10;118:8,
9
**applicable (1)**
27:8
**applied (1)**
133:15
**appropriate (1)**
92:21
**appropriately (1)**
94:8
**approval (1)**
16:20
**approved (1)**
128:21
**approximate (1)**
20:15
**approximately (4)**
8:1;10:16;63:21;

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

64:1
**April (1)**
42:13
**arbitrations (1)**
18:25
**Arbor (1)**
12:16
**archive (1)**
81:19
**archives (1)**
69:13
**area (4)**
34:4;59:21;78:2;
129:20
**areas (4)**
45:16;81:23;89:12;
129:23
**around (19)**
6:11,11;14:13;21:6;
33:3;35:13;36:3;37:1;
38:17,24;42:15;70:12;
106:21;107:20,23;
108:9;110:5;138:7;
140:2
**aroused (1)**
118:10
**arrive (1)**
69:6
**arrived (1)**
25:6
**arriving (1)**
30:18
**arrow (1)**
108:17
**artery (1)**
95:12
**article (22)**
12:18;59:22;60:9,
18,20;83:16,17;84:21;
85:1,17,20;86:16,20,
21,25;88:1,5;95:21;
100:4,5;125:10;141:5
**articles (7)**
13:8;86:3,9;88:12,
20;89:8;99:23
**Aside (2)**
11:15;52:21
**Aspiration (5)**
95:5,16;96:16,18;
100:25
**assessed (1)**
119:4
**assignment (6)**
73:19;101:12;
105:15;110:24;
125:24;127:16
**assistance (2)**
122:14,20
**assisted (7)**
5:6;9:2;12:22;21:19,
20;22:9;88:2
**assisting (1)**
32:7

**assistive (2)**
126:11,13
**Associates (10)**
5:2,4,4,14,23;6:4,6,
15,17;12:13
**Association (8)**
13:10,18,21;15:1;
78:16;79:15;83:8;
86:24
**associations (3)**
13:17,19;87:15
**assume (2)**
4:8;82:23
**assumed (2)**
120:8,15
**assumption (1)**
120:13
**assure (2)**
76:6;116:2
**Atla (1)**
14:21
**Atrium (12)**
41:14;63:18;71:2,5,
7,9,15,21;72:21,22;
73:1;83:13
**Atriumlivingcenters.com (1)**
83:7
**attach (3)**
18:3,7;142:10
**attending (1)**
108:4
**attendings (2)**
44:8,16
**attorney (7)**
15:4;19:10;49:24,
25;50:3;129:25;
133:16
**attorneys (4)**
8:10;25:23;27:18;
58:21
**audits (1)**
134:18
**August (4)**
13:7,16;40:6;83:24
**author (1)**
83:19
**authored (6)**
57:22;83:17;85:25;
86:3;88:13;136:25
**authority (2)**
16:12;86:20
**automatically (2)**
108:20;130:6
**available (4)**
14:5;77:23;137:10;
139:23
**average (8)**
77:14;79:12;80:1,
10,14;81:3,6;108:22
**awake (1)**
118:16
**award (3)**
78:9,14,14

**aware (9)**
72:3;94:19;95:18;
98:21;100:8,10;
105:13;139:1;140:12
**away (1)**
23:21
**awful (1)**
52:1

## B

**back (42)**
7:22;9:15,24;11:18;
15:3;18:18,21;25:2;
27:25;29:21;31:19,20;
35:11;40:23;54:23;
60:11,13;61:18;65:10;
72:3;77:18;81:20;
83:15;89:24;90:2,5,7;
91:5,17;92:11,19,25;
94:19;97:14;99:21;
104:5,7;119:14;
129:24;130:2;131:3;
132:1
**backdrop (6)**
103:3;104:10,14;
105:1;106:25;131:24
**backfired (2)**
50:2,6
**background (6)**
5:12;37:1,8;39:1;
45:19;78:13
**bad (3)**
90:25;132:10;
135:13
**balance (1)**
14:23
**ball (1)**
104:16
**base (1)**
76:4
**based (20)**
27:13;40:15;46:12;
52:7;55:10;59:16;
67:16;72:9,17;79:19,
20;87:14;90:10;94:12,
17;100:15;130:12;
136:14;137:9,18
**basement (1)**
18:20
**bases (1)**
142:8
**basically (4)**
33:13;91:3;107:23;
132:17
**basis (11)**
3:19;34:19;46:10;
49:21;56:20;59:19;
77:3;120:19;136:1,6;
137:5
**bathroom (1)**
33:1
**became (1)**

37:15
**become (2)**
31:22;43:4
**becomes (1)**
139:15
**bed (1)**
125:12
**bedside (5)**
31:7,15;32:4;33:7;
61:2
**began (1)**
20:24
**begin (3)**
7:2;20:12;89:23
**behalf (7)**
3:15,16;24:13,22;
25:8,9;72:22
**behavior (11)**
107:2;108:3;110:9;
115:12,13;117:12;
129:6;140:12,13;
141:5,11
**behind (2)**
10:22;22:10
**belief (2)**
60:10;115:9
**believing (1)**
59:24
**bell (1)**
54:20
**below (1)**
23:21
**belt (5)**
124:7;125:12;126:7;
128:9;138:6
**bench (1)**
19:2
**benefit (2)**
85:13;117:18
**best (4)**
16:24;27:5;45:1;
63:12
**bet (3)**
102:19;110:6;
116:14
**better (7)**
42:3;63:16;114:13;
116:15;126:15,25;
127:6
**beyond (4)**
55:20;70:4;75:25;
88:10
**biased (1)**
28:13
**big (4)**
92:23;98:20;106:8;
112:15
**biggest (1)**
44:7
**billed (1)**
5:24
**billing (3)**
5:19;15:16;96:24

**bit (10)**
3:20,24;6:19;7:13;
18:2;28:15;41:18;
43:19;53:18;91:17
**bizarre (2)**
107:2;115:12
**blame (1)**
134:21
**blunder (1)**
109:23
**board (3)**
28:7;96:13;122:21
**body (9)**
132:14,14,17,17;
133:3,4,6,7,11
**bond (1)**
40:17
**bonds (1)**
42:18
**bookends (1)**
55:17
**bordering (1)**
9:5
**both (15)**
8:8,10;11:17;23:16;
25:11,13;44:13;48:1,
25;68:5;75:17;83:9;
126:11;132:15,22
**bothered (4)**
102:11;111:8;116:7;
126:17
**bothers (1)**
113:9
**bottom (1)**
66:20
**boy (2)**
11:18;21:13
**brain (1)**
88:7
**breach (2)**
28:2;29:12
**breached (1)**
52:15
**breaches (3)**
27:7;105:18;113:14
**break (9)**
4:14,15;50:12,14;
68:6;129:14,18;134:6;
142:18
**breakdown (1)**
22:15
**breakfast (1)**
100:8
**breathing (1)**
104:2
**brief (1)**
51:2
**Brighton (1)**
3:1
**bring (2)**
77:15;79:4
**brought (3)**
3:14;141:18,22

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

buck (1)
    135:12
buckets (3)
    33:14,19;46:14
bucks (1)
    131:4
building (9)
    35:19;45:14;66:13;
    67:10,15,23;82:3;
    100:13;140:2
buildings (3)
    36:17;39:5,7
bullet (1)
    66:21
bunch (1)
    23:4
Burkhardt's (1)
    54:19
business (5)
    4:18,22,23,24;111:7

**C**

calculate (1)
    73:21
calculated (1)
    80:5
calculations (1)
    79:23
call (12)
    10:7;12:3;32:9,15;
    48:22;51:25;90:16;
    100:16;103:9;107:16;
    113:25;125:12
called (13)
    3:6;12:19;14:21;
    15:5;31:19;35:2,6;
    80:21;84:5;108:15;
    138:9;140:4,9
calling (2)
    117:10;122:1
came (11)
    26:21;55:17;60:11,
    13;65:11;76:9;82:21;
    88:25;94:23;98:10;
    138:20
can (79)
    6:22;8:18,22;9:22;
    11:3;19:8,9,10,20,
    24;4;25:3;26:10,17;
    30:24;32:9,17,20,22;
    38:17;49:5;52:13;
    53:25;58:19;63:8,13;
    66:1,1,8,21;67:14;
    68:17;69:12,12,13;
    70:11;73:17;74:2,14;
    76:6;77:15,21;79:6,10,
    23;81:17,19,20;86:16;
    88:4;89:7;94:25;
    95:12,19;96:14;99:8;
    100:7;107:18;109:10;
    111:15;112:16;
    113:23;114:7,8,21;

116:1;117:18;121:12;
    127:20,23,24;129:13;
    132:9;133:19;137:14,
    19;140:20;141:3,5,10
candidly (1)
    14:4
capable (5)
    30:3,6,9;59:25;
    132:20
caption (1)
    19:9
care (66)
    9:2;12:7,21,22;
    13:10,18,20;21:21;
    22:4;25:24;27:22;
    31:7;32:4,5,25;33:7;
    35:2,5;40:3;42:11;
    43:23;44:24;45:12;
    47:15,16;48:14;60:17;
    61:1,2;64:21;67:15;
    78:15;79:15;84:5,20;
    85:8;86:24;87:25;
    96:8,17,19;104:19;
    111:16;115:15,17,18;
    121:17;123:2;124:4,
    10,21;126:7,13;
    128:13;130:4;135:12;
    138:7,14,16,19;139:2;
    140:4,10,20;141:4,25
cared (1)
    94:12
career (3)
    20:6;21:14;43:3
careful (2)
    34:13;131:21
caregiver (1)
    33:4
caring (3)
    60:1;67:24;68:14
carried (7)
    101:18;112:22;
    113:1;128:18;132:22;
    134:5;138:20
carries (1)
    97:1
carry (2)
    96:25;138:23
case (68)
    3:14;7:22;9:25;11:4;
    15:12,19;16:17;17:21,
    24;19:7,10;20:11;
    21:11;24:17;25:7;
    26:4,5,11,12,13,25;
    27:3;29:11,12;33:10;
    48:24;49:2,4,9,10,22,
    24;50:17;51:3,24,24;
    52:7;53:3,12;58:7,24;
    63:1;64:14;65:12;
    67:5,25;71:9;72:6,14,
    20;73:25;74:21;76:16;
    77:11;80:16;83:6;
    88:19;95:23;111:11;
    119:12;127:19;

130:25;135:25;
    138:24;139:11;142:3,
    21
caseload (1)
    22:14
cases (27)
    7:25;17:9,13,19;
    19:23;21:15,18;22:2,6,
    8,23;23:2,4,10,16,20;
    25:11,12,15;26:7;36:8;
    47:17;52:1;63:24;
    73:1;87:5;130:11
casual (1)
    102:1
casually (1)
    110:5
categories (2)
    34:13,14
causation (3)
    29:5,9;51:11
cause (6)
    30:4,7,10,11;97:4,10
caused (4)
    29:12;92:6;96:7,19
causing (2)
    93:18;94:5
census (2)
    66:16,18
Center (2)
    35:2;42:12
Centers (1)
    41:14
certain (8)
    5:10;8:22;50:25;
    56:3;65:21;87:6;
    92:16;123:7
certainly (8)
    30:16;44:14;62:8,
    25;63:13;64:8;84:23;
    135:4
Certificate (2)
    55:3,22
certification (2)
    32:2;131:22
certified (5)
    28:21;31:20,22,24,
    24
CFR (10)
    48:5,7;96:22;
    132:16,18,24;133:2;
    135:6;141:23;142:8
challenged (1)
    21:24
challenges (1)
    141:3
change (15)
    43:3;56:21;102:18,
    19;103:4;108:19;
    116:3;117:25;118:16;
    119:22,23,23;123:13;
    131:8;137:17
changed (2)
    41:15;131:17

changes (2)
    99:23;137:13
changing (1)
    22:22
chapter (1)
    46:3
characterizing (1)
    121:11
charged (1)
    98:16
charges (1)
    9:20
Charles (2)
    13:24;14:1
chart (4)
    62:4;106:10;122:5,8
charted (1)
    122:18
charting (1)
    102:21
charts (2)
    127:4,22
Cheboygan (2)
    35:2;42:11
check (7)
    9:17;10:19;54:24;
    101:16;107:5;112:6;
    119:25
checking (2)
    105:16,17
checklist (1)
    102:3
checks (8)
    102:14;103:4,20;
    107:8;109:25;114:25;
    120:10;123:4
chief (4)
    36:4,5,9;40:14
children (1)
    75:2
choice (1)
    139:15
choices (1)
    139:22
choked (1)
    68:3
chopped (1)
    86:18
chronic (1)
    95:8
circle (1)
    49:16
circled (1)
    117:16
circles (1)
    87:24
circumstance (2)
    105:4,25
circumstances (18)
    26:22;27:12;28:1;
    34:10;46:24;47:7;
    51:14,23;52:11,14;
    65:21;68:9;74:18;

87:6;96:9;100:9;
    105:12;114:17
citation (2)
    39:19;40:1
citations (3)
    38:3;39:15;87:19
cite (4)
    86:19;89:3;135:13,
    14
cited (5)
    67:21;105:2;127:24;
    128:5;131:13
citing (1)
    96:24
claims (1)
    74:15
classic (1)
    100:3
clear (5)
    7:16;52:18;53:8;
    62:17;137:25
clearly (2)
    112:10;115:10
Cleveland (2)
    48:24;49:22
clinic (1)
    54:22;55:9,9
clinical (3)
    32:4;33:25;94:7
clinically (1)
    94:10
clinician (3)
    103:25;114:3,14
clinicians (1)
    131:5
close (3)
    22:10;24:19;87:1
closely (2)
    124:19;126:23
clue (1)
    134:14
CMS (5)
    44:6;69:15;79:14;
    133:4,17
CMS's (1)
    44:25
CNA (3)
    65:13;66:4;123:1
CNAs (1)
    66:5
Cole (16)
    3:15;56:9;68:15;
    69:4;74:2,22;92:3;
    93:18;105:23;115:19;
    118:21;125:6;132:1;
    136:7;139:1,19
Cole's (7)
    56:13;97:4,10;
    130:16,25;133:21;
    140:12
collected (1)
    21:4
collective (1)

100:10
**collectively (1)**
138:18
**College (4)**
12:15,25;84:19;85:8
**Columbia (1)**
13:23
**combative (1)**
140:12
**coming (2)**
22:23;23:11
**comments (2)**
83:12;109:24
**communicate (1)**
121:24
**Community (4)**
12:15,24;77:25;
84:19
**comorbid (1)**
95:18
**comorbidities (2)**
96:23,25
**companies (2)**
36:12;133:22
**companion (1)**
142:7
**company (17)**
36:9,10;37:17;
41:11,12;42:4;43:9,16;
71:6,17,18,19;72:18;
132:3,16;133:12,20
**compare (4)**
68:18;80:6,20,24
**comparison (2)**
80:8,12
**comparisons (1)**
81:8
**compendium (3)**
79:6,8;80:22
**competent (1)**
132:19
**competition (1)**
139:18
**competitor (1)**
43:10
**compilation (3)**
86:9;88:3,12
**complaint (4)**
51:21;54:13,14;74:8
**complete (3)**
4:9;55:1;76:3
**completed (1)**
58:2
**completely (1)**
121:23
**complex (1)**
38:22
**compliance (3)**
29:15;51:22;102:1
**complied (2)**
66:23;110:14
**comply (1)**
47:3

**component (1)**
135:21
**comprise (1)**
22:12
**computer (1)**
58:1
**concealment (1)**
136:16
**concept (1)**
87:21
**concepts (1)**
87:1
**concern (3)**
92:23;119:3,8
**concerned (5)**
103:11;136:19;
138:8,9,11
**concerning (1)**
136:23
**concerns (1)**
92:14
**conclude (1)**
114:18
**concluded (1)**
143:6
**conclusion (1)**
30:18
**conclusions (1)**
87:4
**condition (12)**
29:20;92:19;99:23;
102:17,19;103:4;
108:18;116:3;119:22,
23;123:13;131:7
**conditions (3)**
29:17;95:19,20;
96:22
**conduct (4)**
33:20;64:9;98:23;
130:13
**conducted (1)**
98:16
**conferences (1)**
10:4
**confined (1)**
34:2
**confirmed (1)**
64:17
**conflicting (1)**
122:15
**conflicts (1)**
23:24
**confronted (1)**
136:8
**connect (1)**
30:14
**connecting (1)**
30:17
**connection (1)**
72:2
**consider (3)**
27:25;90:4,4
**considered (2)**

96:10;105:9
**consistent (2)**
27:23;109:7
**consolidate (1)**
90:2
**consolidation (1)**
90:5
**consulted (2)**
43:12,13
**consulting (8)**
7:1,3,7,21;8:4;43:7,
9,19
**consults (1)**
54:9
**consuming (2)**
107:3;108:2
**consumption (5)**
65:14,19,20;66:2;
123:1
**contact (1)**
131:20
**contacted (10)**
23:8;50:16;75:22;
107:11,23;109:2;
114:6,17;123:4,8
**contain (2)**
59:5,18
**contained (2)**
61:10,16
**contains (1)**
76:18
**contest (1)**
4:14
**context (1)**
87:22
**continuation (1)**
61:3
**continuity (2)**
138:14,16
**contract (1)**
71:2
**contracts (2)**
39:3;41:4
**contribute (1)**
95:19
**converse (1)**
111:9
**convince (1)**
98:24
**convinced (1)**
100:12
**copious (3)**
110:13,13,13
**copy (3)**
50:10;54:13;76:25
**core (2)**
27:3;45:11
**coronary (1)**
95:12
**corporate (2)**
36:6;87:7
**corporation (1)**
71:21

**correction (1)**
68:23
**corrections (1)**
58:20
**Cost (3)**
71:1;73:5;133:23
**cost-consciousness (1)**
25:19
**Council (1)**
70:20
**counsel (9)**
19:22;52:25;53:22;
55:25;57:12;58:24;
62:16;137:14,19
**count (2)**
18:23;25:3
**country (5)**
25:25;37:4;39:18;
48:2;86:25
**County (11)**
78:1,6,7;94:21;
139:13,17,20;140:1,4,
7,10
**couple (21)**
15:15,21;17:13,14,
16;20:18;23:5,19;
26:19;36:14;39:16,22;
42:1;51:7;99:12;
115:4;123:9,20;
127:24;129:13;142:6
**course (10)**
10:11;12:24;20:6;
55:18;64:10;90:13;
93:6;106:17;108:6;
123:17
**court (4)**
18:9;48:19;93:16;
142:20
**courtroom (1)**
10:10
**covenants (1)**
40:17
**cover (2)**
135:20;137:4
**covered (3)**
87:17;135:24;136:5
**crafted (1)**
48:5
**Craig (2)**
3:13;4:5
**created (2)**
75:7;111:6
**credit (12)**
101:15;109:14;
110:12;112:2,13;
113:5;114:8;123:12;
126:5,9;127:16;128:19
**crept (1)**
47:10
**criteria (2)**
78:21;130:12
**critical (1)**
102:12;103:7,19;

117:9
**criticisms (3)**
135:24;136:1,3
**Crittenden (8)**
54:6,7;55:12,14;
78:1;94:21;114:19;
139:3
**cross-reference (1)**
77:21
**crutch (1)**
96:3
**culminating (1)**
99:25
**cumulative (2)**
83:1;142:11
**curiosity (1)**
74:12
**curious (3)**
51:19;74:16;116:18
**current (2)**
10:1;14:11
**currently (1)**
16:18
**cursive (1)**
91:2
**cursory (1)**
127:10
**CV (3)**
83:22;86:4,8
**cyanotic (1)**
104:2

**D**

**daily (1)**
73:18
**data (15)**
68:17;73:21;79:5,
17;80:4,6,8;81:22;
82:11,13,20;87:16;
88:3;89:6,11
**date (11)**
24:8;35:11;50:18,
21;57:24;58:12;69:8;
74:17;97:16;103:7;
108:13
**dated (3)**
50:20;57:23;58:5
**dates (1)**
114:4
**daubert (1)**
48:23;49:19
**day (34)**
10:10,11;12:24;
35:15,19;36:15,15,18;
64:20;66:2;68:4;
80:18;93:3;96:25;
97:1;98:22;99:18;
101:5;102:12,12;
106:20;107:1,5,24;
108:14;112:25;115:12,
18;116:14;120:9,14;
121:1;123:16;124:18

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

**days (2)**
50:22;62:8
**dayshift (1)**
118:2
**deal (2)**
70:13;73:16
**death (6)**
51:16;55:3,22;68:3;
97:10;104:23
**decent (1)**
79:21
**decide (3)**
44:22;51:5;52:5
**decided (5)**
26:24;42:23;69:19;
85:16;100:5
**declined (2)**
26:7,9
**defend (3)**
94:11;104:19,21
**Defendant (2)**
3:6;24:13
**defendants (2)**
3:14;135:25
**defense (17)**
11:17;14:24;15:3;
19:12;22:16,19,21,23;
23:2,4,10,18;24:23;
25:19;26:3;50:4;95:22
**defer (1)**
24:6
**deficiency (2)**
39:24;82:5
**deficiency-free (1)**
38:10
**define (1)**
67:17
**defined (3)**
60:20;132:24;133:4
**defines (1)**
133:18
**definite (1)**
87:25
**definitely (2)**
53:13;81:8
**definition (2)**
125:9;133:15
**definitions (1)**
87:8
**degree (2)**
31:4,5
**dehydrated (1)**
119:2
**dehydration (8)**
30:10;60:16;62:10;
92:17,24;95:6,17;
99:17
**deliver (2)**
32:17;33:6
**delivers (1)**
45:11
**demand (1)**
8:9

**department (5)**
45:5,10,11,13;70:5
**departments (1)**
45:12
**depend (1)**
32:8
**dependency (1)**
122:14
**dependent (2)**
121:23;122:24
**depending (1)**
22:13
**depends (5)**
32:24;64:4;65:25;
96:9;122:18
**deposition (16)**
3:18;17:12;18:14,
15;24:12;49:12;75:9;
76:20;77:6;78:23;
83:2;88:14;130:11;
142:16,25;143:6
**depositions (10)**
3:22;10:6;18:20;
20:6,12;24:2;28:6;
75:10,12,14
**described (3)**
29:20;99:3;100:19
**describes (1)**
14:6
**description (3)**
52:14;63:11;97:19
**designated (2)**
17:11;23:6
**designed (1)**
45:21
**despite (4)**
16:21,24;122:14;
124:14
**destinations (1)**
10:13
**destroyed (1)**
65:4
**details (1)**
19:19
**determine (3)**
79:17;119:6;130:7
**develop (1)**
44:11
**develops (2)**
96:7,18
**devices (2)**
126:11,13
**diagnosed (2)**
95:1;99:18
**diagnoses (5)**
94:18,20;95:2,7;
99:17
**diagnosis (2)**
30:21,23
**diary (2)**
63:13;75:3
**died (6)**
55:18;98:11;99:19;

104:17,18;112:9
**dies (1)**
104:3
**diet (1)**
32:23
**dietary (1)**
113:23
**diff (1)**
99:18
**different (14)**
21:8,9;22:6;41:19;
53:19;71:15;90:23;
94:16;108:21;111:7;
119:24;133:5,17;142:6
**differently (3)**
104:25;126:3;
127:14
**difficult (1)**
139:15
**difficulty (1)**
17:3
**dig (1)**
56:25
**dining (1)**
68:4
**direct (3)**
12:7;41:5;106:5
**directed (1)**
28:17
**direction (2)**
94:16;135:16
**directives (1)**
122:15
**directly (3)**
6:7;41:22,24
**director (6)**
36:7;43:24;44:5,19;
45:16;70:4
**Discharge (9)**
54:10;64:11;94:22,
25;95:1;106:10;109:3,
3;114:14
**disciplined (1)**
130:8
**Discussion (1)**
15:10
**discussions (1)**
58:20
**disease (1)**
95:12
**dismissing (1)**
108:14
**disseminated (1)**
128:15
**distant (2)**
11:16;55:19
**distinguish (2)**
55:5;117:8
**dive (1)**
77:9
**Diversified (2)**
36:20;37:10
**division (3)**

5:19;37:11,13
**docket (1)**
19:15
**doctor (31)**
30:13,24;66:12;
97:11;98:20;100:8,10,
13,16;101:3,16;
102:14;103:9,10,12,
16,17;107:23,25;
108:1,13,15,24;
112:16;114:15;
117:10;120:8,13,15,
17;138:10
**doctors (7)**
33:21;49:1;55:7;
96:4;112:17;131:20;
135:14
**doctor's (2)**
33:24;107:13
**document (7)**
4:12;57:10;116:21;
122:4,7,9,12
**documentation (12)**
92:20;94:7;97:1;
100:21;102:9;110:1;
112:8,11;116:15,18;
119:8,17
**documented (4)**
115:21,24;116:24;
119:21
**documenting (1)**
121:8
**documents (6)**
52:20;53:21;77:12;
82:24;90:17,18
**domain (1)**
14:16
**dominant (3)**
48:9,10,15
**DON (8)**
44:13;45:9,15;
104:12;122:1,1;134:7;
135:13
**done (42)**
11:2,3,20;13:1;
21:12;25:4;28:3,20;
30:17;33:13;35:21;
49:23;52:22;58:2;
65:20;69:12,16;71:16;
74:24;75:4,4;76:14;
77:11;83:6;87:2;88:6;
89:13;93:4;99:2;
100:22;103:17;104:9;
105:11;109:19;110:1;
120:1,2,4;123:16;
128:13;132:22;136:17
**DONs (2)**
13:11;45:3
**dots (2)**
30:14,17
**doubt (5)**
63:2,5;117:19;
120:1,3

**doubting (1)**
121:19
**down (10)**
25:11,12;26:6,15;
66:20;69:11;108:17;
120:25;131:12;134:7
**Dr (1)**
54:19
**drawing (3)**
94:13;132:5;133:23
**drink (1)**
32:18
**dropped (1)**
104:15
**due (2)**
6:23;8:3
**duly (1)**
3:6
**During (25)**
37:25;51:22;55:17;
61:4,5;69:3,15;70:16,
19,21;77:22;80:2;
100:23;105:2;106:6;
111:15;112:3;123:2,3,
5,16;127:4,22;130:17;
135:2
**duties (2)**
30:15;132:23

**E**

**earlier (7)**
62:2;91:19;97:2;
111:10;117:19;
127:25;128:6
**Early (7)**
31:13,18;91:19,22;
92:4;134:17;141:1
**earned (1)**
9:14
**easier (1)**
86:17
**easy (2)**
77:16;86:16
**eat (1)**
100:17
**eating (1)**
103:5
**edition (1)**
141:23
**education (2)**
11:14,22
**effect (5)**
10:15;11:1;110:17;
120:7;123:15
**effectively (1)**
135:10
**efficiently (1)**
135:10
**effort (1)**
125:5
**efforts (1)**
16:25

**eight (4)**
14:13;37:22;81:2;
142:24
**either (19)**
5:2;25:20;33:16,23;
36:4;51:20;53:11;
56:19;60:17;66:19;
74:10;101:23;111:22;
113:4;118:7;121:6,8;
134:17;141:10
**elder (1)**
12:2
**elopement (1)**
52:8
**else (15)**
12:9;33:3;35:18;
39:11;51:12,12;60:19;
87:11,16;90:20;127:1,
7,18;128:15;141:11
**elsewhere (1)**
135:19
**e-mails (1)**
16:22
**embellish (1)**
92:16
**embellishments (1)**
61:12
**emergency (1)**
31:16
**emphasis (1)**
82:9
**empirical (1)**
89:10
**employed (1)**
43:4
**employee (3)**
5:14;6:14;70:19
**employees (1)**
25:20
**empty (1)**
70:8
**enables (1)**
135:9
**encompass (2)**
55:24;120:19
**encounter (1)**
8:11
**encourage (1)**
100:20
**encouraging (1)**
102:8
**end (9)**
6:3;43:6;56:20;64:8;
97:7;109:22;121:18;
138:15;140:24
**ended (1)**
37:12
**end-of-life (1)**
121:20
**enforce (1)**
46:22
**enforcement (1)**
44:15

**engaging (1)**
50:19
**enjoy (1)**
8:16
**enough (9)**
9:8;19:16;41:13;
69:20;86:13;136:18,
22,25;138:19
**entailed (1)**
139:10
**entire (1)**
8:2
**entirely (1)**
82:12
**entitled (4)**
30:1,22;98:4;134:2
**entitlement (1)**
46:1
**entries (1)**
111:23
**entry (4)**
111:17,23;116:24;
117:2
**equate (1)**
40:2
**equipment (1)**
125:11
**ER (3)**
54:9;104:3;109:8
**error (1)**
68:21
**errors (1)**
52:9
**escaped (1)**
106:11
**especially (6)**
65:14;73:9;96:3,10;
128:9,10
**essence (3)**
27:3;32:9;84:21
**essentially (2)**
92:12;117:14
**establish (1)**
47:15
**establishes (1)**
48:14
**Estate (1)**
3:15
**estimate (9)**
6:22;8:18;9:13;20:5,
16;21:1,12;22:11;24:2
**ethics (1)**
87:13
**evaluate (1)**
130:13
**evaluation (2)**
121:5,6
**Even (36)**
25:12;30:24;31:18,
20;35:18;39:13;44:3;
50:8;55:19;61:23;
62:19;63:5;74:12;
76:10;77:4;79:21;

86:25;87:3;90:22;
94:2;96:22;111:13,17;
112:23,24;113:6,7;
115:12,12,16;117:18;
118:8;120:5,7;122:16,
17
**evening (1)**
117:15
**Everybody (8)**
6:16;19:16;28:9;
38:4;96:13,13;127:18;
128:15
**everywhere (2)**
42:5;112:11
**evidence (3)**
56:12;101:18,23
**exact (1)**
50:18
**exactly (2)**
9:6;65:22
**EXAMINATION (1)**
3:8
**examined (1)**
3:7
**example (10)**
36:16;42:19;46:24;
51:25;67:18;68:8;
69:17;79:7;100:4;
124:15
**except (2)**
48:25;126:13
**exception (2)**
82:9;125:13
**excerpts (1)**
55:15
**exclude (2)**
39:13;50:4
**excluded (3)**
48:19;49:11;50:5
**exclusion (3)**
48:21,22;49:21
**excuse (1)**
140:20
**executive (1)**
87:7
**Exhibit (20)**
18:3,7,14,15;76:17,
20,23,25;77:6;78:22,
23;83:1,2;88:11,14;
89:16;142:11,12,16,23
**exhibiting (1)**
115:11
**exhibits (2)**
142:14,24
**exist (10)**
34:12;46:16;64:14,
17,22,25;65:2,15;
89:16;96:22
**existence (1)**
90:10
**expect (3)**
22:25;93:5;116:17
**expectation (2)**

44:4,25
**expected (4)**
28:4;93:1;116:6;
118:20
**expecting (1)**
23:4
**expenses (1)**
10:12
**experience (3)**
26:2;28:15;59:17
**expert (32)**
3:16;5:2,16,17,21;
6:21,24;7:7,9,14,17;
8:3,7,20,24;9:1,14;
11:10;14:6;15:13;
20:3,7,25;27:16;28:9,
10;43:19;51:10;54:11;
62:22,23;87:2
**expertise (6)**
14:7;34:4;45:16,19;
49:8;51:13
**experts (8)**
25:21,22;26:3;
27:20;48:24;50:4;
85:21;130:1
**expertwitnesscom (2)**
16:9,21
**explain (3)**
9:22;46:25;62:9
**explained (1)**
27:11
**explaining (1)**
43:16
**explanation (5)**
8:1;25:6;49:25;50:7;
58:9
**expressing (3)**
59:6;60:7;61:9
**extend (1)**
65:18
**Extended (2)**
35:5;114:5
**extensive (4)**
77:17;79:2;84:6,17
**extent (18)**
27:22;28:11;33:22;
47:10,18,19;49:12;
54:21;59:8,9;67:8;
74:10;106:8,9;134:11;
137:6;140:25;142:4
**extract (1)**
90:15
**extreme (1)**
92:18
**extremely (4)**
27:21;37:1;39:1;
135:5
**extremes (2)**
82:7,10
**eyes (3)**
102:5,6;125:15

**F**

**F490 (1)**
130:23
**F493 (1)**
132:17
**facilities (35)**
5:7;9:3;21:20;23:14;
28:8;35:14;36:1,11,25;
37:19;38:3,8,14;39:14,
22;40:11,12;41:6;42:8,
18;43:13,17,23,24;
44:18;48:1;65:16;
68:18;70:7;77:22;
80:25;81:3;82:7;
87:25;95:22
**facility (74)**
25:21;27:19;32:5;
33:11;34:17;35:1,21;
36:24;37:22;38:1;
39:25;45:2;46:23,25;
47:2,5,9,21;48:4;49:1,
2;50:1;51:15;52:5;
54:21;60:24;65:17;
67:18;68:1,13,20;69:5,
25;72:23;73:2,16;
78:9;79:9;80:10;81:2,
6,13,21;91:4;92:6;
93:23;96:18,24;98:14;
101:10,24;104:24;
105:6,11;106:6;
108:19;125:8;127:5;
128:11;129:23;131:9,
12;132:21;133:8,8,24;
135:8,15;138:1;139:2;
140:4,7,9,10
**facility's (1)**
93:17
**fact (16)**
23:9;38:16;48:3,6;
58:17;62:19;66:6;
95:21;108:15;112:4;
136:7,20;140:3,10;
141:5;142:5
**factor (3)**
10:8;93:18;94:4
**factors (2)**
30:11;52:18
**failed (1)**
126:25
**failure (2)**
95:5,17
**failures (2)**
130:24;132:12
**fair (7)**
4:10;9:8;41:19;67:3;
69:20;86:13;97:18
**fall (29)**
26:12;27:9,10;
32:14;33:19;43:7,8;
52:17;93:12,12;101:5;
103:14;107:2;115:3,

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

10,11;121:1,7,22;
124:17;125:19,19;
126:16,16,17,18;
127:14;128:20;129:9
**fallback (1)**
44:15
**fallen (1)**
115:8
**falling (2)**
108:3;126:20
**falls (26)**
27:8;33:15;52:8;
93:9,11;101:13,21;
115:3;123:20,22,25;
124:3,11,15,17,23;
125:1,5,6,10;126:18,
21;127:3,8;128:8;
129:2
**fall's (1)**
51:24
**familiar (7)**
16:1;21:24;71:5,11;
72:1,7;139:4
**families (4)**
27:19;28:8;122:11;
139:14
**family (1)**
123:10
**fantastic (1)**
18:13
**far (5)**
18:18;22:15;35:20;
45:10;108:21
**fashion (1)**
113:1
**faster (1)**
63:16
**fatigue (1)**
10:8
**fault (1)**
98:14
**favor (1)**
27:18
**favorable (2)**
26:23;27:2
**Federal (9)**
19:3,3,17;28:21;
45:21;47:14;48:13;
67:8,22
**Fee (7)**
9:21,25;16:15;18:4;
132:5;133:25;134:2
**Feed (1)**
31:15
**feeding (1)**
122:13
**feel (3)**
4:13;27:7,21
**fees (3)**
9:25;10:10;73:12
**fell (1)**
121:1
**felt (5)**

14:22;26:22;27:15;
60:16;75:3
**few (3)**
6:21;9:16;18:22
**fewer (1)**
111:1
**figure (2)**
9:6;91:5
**figures (1)**
9:19
**file (4)**
18:12;55:6;74:8;
90:16
**files (1)**
59:4
**fill (2)**
66:7;102:4
**fills (1)**
63:16
**final (1)**
96:24
**financed (2)**
42:17,19
**financials (1)**
41:1
**find (20)**
3:18,25;4:12;19:20,
21;27:6,18;28:2;
51:12;52:1;57:4;
60:19;69:13;81:20;
85:4,22;87:10;90:1;
112:12;136:13
**finding (2)**
15:13;32:17
**findings (7)**
87:20;88:4;136:4,5,
6;137:4,5
**Fine (4)**
42:4,24;57:1;105:22
**fines (1)**
131:18
**fired (3)**
43:22;134:25,25
**firm (6)**
11:2,4;17:5,10,13;
50:19
**firms (2)**
10:25;23:5
**first (17)**
3:6;7:22;20:11;
22:18;51:14;61:5;
62:9;64:11;74:4;
89:18;90:10;92:24;
93:6;99:22;109:11;
115:13;130:18
**fit (1)**
34:12
**fits (2)**
25:25;100:3
**five (25)**
6:25;7:4,6;8:13,14;
9:10;13:12;14:19;
15:24;16:10,21;17:15;

20:17;22:21;39:21;
49:15;62:8;63:21;
64:1;68:5;80:22;81:3;
82:7;86:11;109:11
**fix (1)**
39:4
**fixed (1)**
39:11
**flag (1)**
89:2
**flood (1)**
18:20
**floor (4)**
66:13;70:8,14;111:1
**fluctuated (1)**
22:18
**fluid (3)**
65:19;66:1;93:2
**fluids (3)**
100:20;102:8;107:3
**follow (2)**
33:23;46:9
**followed (2)**
22:9;120:15
**following (5)**
43:8;60:14;124:10,
21;129:8
**follows (1)**
3:7
**food (4)**
65:19,20;66:1;123:1
**food/fluid (1)**
65:14
**forgive (2)**
77:13;98:7
**forgot (2)**
24:20;77:14
**form (9)**
27:22;32:10;92:18;
102:18,19;108:19;
110:6,9;116:4
**formal (1)**
88:6
**formally (2)**
41:10;42:5
**format (1)**
80:15
**formed (1)**
77:2
**forms (3)**
102:17;123:13;
127:13
**formulate (1)**
89:24
**for-profit (1)**
140:6
**forth (8)**
6:19;12:18;14:8;
43:17;63:15;69:19;
131:5;132:6
**forward (2)**
20:16,21
**foster (1)**

21:21
**found (7)**
8:7,11;36:15;53:6;
55:6;90:18;139:24
**Foundation (2)**
40:8;42:14
**four (10)**
6:25;16:9,21;17:14;
19:5;37:23;62:7;64:5;
69:10;80:22
**free (3)**
4:13;39:24;82:5
**frequency (1)**
20:13
**frequent (2)**
22:8;96:12
**frequently (3)**
38:8;111:22;115:20
**Friday (2)**
100:6,17
**front (7)**
13:9;19:3;76:7;
89:25;90:8;92:10;
137:18
**fulfill (1)**
132:23
**full (5)**
3:10,18;4:9;59:18;
120:19
**full-time (1)**
20:22
**fully (1)**
98:21
**function (1)**
45:25
**furthest (1)**
125:22

**G**

**gangrene (1)**
52:1
**gap (1)**
117:9
**gaps (5)**
63:16;98:20;102:24;
104:10;110:15
**garnered (1)**
56:6
**gather (1)**
11:24
**gave (11)**
4:9;8:23;9:5,21;
12:11;17:3,18;26:25,
25;60:20;114:7
**gears (1)**
129:15
**general (1)**
33:5
**generally (5)**
10:5;34:1;46:12;
66:5;90:13
**General's (1)**

129:25
**generate (2)**
5:22;90:11
**generated (6)**
70:16,19,21;74:14;
75:15;78:14
**generates (2)**
79:5,14
**generation (1)**
76:10
**gentlemen (1)**
72:9
**George (1)**
3:15
**Georgia (6)**
40:15;41:16;71:11,
23;72:9,17
**GERD (1)**
95:11
**gets (6)**
33:20;90:25;98:8;
108:6;128:14;135:15
**given (12)**
3:21;20:6,16;24:3,
12;74:10;76:12;79:10;
107:9;110:12;113:5;
130:12
**givers (1)**
12:8
**gives (1)**
9:19
**giving (3)**
20:12;103:10;
139:13
**glad (1)**
138:17
**glean (1)**
73:7
**goes (7)**
29:19;64:8;66:20;
99:16;100:5;103:24;
124:18
**Good (25)**
3:10;38:24;42:19;
45:5,6;58:6;68:24;
72:11;75:13;80:14;
99:14;102:17;111:19;
112:21;115:9;127:9,
11;128:16;138:4,11,
15,16,18,24;142:5
**gosh (3)**
15:23;37:22;71:7
**governing (9)**
132:13,14,16,17;
133:2,4,6,7,11
**governmental (1)**
140:11
**gown (3)**
110:21;111:5;
113:21
**granted (1)**
78:14
**gravity (3)**

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

81:5;103:12;108:1
**great (6)**
44:14;49:18;73:16;
101:19;109:18;112:15
**greater (2)**
93:11;130:4
**greatest (1)**
45:2
**ground (1)**
3:24
**group (2)**
12:17;21:23
**groups (1)**
22:10
**guess (14)**
5:15;6:11;7:9;11:9;
14:4;32:15;35:1;
50:21;51:5;64:23;
79:4;118:14;124:7,22
**guessing (3)**
17:16;108:24;110:8
**guy (2)**
104:11;126:20

**H**

**H&P (1)**
54:9
**habit (1)**
58:11
**half (6)**
7:13;10:17;14:12,
15;43:14;81:3
**Hampshire (1)**
40:20
**hand (1)**
18:23
**hands (1)**
125:15
**hands-on (1)**
33:6
**handwriting (3)**
82:23;90:23,25
**handwritten (4)**
61:16;76:25;77:2;
90:9
**happen (1)**
96:14
**happened (22)**
27:10;42:13;51:16,
18;64:7;92:10;96:1;
98:25;99:1;101:9;
104:5,21;106:14,25;
109:21,22;112:4;
124:7;131:21;134:24;
135:4;138:15
**happening (2)**
103:13,20
**happens (4)**
63:11;64:3;100:1;
130:8
**happy (1)**
4:7

**hard (1)**
7:10
**harm (2)**
81:4;126:19
**head (1)**
101:2
**Health (15)**
13:10,18,20;35:2;
36:21;37:11;40:8;
41:18;42:11,14;43:10;
78:15;79:15;85:8;
86:24
**hear (1)**
141:6
**heard (3)**
16:5;42:24;44:6
**hearing (1)**
49:19
**hearings (1)**
19:3
**heavily (1)**
90:7
**held (9)**
15:10;29:14;32:2;
92:22;93:23;94:9;
95:24;105:19;113:14
**help (8)**
31:14;32:20;33:3;
37:3;40:13;41:9;
82:12;85:11
**helped (1)**
36:2
**helpful (1)**
66:16
**helping (2)**
43:15;44:10
**helps (3)**
5:15,17;127:5
**Here's (2)**
103:19;113:17
**high (11)**
13:11;31:13;79:22;
101:13;115:3,11;
124:14,17;126:1,3;
127:2
**higher (2)**
9:18;134:1
**highlighted (1)**
90:17
**himself (7)**
101:2,8;103:6,14;
107:2;124:9;126:19
**hire (2)**
132:19;134:21
**history (9)**
17:24;18:8,18;
24:21;39:9;49:11;
101:20;115:2;142:21
**hit (1)**
140:23
**hitting (4)**
101:1;103:5,14;
107:2

**hold (2)**
29:1;132:24
**holds (3)**
48:17;133:2;135:6
**home (20)**
22:4;34:9,16;35:9,
10;37:6;39:4,18;
51:15;54:2,6,17;55:12;
78:6;88:2;89:8;93:20;
99:24;139:12;140:1
**homes (23)**
5:6;8:25;12:9,22;
21:16,23;22:7,9,10,12;
23:21,22;36:3;37:2,4,
9;39:2,11,13;43:25;
89:10;139:24;142:7
**honest (1)**
112:24
**honestly (1)**
87:1
**hoops (1)**
85:16
**hope (2)**
102:6;118:1
**hopefully (1)**
132:19
**hoping (1)**
125:21
**hospice (2)**
96:11;121:15
**hospital (20)**
29:19;54:3,3,4,7,8;
55:5,14;64:11;91:18,
21,23;92:3;93:19;
94:18;21;98:11,12;
99:16;108:7
**hospital/nursing (1)**
54:16
**hospitalization (3)**
60:14;92:7;94:5
**hospitalized (1)**
60:15
**hospitals (3)**
22:5;89:9;92:15
**hour (5)**
10:5,6;98:19,19;
125:17
**hours (8)**
10:8;13:12;98:12;
103:6,21;109:11,12;
125:17
**house (2)**
8:6;43:2
**Howell (1)**
4:20
**H-o-w-e-l-l (1)**
4:20
**HPPD (4)**
69:6;73:21;80:3,18
**huge (3)**
89:2;102:24;109:23
**hunch (1)**
115:1

**hundred (2)**
63:24;78:4
**husband (1)**
136:9

**I**

**I&O (4)**
66:10,12;111:21,22
**I&Os (1)**
100:22
**ICFMRs (2)**
21:25;22:3
**idea (4)**
13:4;21:13;112:21;
115:10
**ideas (1)**
128:16
**identification (7)**
18:16;76:21;77:7;
78:24;83:3;88:15;
142:17
**identified (2)**
3:16;134:17
**identify (1)**
118:10
**identifying (5)**
116:8,10,11,12;
130:19
**IDR (1)**
131:16
**ie (1)**
121:25
**II (1)**
83:25
**IJ (1)**
105:22
**Illinois (1)**
24:17
**imagine (2)**
62:23;103:16
**Immediate (8)**
78:11,18;79:11;
80:25;105:3;130:22;
131:19;132:10
**immediately (1)**
10:3
**impact (1)**
62:25
**implemented (1)**
125:5
**important (11)**
27:21;44:22;47:22;
57:10;62:21,24;64:13;
85:4,13;116:1;134:9
**impose (1)**
112:18
**impossible (1)**
38:20
**impression (2)**
64:24;72:18
**improper (1)**
96:19

**inaction (1)**
93:17
**inactions (1)**
92:6
**inadequate (1)**
40:3
**inappropriate (1)**
107:25
**inappropriately (1)**
140:18
**in-between (5)**
35:24;82:9;102:25;
103:23;109:13
**inching (1)**
22:25
**incident (2)**
53:15;56:9
**include (1)**
76:8
**includes (1)**
18:4
**including (4)**
19:5;21:9;82:21;
131:7
**income (11)**
5:22;6:18,23;7:7,8,
17,20;8:2,19;70:24;
73:11
**incontinent (1)**
119:1
**independent (1)**
21:21
**Indiana (12)**
36:2,16;40:22,22;
41:7,25;42:5,8,18;
71:8;130:1,2
**indicate (2)**
19:11;24:21
**indicated (2)**
26:6;75:21
**indicates (1)**
24:25
**indicator (2)**
82:6;111:20
**indictment (1)**
130:21
**Indirectly (1)**
106:1
**individual (1)**
94:14
**individuals (5)**
14:5;71:20;85:21;
94:15;112:7
**industry (9)**
8:5;20:23;38:23;
47:22;85:3,6,12,22;
128:24
**inform (1)**
131:20
**information (22)**
11:24;50:23;52:24;
57:17;59:8;62:3;
67:12;69:1;70:1;73:7,

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

23;75:18,24;78:8,12;
80:6,15;83:12;85:11;
97:18;136:18;137:1
**informed (1)**
104:20
**initial (5)**
50:18,24;51:6;
52:23;53:23
**injuries (7)**
106:4;115:8;123:23,
25;125:6;128:8;
136:14
**injury (3)**
29:13;51:17;124:12
**inquired (1)**
19:25
**in-service (1)**
70:16
**instance (2)**
115:20;116:23
**instead (4)**
50:3;69:7;102:22;
125:17
**institutional (4)**
33:18;34:6,8;46:18
**insufficient (1)**
68:12
**intake (5)**
30:12;74:9;93:2;
108:17;122:23
**intake/output (1)**
123:15
**intend (3)**
59:6;60:6;83:11
**intense (1)**
108:21
**intentions (1)**
99:14
**interaction (1)**
74:15
**intercept (1)**
70:12
**interest (2)**
23:8;88:9
**interested (6)**
12:10;25:22;49:17;
70:15;74:19;75:16
**interesting (3)**
78:10;128:11;
139:11
**interests (1)**
140:8
**interim (1)**
34:19
**internal (12)**
33:22;46:19;47:21,
25;48:8;53:15;56:12;
60:6;74:8;102:23;
133:1;136:10
**Internet (1)**
53:5
**intervention (4)**
112:13;114:9;

115:23;119:20
**interventions (10)**
110:19;125:4,23;
126:5,8;128:21,22;
129:1,7,8
**interview (1)**
74:22
**interviewed (1)**
75:1
**into (21)**
5:9;27:9;32:10;
33:15,19,20;39:5,8;
47:10;50:13;69:13;
77:9;84:17;90:9,19;
98:9;100:4,5;104:1;
122:16;124:3
**introduced (1)**
95:10
**invasive (1)**
66:9
**investigate (1)**
106:7
**investigated (1)**
131:3
**investigation (2)**
65:9;136:10
**investigations (2)**
53:15;56:12
**involve (1)**
105:23
**involved (1)**
71:12
**involvement (5)**
23:12;25:8;74:20,
21;75:7
**involving (4)**
51:20;72:21;73:1;
134:12
**irresponsible (1)**
64:18
**isolate (1)**
115:5
**isolation (11)**
101:11,20;102:7;
105:15;107:7,13;
110:20;113:10,19;
114:10;115:2
**issue (9)**
49:3;51:17,17;61:8;
76:9;100:25;128:4;
140:23;141:11
**issued (2)**
6:3;58:2
**issues (28)**
14:7;27:3;29:22,22;
42:22;44:12;52:4;
53:9;60:16;62:11;
67:4;70:2,13;94:7;
105:14;111:3;113:12;
115:25;122:10,14,23;
130:17;135:20;
136:15;140:13;141:2,
3,17

**itemize (1)**
53:25
**IV (11)**
103:10,20;106:21,
24;108:10,11,16;
110:18;111:24,24;
123:17
**IVs (3)**
114:11;116:12;
138:12

**J**

**Jeopardy (8)**
78:11,18;79:11;
80:25;105:3;130:23;
131:19;132:10
**job (9)**
31:17;40:19;41:2;
44:9,17;132:5;134:4,8;
135:19
**jobs (1)**
93:2
**JOHNSON (16)**
3:9,13;15:9,11;
18:17;50:15;76:22;
77:8;79:1;83:4;88:11,
16;129:19;142:10,19;
143:2
**journal (6)**
84:1,3,14,24;85:7;
86:1
**journals (6)**
11:18;14:19,20;
15:7;83:21;85:5
**judge (2)**
19:3;50:5
**July (13)**
60:14,25;61:22,22,
22;91:19,22;92:4;
93:19;94:5,21;97:5;
127:25
**jump (1)**
29:9
**jumping (1)**
94:11
**jumps (1)**
10:9
**June (3)**
12:16,17;84:20
**jury (2)**
19:2;21:7
**justified (1)**
95:25

**K**

**keep (4)**
19:14;50:25;65:16;
76:15
**keeping (1)**
12:21
**Kentucky (14)**

21:10;34:3;65:17;
67:1;77:14;78:1;
79:11;80:2,10,18;81:7;
132:8;141:19;142:5
**kept (3)**
59:24;60:10,25
**key (1)**
127:12
**kick (1)**
123:17
**kids (2)**
8:6;43:1
**kind (17)**
19:19;23:17;51:15;
52:7;63:10;66:20;
79:9;84:6;98:22;
105:20;116:18;
123:23;124:2;129:12;
132:2;139:11;140:4
**kinds (6)**
7:15;8:14;64:9;
81:22;99:19;101:13
**kitchen (1)**
32:23
**knew (14)**
17:22;34:22;37:14;
41:8;42:1,3;51:13;
57:25;71:22;105:24;
106:14;108:1;112:24;
120:6
**knowledge (2)**
16:15;140:15
**known (3)**
85:21;108:5;129:1
**knows (1)**
96:13

**L**

**lack (2)**
96:8;124:13
**Lance (14)**
3:11;5:1,4,14,22;6:4,
6,14,17;12:12;42:4;
92:10;98:10;104:8
**language (1)**
46:3
**lap (5)**
124:6;125:12;126:7;
128:9;138:6
**large (1)**
108:22
**largest (1)**
45:10
**last (35)**
3:11;5:10;6:12,20,
25;8:13;12:11;15:24;
22:20;23:10,19;24:15,
16;25:8;26:19;34:15,
18;35:8,21;36:8;
55:19;62:6,7;64:5;
69:18;70:3;73:10;
87:2;106:20;107:1;

114:19;126:18;129:15,
20;140:24
**lastly (1)**
141:18
**later (2)**
50:2;103:6
**launch (1)**
43:15
**law (3)**
10:25;17:13;50:19
**laws/regulations (2)**
34:11;46:16
**lawyer (1)**
133:9
**Lawyers (1)**
15:1
**leaping (1)**
94:16
**learn (1)**
8:15
**learned (1)**
8:13
**least (7)**
11:19;21:7;55:14;
76:15;102:3;118:1;
121:4
**leave (2)**
43:21;138:5
**leaves (2)**
101:22;129:12
**lecturing (1)**
88:9
**left (7)**
37:12,17,18;40:5;
43:5;124:5,6
**left-hand (1)**
97:16
**legal (4)**
7:3,22,24;133:15
**legally (1)**
133:7
**less (7)**
7:3,3,9;17:15;24:4;
125:25
**lethargic (1)**
118:8
**letter (4)**
50:19,24;52:23;
53:23
**letters (3)**
10:18;16:22;54:19
**level (7)**
38:14;77:23;93:11;
108:21;115:23;
120:16;127:11
**levels (2)**
80:1;119:19
**liability (3)**
29:22;51:10;52:4
**libraries (1)**
12:3
**library (2)**
77:18;79:3

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

**license (2)**
35:12;130:7
**Licensed (5)**
31:4;35:9,17,20;
36:18
**Licensing (1)**
45:20
**life (1)**
121:19
**lifetimes (1)**
8:15
**lifted (1)**
32:7
**light (2)**
32:9,16
**liked (2)**
8:8;141:15
**likely (5)**
39:18;52:11;89:1;
109:20;119:6
**likewise (1)**
30:20
**limine (1)**
48:20
**limit (1)**
113:20
**line (5)**
61:19;79:6;111:4;
115:6;118:18
**list (13)**
24:6,8;25:3;62:18;
73:24;75:23;76:7;
86:5,6;87:12;95:12;
125:18;132:15
**listed (6)**
10:1;49:11;53:3;
86:3,7;106:9
**listing (3)**
18:18;19:6;55:2
**Lists (2)**
94:23;132:16
**litany (1)**
95:7
**little (13)**
3:20,24;6:19;7:13;
18:2;28:15;41:18;
43:19;53:18;75:8;
91:17;97:17;133:17
**lived (2)**
40:16;139:19
**living (9)**
5:7;9:2;12:22;21:19,
21,21;22:9;41:14;88:2
**local (2)**
25:22;26:3
**long (18)**
8:5;10:14;11:8,20;
14:9;38:17,24;44:23;
62:9;83:18,22,23;84:9,
11;99:19;104:3;107:3;
108:2
**long-term (12)**
9:2;32:5;43:23;

44:23;47:16,16;84:5,
20;87:25;96:17;139:2;
141:25
**longwinded (1)**
105:21
**look (77)**
9:15;25:2,20;27:4,5,
13,20,24;28:11;29:14;
41:1,2;46:15;47:6;
48:3,5;51:14,23;52:10,
16;54:2,23;55:8,20;
63:8,13;64:9;66:22;
68:17;73:10;79:24,25;
80:19;81:5;82:1,2,2,7,
7,8,10,11,19;83:7;
90:4;92:8,20;93:7;
94:6;95:9;96:21;98:5;
99:16,21;100:24;
105:1;106:1;110:19;
111:20;114:21;
116:13;120:22;
121:16;122:18;
125:21;127:12;129:4,
23;130:9,9,24;131:1;
132:9;133:5,6;135:11,
16
**looked (15)**
26:13,21;56:17;
80:16,17;81:11;
110:15;111:19;
112:11;113:15,16;
119:14;126:16;131:16,
18
**looking (10)**
19:21;26:1;51:11;
71:24;73:7;95:13;
102:4;109:9;132:11,11
**looks (7)**
78:2;90:23;91:10;
97:15;98:4;116:11;
142:12
**loose (1)**
89:17
**losing (1)**
73:15
**loss (1)**
70:24
**lost (4)**
42:20;65:4;91:23;
131:22
**lot (60)**
5:6;7:1,24;14:25;
22:23;23:20;24:18;
25:13;27:20;32:13;
33:11,12;36:11,25;
39:3;40:13;41:8;
42:20,25;43:14,18;
46:2,4;48:6;53:1;64:6;
67:23;69:15;70:2,7;
73:9,13,15,17;79:5,18;
82:8;90:18;95:21;
96:3;105:7,18;106:2,4;
109:13;110:22;

115:16;116:17,20;
122:15,22;130:24;
131:6,25;132:25;
135:18;138:2,17;
139:14,18
**lots (2)**
113:13;138:23
**Louis (3)**
13:23,24;14:1
**Louisville (1)**
37:6
**low (4)**
38:14;73:14;124:25;
125:12
**ltceducationbylancecom (2)**
11:13,21
**lucky (2)**
124:8;128:7
**lunch (1)**
100:17
**lungs (1)**
100:23
**lying (1)**
38:19

**M**

**Mackinaw (1)**
35:3
**magazine (6)**
15:2;84:4,4,8,9,16
**Magistrate (4)**
18:24,25;19:4;21:3
**main (1)**
119:3
**maintain (1)**
62:13
**maintained (1)**
11:7
**major (1)**
115:5
**makes (3)**
113:7;140:3,6
**making (3)**
73:13;85:23;106:2
**manage (4)**
40:13;43:17;141:10,
13
**managed (13)**
21:22,23;35:10,16;
36:1,12,15,25;40:24;
73:16;133:1,22;141:14
**management (25)**
12:4,6;13:13,15;
36:12;41:3,10,12;42:3;
43:15;69:25;71:2,19;
72:16;73:12;84:6;
121:25;132:2,3,5,16;
133:12,20,22,25
**manager (3)**
40:18;45:4,5
**managerial (1)**
70:11

**managers (2)**
70:6;104:13
**manages (2)**
8:21;45:4
**managing (3)**
37:8;40:25;131:15
**manner (2)**
130:20;135:9
**Manual (1)**
141:25
**manuals (1)**
47:12
**many (21)**
13:4;15:24;17:8,11;
20:5,15;21:1;23:23;
24:2,17;25:4;37:19;
67:9,10;79:8,10;80:24;
81:1,3;124:14;132:8
**map (1)**
122:17
**MAR (2)**
110:16;111:19
**March (1)**
61:21
**mark (6)**
18:13;76:17,23;
78:22;83:1;88:11
**marked (9)**
18:15;76:20;77:6;
78:23;83:2;88:14;
89:15;142:16,23
**Massachusetts (1)**
40:21
**material (1)**
56:6
**materials (6)**
53:6;55:10,24;
59:16;137:12,18
**matrix (2)**
66:7;102:3
**matter (4)**
47:5;67:9;110:14;
138:17
**may (14)**
3:18;30:13;47:10;
53:14;56:6,7;68:7;
77:4,11;83:23;109:20;
111:17;119:20;131:5
**maybe (36)**
5:9;6:12;7:10,13;
8:25;15:25;19:19;
20:17;22:20;23:1;
24:4,11,16;27:25;
28:12;32:7;38:11;
52:3;54:25;55:17;
65:19;75:3;82:9,20;
104:14;113:11;
114:12;118:17;121:4;
125:25;126:1;134:1,1;
135:3;139:6;140:25
**McDonald's (1)**
68:8
**MD (1)**

108:17
**MDS (3)**
56:16,21;121:18
**MDSs (2)**
56:24;57:9
**meal-to-meal (1)**
122:13
**mean (30)**
17:7;25:10,11;26:7;
28:7,7,9;32:8,19;38:9;
39:7;45:18;51:25;
53:10;57:16;63:2;
64:21;81:11;85:15;
87:8;89:10;91:24;
96:6;98:14;113:15;
118:19;128:11,24;
129:1;139:18
**meaning (2)**
17:14;60:13
**means (2)**
115:17;134:14
**meantime (1)**
40:25
**measuring (1)**
29:15
**Medicaid (2)**
45:22;73:5
**Medical (20)**
5:13;19:1;29:3,16,
22,24;43:24;44:4,11,
14;45:15,19;47:11;
54:5;63:8;74:3;75:22;
92:2;95:19;96:11
**Medicare (10)**
45:22;73:5,9,10,11,
12;77:23;79:5;80:8,21
**Medicaregov (4)**
69:13;81:12,14,24
**medication (1)**
52:8
**medications (1)**
32:12
**meds (2)**
111:25;140:19
**meet (3)**
19:17;26:14;78:21
**meeting (2)**
70:19,20
**member (1)**
121:25
**memory (1)**
4:14
**mentally (1)**
21:24
**mention (3)**
23:6;72:12;137:24
**mentioned (10)**
14:18;66:18;71:4;
73:18;79:2;83:16;
88:17;111:9;113:6;
123:20
**message (1)**
131:14

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

**met (2)**
33:22;95:25
**Metro (7)**
40:8;41:12,18,24;
42:14;43:5,21
**Michigan (19)**
3:1;4:20;23:7,12,14,
18;28:18;34:21;36:2,
17;37:23;40:21;42:2,
10,11;67:19;71:9;
72:14,21
**middle (2)**
3:11;68:3
**might (30)**
7:23;9:16;16:23;
22:25;24:9;25:1;
26:12;29:8;33:3;
41:13,15;47:12;52:12;
54:18;55:6,8;59:9,12,
12;89:23;110:8;112:5,
7;113:4;118:25;119:2;
120:7;124:19;134:25;
139:7
**military (1)**
117:6
**million (1)**
134:1
**mind (1)**
50:13
**minimum (1)**
10:7
**minutes (10)**
70:19,20;102:6;
105:17,18;110:6;
111:6;113:3;120:11;
129:13
**missing (9)**
53:3,9,14,16,17;
56:18;59:11;65:7;
91:14
**Missouri (4)**
13:9,18,21;86:24
**mix (2)**
7:2,12
**mixed (1)**
23:17
**moment (1)**
98:22
**money (4)**
26:19;42:20;73:14,
15
**Monitor (1)**
113:2
**monitoring (4)**
102:21;103:1;
109:14;117:13
**month (3)**
23:10;34:17;81:20
**months (6)**
63:19,21;83:21;
84:10;86:15;127:25
**month's (1)**
64:1

**more (50)**
7:2,2,13,17,20;8:12;
9:17;11:10,19;17:15;
20:12;23:11,20;24:4;
25:15,18,20,22;26:3,3;
27:13;38:25;39:10,21,
23;45:9;52:11;61:1;
71:12;89:1;90:5,6;
95:8;103:21;104:9;
109:20;115:1,16,20;
119:6;121:5;124:12,
19;126:23;129:5;
136:13;137:7,21;
140:22;141:15
**morning (1)**
3:10
**most (14)**
9:14;13:19;22:7;
26:19;37:8;38:13,14;
48:3;62:7;112:17;
115:24;124:23;
126:17;129:3
**mostly (3)**
20:24;23:11,22
**motion (1)**
48:20
**motions (1)**
49:5
**motivation (1)**
114:24
**move (1)**
42:23
**movement (1)**
126:16
**Mrs (2)**
136:7;139:19
**MRSA (6)**
30:7;99:18;101:6;
107:17;114:10;116:10
**much (9)**
7:6;23:16;98:1;
100:17;104:9,25;
114:8;119:3;142:7
**must (1)**
120:12
**myself (6)**
23:24;27:25;29:21;
31:24;53:7;89:22
**mystery (1)**
59:3

**N**

**name (19)**
3:10,11,11,13;14:16;
16:16,19;17:6,21;
19:23;35:1,4;42:7;
43:11;49:14;71:17;
81:15;84:3;91:5
**names (8)**
42:7;71:24;72:1,8,
11,11,12;127:21
**narrated (1)**

74:3
**narration (2)**
59:10;105:20
**narrative (9)**
27:4;53:16;61:19,
21;62:2;63:12,17;
113:6;127:12
**nasty (3)**
98:13;131:18;132:7
**nature (8)**
19:15;28:19;29:16;
39:5,10;59:15;95:8;
139:8
**neat (1)**
13:25
**necessarily (7)**
40:2;69:17;77:3;
82:6;107:12;118:5,9
**necessary (5)**
44:5;60:12;69:2;
73:21;85:2
**need (18)**
4:12,14;32:17,25;
45:1,3,5,6;46:1;56:24;
60:5;62:5,6;66:5;
67:21;85:3;90:3,3
**needed (5)**
14:22,23;27:15;
62:17;126:9
**Needless (1)**
69:1
**needs (7)**
32:16;60:18;62:18;
67:15;116:12;122:19;
128:13
**neglect (15)**
12:2;13:9,15;59:21;
67:15;86:22,23;87:9;
88:24;89:1;105:6;
121:11;130:20;
134:13;136:9
**negligence (3)**
47:16,17;48:11
**Negligent (11)**
12:20;59:23;60:3,
19;61:7;83:17,24;
87:21;88:5,18;141:7
**neither (1)**
60:19
**net (1)**
73:11
**New (3)**
40:20;61:14;129:8
**next (7)**
51:4;52:13;61:19;
65:13;103:6;117:2,8
**Nice (2)**
71:25;78:2
**nightshift (1)**
118:6
**nighttime (1)**
118:13
**nine (1)**

14:13
**Ninety-seven (1)**
35:23
**Ninety-three (1)**
78:3
**NN (1)**
91:11
**nobody (2)**
33:2;122:20
**noncompliant (1)**
52:3
**None (4)**
52:18;71:25;104:13;
122:2
**non-harm (1)**
38:14
**nonprofit (2)**
40:16;79:13
**non-profit (1)**
36:10
**non-risk (1)**
115:25
**normal (1)**
119:22
**normally (4)**
53:14;57:7;58:6;
95:10
**North (1)**
9:11
**northern (1)**
34:21
**Nos (1)**
18:15
**note (10)**
98:2;103:3,6,22,22,
23;106:22;108:13;
117:11;137:21
**notes (62)**
27:4;50:25;53:16;
59:20;61:11,16,20,21;
62:3,9,25;63:12,17,22;
64:2,4,14;75:4;76:15,
18;77:1,2;89:15,18;
90:9,20;91:8,12,13,14;
94:3;97:16,24;98:1,3,
7;99:8;100:20;101:4,
23;102:10,24;107:19;
108:5;109:10;110:13;
111:12,14,18;113:2,6;
115:16,22;120:13;
121:9;122:10;123:5,9;
125:18;127:13;
140:17;141:16
**note's (1)**
77:9
**Notice (5)**
10:22;117:10;
124:16;137:15,20
**noticed (2)**
58:7;59:3
**notified (6)**
98:20;106:17;108:8,
17;109:2;123:10

**November (1)**
3:2
**nowhere (1)**
52:17
**number (9)**
8:23;19:15;21:11,
17;77:13;79:12,22;
80:9;115:8
**numbers (17)**
67:7,11,13,14;68:9,
12,14,15;69:3,14,18;
79:20,20;80:12,20;
81:9,10
**numerous (1)**
3:22
**nurse (28)**
12:6;30:24;31:1,2,4,
7,8;34:2;45:1,2,4;66:8;
70:14;100:14;103:22;
104:13;106:23;112:21,
23;114:24;116:23,24;
118:3,20;119:5,5,8,9
**nurses (22)**
5:9;12:4,5,18;33:21;
45:6;68:5;69:8;70:4,8;
87:14;96:4;102:6;
105:17;112:24;
114:16;120:5,6;
128:12;134:3;138:5,20
**nurse's (31)**
27:4;31:10;32:2;
53:16;61:19,21;62:2,9;
63:12,17,22;64:2,4;
66:17;91:12,13;94:2;
97:24;100:20;101:23;
102:24;103:3,22;
107:19;109:10;
110:13;113:2,6;
125:14,22;127:12
**nursing (42)**
5:6;8:25;12:9,22;
21:16;22:7,9,12;23:21,
22;32:11;33:9,12;34:1,
9,16;35:9,10;39:18;
43:25;44:19;45:4,8;
51:15;54:2,6;55:11;
69:20;70:16;78:6;
88:2;89:10;93:20;
94:15;99:24;111:12,
18;115:21;139:12,24;
140:1;142:6
**Nursinghomecompare (2)**
81:16,18
**nursinghomeinsidercom (2)**
11:8;14:3

**O**

**OBRA (6)**
38:23;44:3;47:23;
67:20;99:13;126:11
**observation (1)**
116:5

obtained (2)
19:23;77:12
Obviously (11)
29:5;46:6;80:13;
82:4;91:18;99:8;
114:14;130:15;132:3;
133:5;139:9
occasion (3)
63:25;74:24;124:5
occasions (3)
3:22;51:7;123:21
occur (2)
89:1;130:16
occurred (4)
46:11;70:3;115:9;
134:16
October (6)
50:20;99:3,4;
115:21;116:23;117:23
odd (2)
16:13;38:7
Oddly (1)
41:13
Off (10)
15:9,10;16:13,24;
17:2;20:21;76:24;
79:6;110:25;142:13
offer (7)
12:1;29:9,18;60:2,
23;83:11;115:1
offering (2)
29:16;80:3
offhand (3)
15:20;17:22;42:9
office (2)
40:15;130:1
officer (3)
36:5,10;40:14
offices (1)
35:15
often (1)
23:25
Ohio (4)
49:9;71:8;72:17;
78:3
OIG (3)
56:14;136:12,14
old (3)
10:23;140:2,3
on/or (2)
106:19,20
once (6)
37:6;98:2;101:20;
113:19;123:16;125:13
one (86)
8:8,9;9:14;10:18;
12:3,4;13:6,7,8;14:11,
12;15:20;16:1,23;
17:12,18;18:23;23:11;
24:9,11;26:20;27:10,
24;33:19,22;37:15;
38:11;39:7;42:1;
45:24;48:1;49:17;

52:16,17;54:18;55:18,
19;56:5,5;57:5;61:11;
65:13;68:20,25;72:10;
79:23;80:13;82:4,5,8;
83:16,18,20,20;86:14,
23,24;88:22;89:12;
90:22;92:24;93:6;
95:1;99:22;103:21;
105:4;110:3;111:23;
114:1;117:4,16;124:1,
20;125:7;129:20,23;
130:1,11;131:9,9;
132:18;135:16;137:6,
21,23;141:6
one-month (1)
35:7
one-on-one (1)
110:10
ones (3)
41:8;42:10;141:22
One's (2)
67:6,7
ongoing (2)
63:11;74:7
on-line (7)
69:16;80:18;83:21;
84:4,7,10;86:16
only (49)
5:11;8:25;13:1;
15:21;22:20;24:4,11;
30:24;31:16,17;35:12;
37:16;39:22;41:25;
45:13;47:10,20,23;
48:21;49:4;52:1;55:8;
60:22;61:17;65:20;
66:11;67:13,21;71:16;
72:2;74:2;75:5;78:5;
87:23;88:1;97:11;
107:18;109:1,10;
114:7,8;115:4;123:16;
129:10;133:11,13,13;
135:16;139:12
open (1)
39:21
operate (1)
4:24
operated (1)
131:11
operating (5)
36:5,9;40:14;64:24;
71:8
Operations (2)
36:24;38:1
opine (1)
28:3
opined (1)
14:8
opinion (29)
27:1,1;29:24,25;
30:3,6,9;33:18;47:14;
48:12,16;50:10;60:2,
22;67:4;88:21;89:4,
23;92:5;96:6,16;

112:20;117:21;
118:21;120:18;
132:23;134:19;137:1;
141:9
opinions (47)
3:19,19;26:23;29:4,
5,10,16;30:1;33:9;
34:4;46:11;48:18;
53:10;59:5,12,19,19;
60:7;61:6,8;62:7;63:1,
4;64:6,7;77:3,4;80:3;
83:11;88:19;90:6;
94:14;99:11;104:23;
111:10;114:18;120:20,
24;125:7;129:21;
133:19;135:22;136:2,
3;137:13,17;142:3
opposed (1)
8:3
order (41)
4:12;29:18;33:24;
50:10;65:25;66:3,6;
77:4;80:12;101:16,17,
19,25;102:1;107:6,7,7,
9,9,13,20;108:10,11,
16;109:3,4,8,18,19;
110:3,4;111:5;112:25;
113:3;114:14;120:2,9,
18;129:2,3;135:10
ordered (2)
66:12;138:12
orderly (1)
31:19
orders (5)
63:15;66:10;104:11;
120:14,16
organizations (1)
79:16
original (1)
20:2
originally (4)
19:22;52:20;76:2;
140:7
others (2)
13:3;138:22
Otherwise (1)
78:19
out (55)
3:18,25;4:24;8:6;
22:6;29:1;30:16;
31:14;37:2;40:15,19;
41:9,15;42:22;43:2,11;
48:25;52:1,4;65:10;
66:7;69:13;70:8;72:9,
17;74:11;81:20;82:14,
21;85:11;91:5,18,21,
23;97:18;98:17;
100:15;101:18;102:4;
103:2,17,24;104:6;
106:12;109:21;111:4;
113:1;114:20;115:6;
124:18,23;132:22;
134:3,6;136:13

outcome (4)
19:12;29:14;99:15,
15
outcome-oriented (2)
38:25;99:13
output (2)
123:18
outright (1)
48:21
outside (6)
13:24;14:1;28:9;
55:21;83:5;139:16
over (19)
10:8;17:16;20:6;
22:18;37:7;39:1;41:7,
25;42:20;44:6,8;
67:19;82:16;87:5,5;
106:17;114:5;122:17;
141:20
overall (4)
22:17;81:1;124:13;
131:10
overarching (1)
68:14
oversaw (1)
36:12
oversee (1)
40:19
oversight (2)
108:21;134:9
overview (1)
51:3
own (8)
25:6;40:5;43:21;
46:4;48:8;54:15;56:7;
77:11
owned (4)
35:5;36:11;43:13;
140:11
owner (2)
39:4;40:11
owners (6)
28:8;71:11;72:3,5;
132:15;133:12
ownership (1)
41:15

P

Page (15)
33:15;53:4;56:2;
57:17,18;73:10;76:24;
90:24;91:7;97:22,23;
103:1;121:13;122:24;
124:3
paid (3)
6:6;43:6;134:10
panel (1)
19:1
paper (6)
75:5,6,8;83:23;
93:24;95:25
Paragraph (4)

33:17;57:17;122:19;
137:6
Pardon (1)
122:6
parenthesis (1)
91:11
part (9)
9:21;20:23;44:25;
45:25;48:15;76:8;
78:17;91:19;103:19;
134:2;141:7;142:3
partially (1)
134:20
participate (1)
46:8
participation (1)
45:22
particular (27)
9:25;10:14;11:25;
13:7;14:9;15:4,18;
17:23;27:9;29:12;
33:10;42:2;47:9;48:6,
11;49:10;54:4;68:4,
13;69:8;70:2;79:3;
90:24;97:8,16;105:25;
139:10
particularly (3)
23:7;61:2;134:12
parties (1)
15:22
Parts (1)
83:24
party (3)
27:1;28:12;75:2
passed (1)
126:12
passive (5)
125:8,11,20;126:8;
129:10
past (12)
11:16;14:8;15:14,
17;16:7;23:13,16;
34:23;38:10;44:3;
55:20;58:7
patient (6)
32:5;96:7,17;
111:13,16;117:22
patient's (3)
62:4;122:5,8
pattern (2)
64:8;126:21
patterning (1)
125:16
pay (1)
16:15
paying (1)
10:12
pays (1)
8:17
peer (4)
34:7;85:17;89:11;
132:11
peer-reviewed (7)

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

84:12,16,23;85:1,5,
7;86:1
**pending (1)**
19:7
**people (20)**
8:21;12:21;23:23;
25:3,17;33:13;47:23;
51:25;65:7;67:9,14,23;
78:7;79:18;87:18;
98:20;112:5;128:5;
133:5;141:7
**per (8)**
10:4,10;66:18;67:1;
68:16;80:9,11,18
**percent (13)**
6:20,23;7:9;8:25;
9:10;22:13,19,21;23:1,
18,19;25:7;38:11
**percentage (1)**
22:11
**perfect (1)**
114:1
**perfection (1)**
102:5
**performance (2)**
82:3;135:5
**performing (1)**
36:13
**perhaps (1)**
125:21
**period (25)**
6:22;37:25;51:21,
22;64:15;69:3;94:3;
98:15;99:6,10,22;
100:23;105:2,9;106:6;
109:7;111:16;121:4,
11;123:2,3,5,19;127:5;
135:3
**periods (2)**
111:11;114:9
**person (7)**
25:25;35:17;37:17;
44:12;68:3;98:11;
101:12
**personally (4)**
38:9;49:4;105:24;
135:6
**personnel (1)**
87:24
**perspective (3)**
15:23;96:21;103:8
**pertained (1)**
81:13
**phrase (1)**
51:6
**physician (17)**
28:22,24;29:1;
30:19;63:15;65:25;
101:17;104:11,20;
105:13;106:17;
107:10;108:8;109:2;
110:4;114:5;129:3
**physicians (1)**

29:6
**physician's (5)**
66:3,6;101:25;
102:1;110:3
**physiological (1)**
29:17
**piece (4)**
52:24;62:3;82:11,13
**pivotal (1)**
62:3
**place (3)**
101:19;131:15;
137:19
**places (1)**
133:12
**plaintiff (13)**
3:17;11:17;19:13;
22:16;23:20;24:22;
25:9,15,23;26:4;49:24;
72:24,25
**plaintiff's (4)**
19:22;26:16;52:25;
53:22
**plan (9)**
61:9;66:13;124:4,
10,22;126:7,13;
128:13;138:7
**pleading (2)**
49:23;50:2
**pleadings (1)**
49:3
**please (6)**
4:6,13,19;57:3;
68:23;137:15
**plus (3)**
6:20;14:19;43:19
**pm (3)**
118:22;119:10;
143:6
**pneumonia (5)**
95:5,16;96:16,18;
99:17
**point (13)**
30:16;31:9;43:2;
56:7;59:13;74:6;
75:13;80:4;117:12;
127:9;136:19;141:10,
12
**policeman (1)**
44:8
**policies (12)**
47:8,25;48:4,6;
69:20;102:20;106:23;
110:7;115:25;121:3;
132:21;134:5
**policies/procedures (1)**
44:11
**policy (1)**
116:2
**Poor (7)**
65:8;100:23;124:16,
23;132:1;135:5;
139:17

**poorly (1)**
131:11
**population (1)**
78:3
**portion (1)**
8:2
**portray (1)**
107:19
**position (1)**
27:2
**positive (1)**
101:6
**possible (2)**
101:9;105:4
**post-fall (1)**
121:5,8
**potentially (2)**
53:11;106:3
**PowerPoint (3)**
84:18,22;87:12
**Practical (2)**
31:4;47:5
**practically (1)**
47:1
**practice (12)**
32:11;33:25;34:2;
46:17;47:3,6;48:16;
51:1;58:14;65:6;91:6;
94:14
**practicing (2)**
54:21;139:25
**practitioner (2)**
30:25;100:14
**practitioners (1)**
131:6
**precautions (2)**
101:7;113:11
**predicted (1)**
114:2
**pre-existing (1)**
95:18
**prefer (1)**
58:21
**prepared (1)**
57:24
**preparing (1)**
90:14
**prescribed (1)**
30:23
**present (1)**
139:25
**presentation (1)**
84:18
**presented (2)**
26:14;84:19
**president (2)**
37:14;42:14
**presume (4)**
10:25;11:3;65:4,5
**Presumed (1)**
57:11
**presuming (1)**
57:16

**pretty (7)**
38:15;77:16;108:12;
131:18;132:7;134:11;
142:7
**prevent (3)**
125:5,6;129:2
**preventable (2)**
104:24;125:2
**prevented (1)**
30:15
**Preventing (4)**
13:9;86:22,22;88:24
**previously (1)**
88:17
**primarily (1)**
15:3
**primary (5)**
33:4;45:24;46:8;
89:12;95:13
**principal (2)**
74:20,20
**principals (2)**
71:22;72:16
**principles (2)**
85:23;87:10
**print (2)**
90:25;91:1
**printed (2)**
82:14,21
**printout (1)**
80:17
**Prior (11)**
7:1,6,20;9:8;11:4;
13:6;14:12;35:7;
50:21;76:10;103:13
**private (1)**
140:8
**privilege (1)**
137:8
**privileged (1)**
61:23
**Probably (31)**
6:11,13,25;7:19;
9:15;13:19;14:12;
18:22;21:14;35:13;
44:12;85:7;104:13;
106:11;107:14,19;
112:20,21;113:10;
118:15,25;119:7;
120:10;121:2;130:5;
131:22;132:8;133:24;
136:11,11;140:8
**problem (20)**
19:18;52:12;93:5;
106:5,8;111:21;
112:14,15;113:17;
117:20;118:6;120:25;
124:9;126:14;128:2,4,
16,17;138:13;139:15
**problems (10)**
61:4;100:3;101:14;
104:14;105:7;110:9;
116:9;131:6,25;135:18

**procedural (1)**
113:12
**procedure (1)**
116:3
**procedures (12)**
47:8,25;48:4,7;
69:21;102:20;106:23;
110:7;116:1;121:3;
132:21;134:5
**proceedings (1)**
21:2
**process (5)**
89:17;119:25;
131:22
**producing (1)**
90:7
**profess (1)**
45:3
**profession (1)**
130:22
**professional (1)**
5:12
**professionals (1)**
84:21
**professor (1)**
85:10
**profile (1)**
71:24
**Profit (2)**
70:24;79:13
**profitable (1)**
37:13
**program (1)**
125:16
**programs (3)**
12:8;45:23;46:1
**projects (3)**
5:10;28:18,20
**promote (1)**
11:14
**prompt (1)**
89:22
**prompted (1)**
124:20
**proofing (1)**
5:18
**proper (6)**
96:8;101:7;107:15,
16;130:20;137:16
**properly (9)**
42:20;93:22;94:2,
10;131:15;132:14;
133:1;138:19;141:14
**properties (1)**
40:23
**proprietorship (1)**
5:1
**protocol (3)**
113:10;116:5;
118:19
**protocols (1)**
119:23
**provide (11)**

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

17:25;18:8,9;19:6;
60:17;61:1;88:4;
129:22;137:1;141:3;
142:20
provided (10)
10:19;50:23;52:20;
55:11,25;64:16;65:2;
75:18;76:2;119:20
provider (2)
114:6;139:17
providers (2)
53:25;82:1
providing (2)
32:12;40:3
proximity (1)
66:17
publication (2)
85:25;87:20
publish (1)
79:16
published (13)
12:19;15:3;59:23;
60:9;83:20,22;84:1,7,
7,10;86:1,10,14
publishes (1)
79:15
pull (2)
37:2;86:16
pulled (4)
65:10;78:8,11;
110:25
purely (1)
11:13
purpose (5)
3:25;14:2,4;46:8;
85:17
purposes (4)
61:13;85:2,10;88:8
pursue (1)
88:9
purview (2)
51:8;52:9
put (19)
12:8;15:22;21:4;
24:9;48:9;65:10;66:4;
75:14,16;79:23;82:8;
89:24;101:7,10;107:7;
124:16;137:14;138:7;
142:15
puts (1)
110:20
putting (1)
125:24

**Q**

Q15 (2)
111:6;113:3
Q15-minute (10)
101:16;103:4,20;
107:8;109:25;110:9;
112:14;114:25;
120:10;138:10

Q15-minutes (3)
109:18;124:21;
128:14
Qualifications (2)
9:24;18:4
qualified (3)
97:6,11;118:5
qualify (1)
116:22
quality (2)
78:9;130:3
quarterly (2)
56:20;69:14
quick (2)
114:21;120:22
quickly (2)
22:22;80:5
quite (4)
75:8;78:19;123:6;
134:24

**R**

radar (1)
106:11
R-a-n-d (1)
3:11
range (7)
8:24;9:4;20:9;21:6;
23:1;32:8,13
rare (3)
38:11;39:24;140:9
rate (1)
10:3
rated (4)
68:20,22,24;124:24
rather (4)
43:1;83:18;86:18;
108:7
rating (4)
68:24;79:18,19;
80:14
ratings (4)
13:12;81:19;82:2;
131:8
ratios (7)
66:22;67:2;68:17;
69:6;73:22;80:3;
116:19
read (2)
99:8,8
real (5)
37:6;86:16;107:3;
114:21;120:22
realize (4)
53:14;74:9;95:23;
96:21
really (53)
7:11,11;12:5;13:25;
19:19;20:21,22,24;
23:17;25:13;30:25;
33:11;36:4;43:8;45:8;
54:5,16;56:20;59:24;

62:7;64:7;70:14;
72:11;78:2;79:22;
84:22;98:8,13;101:21;
103:7,11,24;104:15;
107:14;108:1;109:16;
110:17,18,20,23;
116:17;117:9;118:13;
123:4;126:20,22;
128:12,17;132:10;
138:14;139:18;140:9;
141:16
reason (9)
16:14;58:4,4;65:6;
66:9;91:1;115:6,25;
138:22
reasonable (6)
46:23;47:5;104:24;
105:10;112:19;120:14
reasons (2)
65:8;110:2
recall (19)
7:15;16:25;17:21;
20:1,4;53:24;54:10,17;
57:15,21;73:3,3;76:5,
11;119:12,15;123:11;
135:4;139:5
recalled (1)
139:7
receive (6)
23:4;38:3;39:15;
53:23;59:11;63:3
received (24)
15:12,19;16:6;17:5;
22:24;39:19;50:10,24;
52:24;53:22;54:1,4,19;
55:11;56:8,10;57:15;
61:3;64:1;75:22,25;
78:9;124:13;130:3
receiverships (1)
28:19
receives (1)
40:1
receiving (4)
16:25;22:23;54:10;
111:17
recent (1)
12:18
recently (3)
17:1;59:22;86:21
reckless (1)
64:18
recognize (2)
96:2,4
recognized (1)
103:12
recognizes (1)
96:23
recommended (1)
112:20
record (6)
15:9,10;90:11;
103:23;110:3;142:13
recorded (2)

100:22;120:4
recordkeeping (1)
65:8
records (61)
10:3;27:13,17,20,24;
47:11;54:1,5,8,9,17,20,
22;55:6,8,12,14;56:3;
57:4;59:11;61:18;
62:1,17,21,24;63:3,8,9,
9,10,14;65:7,13,16,18,
25;70:16;74:3;75:22,
23;76:7;90:14,15;92:2,
25;93:8,21;94:13;
96:11;98:12;113:16;
114:7;117:15,17;
121:16,24;122:12;
123:2;137:6;139:5,7
red (1)
89:2
refer (4)
51:11;57:7;87:11;
99:12
reference (6)
48:7;68:15,19;
88:18;91:4,13
referenced (3)
56:2;69:21;122:1
references (2)
72:15;121:7
referrals (4)
15:12,19;16:7;17:1
referring (1)
9:19
refers (1)
88:1
reflect (7)
77:4;92:3;93:21;
98:12;121:25;122:13;
123:6
reflected (1)
62:18
reflecting (1)
120:5
reflective (2)
59:14;85:23
reflects (3)
60:4;94:8;117:11;
124:12
refuse (1)
100:7
regard (11)
33:21;80:20;87:23;
93:22;94:14;99:11;
108:10;127:3;130:25;
133:15;137:22
regarding (2)
56:9;58:20
regardless (2)
67:13;68:9
region (3)
37:3;41:7,25
regional (6)
36:5,7;134:3,3,19,20

regulation (4)
33:21;46:12;47:4;
48:13
regulations (11)
29:7;33:11,12;38:7,
23,24;45:21;47:15;
141:19;142:3,5
regulatory (7)
33:16,20;34:5,10;
39:19;40:1;46:15
relate (2)
95:14;130:18
relates (1)
69:3
relative (9)
31:1;47:9;76:12;
80:16;83:6,12;96:15;
114:18;133:20
relevance (1)
87:25
relevant (1)
141:23
relies (1)
125:8
reluctant (1)
140:21
rely (8)
82:12;88:20;90:6,
14;112:8;114:7;
120:17;131:5
relying (1)
142:2
remember (8)
9:6;13:7;15:2,5;
37:5;42:7;43:11;72:10
remove (1)
23:24
renal (2)
95:5,17
render (7)
29:3,5,23;30:1;64:6;
67:4;92:4
rendered (3)
29:24;31:7;32:4
rendering (6)
30:3,6,9;32:25;33:9;
141:4
rephrase (2)
4:6;92:2
replace (1)
34:24
replaced (1)
37:14
replacement (1)
36:16
replacements (1)
36:14
report (44)
33:14,16;41:21,24;
53:2,3;56:2;57:7,13,
18,22,23,24;58:2,5,13,
18,21;59:5,18;60:9,23;
61:10;68:20;76:9,10,

MOREI II GROUP   800-536-0804
Court Reporting and Videoconferencing

(14) provided - report

14,17;82:18;88:23;
90:1,8,12,14,19;92:8,
13;99:9;103:2;106:7;
114:21;136:13,25;
137:22
reported (5)
56:13;69:14;74:7;
81:22;136:12
reporter (2)
18:9;142:21
reporting (3)
116:6;130:19;
136:21
reports (7)
53:15;54:11;56:9;
58:12;71:1;73:5;
133:23
reposition (1)
47:1
represent (1)
3:13
request (4)
54:7;57:11;59:2;
76:12
requested (10)
47:13;53:2;56:3;
57:16;61:19;64:15;
69:21;73:24;75:24;
137:7
requests (1)
75:19
require (2)
59:9;129:3
required (3)
43:23,24;47:4
requirement (1)
19:17
requirements (4)
44:18;66:23;67:1;
68:2
requires (1)
110:23
research (20)
5:18;10:4;52:22;
53:5;71:16;72:4,13,15;
77:10,17;78:1;83:5;
87:11,13;88:3;89:6,13,
22;90:3;92:12
researched (2)
71:10;77:17
reserve (1)
137:7
residence (1)
4:23
residency (3)
127:23;133:21;
139:10
resident (19)
12:7;13:14;32:16;
51:20;52:2,3;69:4;
70:20;72:23;106:4,9;
108:16,22;124:14;
126:3;127:22;130:19;

135:12;141:4
residents (10)
38:15;66:2;110:21;
111:2;116:14;126:1;
131:21;134:13;139:14,
16
resource (2)
44:10,14
resources (1)
135:9
respect (3)
109:24;111:10;
135:21
respiratory (3)
101:6;107:17;
114:10
responds (2)
103:10,18
response (4)
4:9;57:21;75:19;
76:11
responsibilities (3)
5:20;37:20;132:18
responsibility (2)
38:2;41:5
responsible (10)
29:6,8;33:24;75:2;
130:10;132:4,25;
135:6,8,11
rest (1)
7:14
restorative (2)
113:16;123:2
result (3)
114:10;123:25;
128:8
resulted (1)
136:21
retain (1)
26:1
retained (9)
19:11;22:15,16;
24:22;50:1;58:24;
72:22;129:25;130:2
retainer (3)
10:2,19,24
retaining (1)
27:1
Retention (12)
12:20;20:2;59:23;
60:3,20;61:8;83:17,24;
87:21;88:5,18;141:7
return (1)
142:11
returned (1)
60:25
review (19)
10:4;19:23;21:18,
19;26:8;27:17;50:16;
51:4;55:10;76:3;
89:11,19,19,20;90:10,
16;111:11;130:6;
137:13

reviewed (16)
17:9;22:2,7,8;26:8,
25;47:8;59:17;63:25;
72:21;73:1;75:9,10,23;
85:18;127:4
reviews (2)
21:11;22:12
revised (1)
14:14
rewarding (1)
8:12
right (73)
4:18,24;6:9;7:5;9:4,
13,20;10:14;11:21;
13:24;14:2;16:6;
20:23;28:22;29:11;
31:11;35:24;36:8,25;
39:17;40:9;48:5;
49:18;53:25;55:16;
60:15;61:7,18;63:22;
65:13;66:15;68:11;
69:20,25;70:18;72:20,
25;73:18,23;77:5;
78:22;83:18;85:15;
88:22;89:3;90:9,13;
91:2,17;97:13,18,21,
25;98:20;100:4;
106:16;108:17;109:9;
110:11;119:18,19;
129:11;135:24;137:4,
12;138:1,1,2;141:8,9;
142:1,1,9
right-hand (1)
44:12
rights (2)
12:7;107:15
rigorous (1)
85:14
ring (1)
54:20
risk (14)
52:17;101:13;
110:21;115:3,10,11;
121:22;124:14,17;
126:1,4;127:2,7,14
Risperdal (1)
129:5
river (1)
78:3
RN (1)
31:5
Road (2)
4:20;69:11
role (9)
27:16,17;28:9;36:6;
41:17;44:24;45:7;
70:12;134:10
roof (1)
68:7
room (16)
66:16;68:4,6;101:8;
104:1;105:15;110:19,
20;111:4;112:6;

113:21;115:5;124:6;
125:21;128:10;138:5
Roswell (1)
40:15
roughly (1)
22:11
rounding (1)
134:18
rounds (2)
13:14,15
rule (1)
33:8
rules (7)
3:24;46:4,6,9;47:24;
141:22;142:2
ruling (1)
50:8
run (1)
99:9
running (1)
97:23
rural (1)
78:6

S

same (16)
14:16;31:1;34:2,8,9;
40:13;46:23;49:2;
50:1;61:4;96:15;
105:11;107:24;
116:16;122:24;141:22
sat (2)
34:17;36:14
Saturday (13)
70:12;100:13;101:2;
102:7,16;107:6,24;
113:4;114:9,13;
123:17;126:18;138:9
saw (26)
10:18;39:10;50:8;
54:18;61:3,5;82:19;
93:6;103:21;104:6,6;
108:13;115:14;118:3,
15,17;119:7,9;121:24;
122:2;130:25;131:7,
25;132:12;138:23;
141:12
saying (10)
62:23;63:7;92:10;
102:8,25;104:4,17;
108:23;113:22;127:9
scenario (2)
111:7;113:25
Schedule (4)
9:21,25;10:14;18:5
scheduling (1)
5:19
school (1)
31:13
scope (9)
14:7;32:14,15;
48:16;55:21;59:18;

65:22,24;120:19
screen (3)
26:17;51:2,6
scrutinized (1)
85:20
se (3)
67:1;68:16;80:11
second (11)
10:11;59:25;60:11,
13;61:4;91:7,10;97:22,
23;109:11;142:14
secondly (1)
51:16
seconds (1)
19:20
section (13)
77:10;89:18,24,25;
90:2,7,8;98:3,3;
129:13,15,21;132:3
sections (1)
89:18
sectors (1)
22:6
seeing (12)
63:6;95:16;100:15,
21;102:9,22,23;112:2;
119:15;120:11;
123:11;139:7
seeking (1)
70:1
seem (3)
16:13;61:14;74:7
seemed (2)
56:18,22
seems (2)
123:9;139:6
sees (1)
90:22
segment (1)
97:8
segregate (1)
79:13
self-harm (2)
115:13;140:25
seminar (2)
12:12;13:1
seminars (3)
11:12;12:1;13:4
send (6)
24:10;37:7;39:3;
58:15;103:17;134:3
sending (1)
131:14
sense (5)
5:23;63:14;75:7;
88:6;98:8
sent (8)
23:9,10;37:5;50:19;
58:13;64:11;100:15;
104:2
separate (1)
76:25
separately (1)

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

5:24
**sepsis (10)**
30:4;92:17;93:6;
95:3,4,16;96:7;97:4;
98:12;99:17
**sequence (1)**
114:20
**service (4)**
15:13;16:16;20:3;
39:14
**ServiceMaster (9)**
36:20;37:10,15,21;
39:2;40:6,12;41:18,21
**services (7)**
5:23;11:6;15:16,18;
16:10,18;61:2
**Services' (2)**
122:10;141:16
**set (3)**
62:21;75:22;90:16
**sets (2)**
102:10;142:6
**settlement (1)**
19:13
**seven (10)**
14:13;49:15;62:13,
14;63:18;68:5;86:11;
103:6,21;109:12
**seven-hour (1)**
110:15
**seven-month (1)**
56:17
**several (2)**
11:11;63:24
**severe (9)**
39:6;60:15;62:10;
92:16,24;95:5,17;
124:2;134:11
**Sexton (1)**
4:20
**sheets (7)**
47:2,3;73:19,19;
93:2;111:20;123:15
**shift (6)**
93:3;96:12,12;
117:25;118:15;129:14
**shifts (1)**
103:13
**short (2)**
28:6;50:12
**shoulder (1)**
101:5
**show (11)**
64:8;79:7,8;93:1;
96:11;98:13;105:10,
12,14;113:17;127:13
**showing (1)**
105:6
**shows (2)**
80:18;107:21
**sick (7)**
101:21;104:11;
110:18;111:5;115:2;

126:20,22
**side (10)**
11:17;14:24;15:4;
25:4,19;26:16;27:24;
50:4,5;97:17
**sides (7)**
8:8,10;23:17;25:12,
13;48:25;75:17
**sight (3)**
111:4;115:6;118:18
**sign (8)**
58:12,14,15,18,
22,25;59:2
**signed (3)**
57:25;58:4,5
**significance (1)**
58:17
**significant (1)**
56:21
**signs (1)**
118:11
**similar (4)**
21:20;34:8;46:24;
105:12
**simply (3)**
74:6;76:11;115:1
**sit (4)**
59:15;127:20;
136:24;137:9
**site (7)**
11:22,25;81:12,15,
25;82:15,21
**sitting (1)**
138:21
**situation (2)**
98:13;108:7
**situations (1)**
37:16
**six (6)**
10:8;11:19,19;
37:24;86:11;130:11
**six-hour (2)**
12:23;84:18
**size (1)**
133:24
**skilled (14)**
64:19,20;98:1,2;
112:9,10,11;115:15,
17,17;116:20,22;
121:17,21
**skin (3)**
101:5;115:4;124:1
**sleep (1)**
129:6
**sleeping (3)**
118:7,8,9
**Small (1)**
78:3
**snip-it (1)**
97:17
**Snowstorms (1)**
31:15
**social (5)**

5:13,13;87:14;
122:10;141:15
**sold (3)**
71:13;72:18;140:8
**sole (2)**
5:1;6:18
**solely (2)**
4:22;79:19
**solve (1)**
128:18
**somebody (9)**
32:7;35:18;51:11;
67:15;81:1;101:15;
110:10;112:15;117:25
**somehow (1)**
128:14
**someone (14)**
29:19;32:17;45:1,3;
47:1;51:12;58:14;
96:10;101:10;115:5;
138:8,8,11;140:22
**someone's (3)**
32:9;92:19;103:11
**sometime (1)**
106:19
**sometimes (15)**
8:16;27:6,9;32:18,
20;37:3;46:3;55:7;
74:25;79:14;90:25;
122:9,12;133:17;
140:21
**Somewhat (1)**
36:7
**Somewhere (15)**
7:12;9:4;21:6,14;
24:5;35:14,23;37:24;
60:19;82:19;108:10;
120:24;125:18;
133:25;141:11
**sooner (1)**
109:21
**sorry (16)**
6:17;24:12;29:23;
53:20;57:17;58:10;
61:20;86:6;88:19;
91:21;92:1,1,5;105:20;
123:14;133:19
**Sort (10)**
5:19;44:15;45:8;
46:13;50:2,6;52:4;
55:16;74:19;77:2
**sounds (5)**
40:5;41:17;81:11;
139:4,9
**source (5)**
6:18;48:10;89:3;
106:5;136:15
**sources (1)**
86:19
**south (3)**
9:11,12;35:3
**Southfield (1)**
43:12

**sparse (1)**
118:12
**speak (1)**
74:22
**speaking (6)**
5:3;6:19;10:6;11:14;
57:22;66:5
**special (5)**
102:21,21;105:14;
125:24;127:16
**specialized (2)**
101:11;110:23
**specialty (1)**
12:1
**specific (3)**
81:12;116:2;133:20
**specifically (2)**
53:2;69:2
**speculate (2)**
20:8;24:4
**speculating (1)**
24:6
**speculation (1)**
26:5
**speculative (2)**
21:17;118:24
**spell (1)**
91:2
**spent (1)**
43:14
**spouse (1)**
75:1
**sprinkled (1)**
20:18
**St (6)**
13:23,24,24;14:1,1;
112:10
**staff (9)**
30:12;45:6;67:22;
69:25;92:6;93:17,21;
95:25;98:17,24;
109:14;110:21;
112:18;113:22;134:13,
19,20;139:14;140:17
**staffing (28)**
49:7;66:21;67:1,4,6,
16,20;68:2,13,21;69:2,
18;73:14,19;77:18,20;
79:3,17,25;80:11,15;
81:7,21;82:10;100:3;
104:14;124:25;131:10
**staff's (1)**
30:15
**stage (2)**
51:4;52:13
**standard (17)**
10:3;26:15;27:7,22;
33:23;46:20,22;47:15,
20,23;48:14;52:15;
67:9;94:9;113:10,13;
126:10
**standards (18)**
27:21;28:2,11;

29:14;34:10;46:2,19;
47:21;48:8;67:6;
87:13;92:21;93:23;
94:12;95:24;96:1;
102:23;105:19
**standpoint (5)**
93:8;113:13,13;
115:10;126:21
**Star (17)**
68:21,25;79:18,19,
23;80:14;81:18,23;
82:4,6,7,8;131:8,9,10;
137:23,23
**Stars (5)**
68:22,24;80:14;
131:10
**start (7)**
17:8;22:25;89:21;
99:15;100:6;103:2;
106:24
**started (3)**
5:5;22:19;43:7
**starting (3)**
43:8;100:7;106:21
**starts (1)**
100:17
**state (31)**
3:10;23:23;24:1;
34:22;39:8,9;45:20;
47:2,15,24;48:2,13,17;
64:12;65:9,11;66:23,
25;67:19,21;68:2;
77:18,22;79:9;80:23,
24;81:9;85:14;119:22;
130:9;140:5
**statements (1)**
70:24
**states (10)**
13:19;19:1;21:8,9,
20;40:20;46:2,5;49:6;
79:3
**station (3)**
66:17;125:14,22
**statistically (2)**
38:9,19
**status (1)**
122:16
**statutes (1)**
141:19
**stay (21)**
23:21;27:23;34:13;
42:15,16;43:1;56:17,
23;61:4;62:6,8;64:5;
69:15;70:17,20,21;
91:10;95:14;130:16,
17;140:24
**stays (2)**
54:3,4
**step (2)**
27:25;60:17
**still (16)**
7:17;10:25;14:16;
16:11,22;37:10;39:8;

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

59:21;63:12;68:23;
72:5;102:8;112:10;
123:18;124:18;141:22
**stint (1)**
　35:7
**stop (1)**
　4:5
**stops (2)**
　131:4;135:12
**storm (1)**
　114:1
**strange (1)**
　101:1
**strangely (1)**
　103:5
**Strangle (1)**
　124:8
**strictly (1)**
　11:22
**stripped (1)**
　48:25
**structure (1)**
　70:10
**structured (1)**
　70:5
**struggle (1)**
　60:6
**struggling (3)**
　55:7;59:21;60:1
**stuff (3)**
　99:19;109:13;
　125:12
**subcontractors (2)**
　5:8;6:16
**subject (2)**
　13:14;59:13
**substandard (1)**
　130:3
**substantial (2)**
　93:18;94:4
**sudden (1)**
　23:3
**sufficiency (6)**
　67:7,8,13,17;68:8;
　116:21
**sufficient (2)**
　67:22;68:14
**suggesting (1)**
　64:22
**Summary (8)**
　9:24;18:3;31:9;54:9,
　10;94:22,25;95:1
**summation (1)**
　132:2
**summer (1)**
　43:6
**Sunday (21)**
　70:12;100:14;
　102:10,11,16,22;
　103:2;106:20;107:24;
　108:8;109:2,5,10;
　111:2,25;112:23;
　113:7;114:11;120:1,6;

121:7
**supervising (2)**
　126:2;128:10
**supervision (11)**
　37:20;93:12;120:16;
　124:13,16,24;126:12,
　14;127:1,7,11
**supervisor (1)**
　45:6
**supervisors (1)**
　70:6
**support (6)**
　86:20;87:20;88:4,
　21;89:4;93:24
**supposed (3)**
　46:20;115:15;
　116:21
**sure (63)**
　6:12;7:16;9:8,23;
　13:5,5;24:10;25:1;
　32:6;35:5;39:12,16,16;
　41:3;45:18,18,19;
　49:16;54:14;55:1;
　58:8,23;61:7,14;64:3,
　3;65:22;74:4,25;75:20,
　21;76:5,9,19;77:24;
　78:19;82:5;91:1,3,9;
　96:3,5;97:20;98:6;
　99:12;108:12;112:23;
　114:4;118:13;120:23;
　121:2,10;123:5;125:3;
　132:4,20;134:5,6,7,24;
　138:6;141:21;142:14
**surf (1)**
　16:23
**surface (1)**
　26:11
**surprise (1)**
　112:5
**surprised (5)**
　4:2;116:20;123:23;
　124:2;132:12
**surround (2)**
　62:7;64:7
**surrounding (1)**
　30:12
**survey (8)**
　39:9;51:21;106:15;
　130:4,9;131:25;132:7;
　141:25
**surveyed (1)**
　38:8
**surveyor (10)**
　28:12,16,21;92:9;
　98:10,24;100:24;
　104:5,8;122:23
**surveyors (1)**
　93:1
**surveys (10)**
　27:6;38:10;41:2;
　54:15;80:8,21;82:22;
　131:9;132:8;135:14
**sworn (1)**

3:7
**symbol (1)**
　78:16
**System (2)**
　79:18,19
**Systems (5)**
　43:10,17;105:8;
　133:1;134:6

**T**

**tab (1)**
　90:5
**tabbed (1)**
　90:17
**Tag (1)**
　44:2
**talk (8)**
　28:15;49:6,7;58:22;
　85:14;87:18;123:3;
　137:8
**talked (3)**
　74:15;93:10;121:22
**talking (2)**
　25:17;97:22
**TAR (1)**
　110:17
**TARs (1)**
　111:19
**taught (8)**
　12:14,15,17,23,24;
　13:8,13;86:23
**teach (5)**
　11:11,12;12:3,5,6
**teaching (3)**
　5:3;85:12;88:8
**team (1)**
　106:15
**tear (2)**
　101:5;124:1
**tears (1)**
　115:4
**tells (3)**
　19:16;73:9,15
**template (1)**
　88:25
**ten (12)**
　5:10;6:13;8:13;
　19:19;20:17;22:21;
　37:22,24;62:14;77:18;
　87:2;129:24
**tend (9)**
　15:16;26:3;81:5;
　82:1,6;89:21;90:1,3;
　95:8
**tends (2)**
　25:18;90:5
**term (2)**
　133:13;138:13
**terminal (3)**
　96:10;115:18;
　121:15
**terms (27)**

29:15;30:14,17;
　31:16;32:11,25;33:25;
　35:11;47:11;49:7;
　51:2;66:3,4;74:11;
　80:8,11;85:20;87:10,
　15;89:10;92:16,21;
　93:11;94:13;104:18;
　106:3;124:4
**testified (7)**
　3:7;17:12;21:2,23;
　22:2;49:8;68:1
**testify (9)**
　21:19;23:14;29:11;
　49:19;68:11;91:20;
　93:16;97:3,9
**testifying (2)**
　5:16,21
**testimonial (5)**
　17:24;18:8,18;
　24:21;49:11
**testimony (11)**
　4:1;10:10;11:5;
　17:18;24:13;25:21;
　48:18;49:10;97:2;
　119:13;142:21
**Texas (3)**
　36:2;37:23;40:21
**Thanks (1)**
　143:3
**theories (2)**
　25:10,14
**theory (3)**
　25:16,18;27:2
**therapists (1)**
　112:6
**therapy (3)**
　100:18;106:21;
　121:21
**therefore (2)**
　6:9;69:7
**therefrom (1)**
　55:15
**thinking (3)**
　42:15;78:17;120:10
**third (1)**
　28:12
**third-party (1)**
　40:18
**though (8)**
　35:18;52:12;53:8;
　71:1;94:2;107:21;
　111:17;122:2
**thought (6)**
　26:12;75:13;112:21;
　117:5;120:24;141:14
**thoughts (2)**
　90:2,6
**three (26)**
　12:2,14;15:25;
　17:14,16;22:20;23:9;
　25:8;33:14,19;34:12,
　14;37:23;39:23;46:14;
　64:5;69:9,9;78:11,18;

102:10;105:2;109:10;
　114:8;130:15;132:9
**three-hour (1)**
　10:7
**throughout (4)**
　31:13;37:4;48:2;
　56:22
**time-consuming (1)**
　111:3
**timeframe (2)**
　51:18;141:24
**times (9)**
　5:8;11:15;20:5;21:1;
　63:3;69:16;114:4;
　140:16;141:14
**timing (1)**
　131:7
**tired (1)**
　8:6
**title (1)**
　36:23
**today (13)**
　3:17,25;4:4;10:9;
　33:18;59:16;60:5;
　61:13;79:4;136:24;
　137:9;138:21;142:25
**together (4)**
　12:9;15:22;21:5;
　142:15
**told (7)**
　49:2;58:13;62:2;
　65:7;76:8;101:3;
　119:15
**ton (1)**
　67:14
**took (8)**
　7:23;20:21;40:23;
　41:7,25;49:12;52:2;
　67:19
**top (7)**
　91:10;98:19,25;
　104:19;120:8;122:3;
　128:17
**topic (2)**
　18:2;137:2
**topics (1)**
　87:17
**total (1)**
　142:24
**totally (2)**
　52:2;122:24
**touched (1)**
　76:4
**touching (1)**
　67:11
**tough (1)**
　38:16
**toward (1)**
　23:1
**towel (1)**
　32:21
**town (2)**
　13:25,25

**track (3)**
66:1;93:3;98:19
**tragic (1)**
8:16
**trail (5)**
75:5,6,8;93:24;
95:25
**trained (1)**
28:24
**training (4)**
59:17;113:11;
131:23;134:15
**transferred (1)**
109:8
**travel (2)**
10:4;139:16
**traveling (2)**
8:7;42:25
**treated (2)**
127:14,17
**treatment (2)**
30:23;63:9
**treatments (1)**
32:12
**trial (8)**
4:1;15:1,1;19:2,2;
59:6;97:3,7
**trial/arbitration (1)**
21:2
**trials (1)**
21:7
**tried (1)**
127:15
**trigger (3)**
102:21;116:5;121:5
**triggered (1)**
116:4
**triggers (1)**
108:20
**trouble (6)**
33:2;40:22;103:25;
109:17;122:22;135:15
**troubled (12)**
36:3;37:2,4,6,9;39:2,
10,12,13;51:21;105:7;
130:15
**Troutman (6)**
11:4;17:5,9;51:1;
76:5;143:5
**true (4)**
33:8;63:23;74:5;
137:3
**trust (1)**
88:7
**try (4)**
23:21;26:17;27:18,
23
**trying (8)**
50:4;72:8;73:3;97:8;
100:19;120:12;126:19,
19
**turn (2)**
36:3;47:1

**turnaround (1)**
37:7
**turned (4)**
25:11,12;26:6,15
**turning (1)**
37:1
**turnover (2)**
134:23;135:1
**twice (1)**
125:13
**two (38)**
4:16;13:6;15:20,25;
16:23;23:11;24:11;
26:10;37:12;39:23;
50:2;65:8;67:6;68:22,
24;69:8;71:10,22;
72:9;80:14;82:10;
83:21;84:10;86:15;
88:1;89:18;109:12;
110:2;111:23;125:17;
130:18,18;131:10;
132:18;133:12;135:2;
137:22;141:6
**Two-thirty (2)**
117:3,3
**type (3)**
19:4;39:19;80:23
**types (4)**
21:18;22:8;77:20;
88:1
**typewritten (1)**
90:12
**typically (4)**
101:24;122:4,7,9

**U**

**ultimate (1)**
130:21
**unbiased (2)**
28:10,12
**under (17)**
28:1;29:6;34:9,12;
46:23;64:19,24;65:20;
67:20;68:6;80:13,13;
105:11;112:10;
114:16;126:10;132:18
**underlined (1)**
62:19
**underlying (1)**
29:17
**underneath (1)**
12:12
**understood (1)**
4:8
**unfortunately (3)**
16:11;24:18;42:17
**unit (3)**
68:4;70:6;116:19
**unknown (2)**
106:5;136:15
**unless (6)**
30:25;61:1;68:16;

78:5;114:15;118:11
**Unlike (2)**
27:20;45:12
**unsafe (1)**
115:11
**up (24)**
17:4;22:23,25;24:8;
60:17;74:10;76:10;
81:11;86:16,18;88:25;
91:17;94:19;97:8;
110:22;111:5;113:21;
118:7;128:13;129:16;
130:6;131:19;132:9;
138:20
**updated (2)**
105:13;141:21
**upfront (1)**
26:17
**upon (7)**
55:10;59:16;65:25;
88:20;90:10;94:17;
142:2
**urgent (1)**
108:7
**use (19)**
10:2;11:14;23:8;
25:21;26:24;47:5;
73:13;91:2;92:16;
94:25;95:22;110:8;
116:4;117:6;125:11;
126:6;135:9;136:2;
138:13
**used (13)**
14:21;51:7;71:19;
79:17;80:7;81:9;
87:22,23;88:8;96:3;
125:19,20;141:20
**uses (2)**
47:2;65:18
**using (5)**
25:20;87:23;102:17;
108:18;133:13
**usual (1)**
111:8
**Usually (17)**
26:17;27:4;58:15;
65:8,11,21;66:7,12;
71:1;73:17;75:5;
76:14;80:22;89:17;
113:1;117:24;140:5
**utilize (1)**
16:16
**utilized (2)**
128:21;129:8
**utilizing (1)**
16:19

**V**

**valuable (1)**
44:10
**variety (1)**
12:1
**watch (5)**

**various (5)**
8:10;11:18;12:8;
25:17;36:1
**venture (2)**
32:10;69:11
**venues (1)**
21:16
**verbally (1)**
99:9
**verdict (2)**
19:12,13
**verse (1)**
46:3
**versus (7)**
7:7;22:16;79:13;
81:2,6;125:8;137:23
**vice-president (4)**
36:6,24;38:1;134:4
**victim (1)**
136:9
**view (2)**
27:16;28:5
**vigilance (1)**
93:22
**vigilant (1)**
96:12
**violated (1)**
124:3
**violation (3)**
46:11;80:23;107:14
**violations (21)**
38:13,19;39:6;
51:20;77:14,20,20;
78:11,19;79:8;80:9,25;
81:1,4,6;105:3,22;
130:16;132:10;
133:11;134:12
**Virginia (1)**
68:1
**virtually (1)**
89:13
**virtue (1)**
45:18
**visit (1)**
41:1
**vital (1)**
118:11

**W**

**W2 (1)**
6:3
**wait (1)**
58:14
**wall (1)**
35:12
**washcloth (1)**
32:21
**Washtenaw (1)**
12:15
**waste (1)**
26:18
**watch (5)**

101:12;111:2;115:7;
124:19;126:10
**watched (1)**
126:22
**watching (2)**
125:16;128:5
**water (1)**
32:19
**way (20)**
7:22;17:8;26:14;
29:15;35:10;47:3;
48:9;53:11,21;62:9;
74:11;86:18;90:19;
96:23;100:1;101:22;
104:7;110:16;112:9;
124:16
**ways (4)**
26:10;112:1,12;
124:15
**weak (1)**
100:19
**web (1)**
16:11
**website (10)**
11:7,11,14;14:3,10;
71:25,25;83:7,13;84:6
**week (7)**
25:12;26:11,21;
37:5;52:17;112:3;
140:24
**weekend (15)**
69:18;70:3,6,7;
99:25;100:23;104:12;
105:25;106:18;
111:15;112:4;114:5,
19;120:20;122:17
**weekends (4)**
70:9;89:2;100:2;
131:8
**weeks (1)**
64:5
**weren't (14)**
30:13,16;31:18,20;
36:13;59:25;60:11;
64:16;65:2;67:10,23;
124:10,21;132:8
**West (1)**
68:1
**western (2)**
71:9;72:21
**what's (11)**
5:12;22:17;25:16;
35:4;54:14;79:21;
81:14;96:13;106:25;
120:12;140:15
**whatsoever (1)**
52:18
**wheelchair (1)**
124:5
**wheezing (2)**
100:24;103:14
**whenever (2)**
5:9;54:3;77:19

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

**whereas (1)**
25:22
**whole (7)**
82:8;104:14;109:13;
111:6;125:18;139:14,
18
**wife (8)**
5:11;6:10;8:21;43:1;
60:18;106:2;123:4;
131:2
**wife's (1)**
5:12
**willing (2)**
60:12;61:1
**wing (1)**
66:18
**Wisconsin (3)**
36:2;37:23;40:21
**wisdom (2)**
112:15;138:4
**withdraw (2)**
59:12;63:4
**within (14)**
4:15;6:25;9:10;
32:14;50:21;51:8;
52:9;60:23;61:10;
85:5,8;88:18;98:11;
111:18
**without (7)**
16:12;19;63:5;66:2;
67:12;102:25;138:16
**witness (21)**
3:16;5:2,16;6:21,24;
7:7,10,14,17;8:3,7;9:1;
11:10;14:6;15:13;
16:1;20:3,7,25;43:20;
143:4
**word (1)**
136:2
**words (3)**
95:11;127:12;130:8
**work (34)**
5:2,6,16,18;6:21,24;
7:3,7,10,13,18;8:3,8,
11,16,20,24;11:2,3,10;
14:25;20:25;25:23;
29:21;37:16;40:19;
42:4,22;43:20;52:19;
69:16;71:18;85:3;87:2
**worked (10)**
15:22;22:3;28:17;
34:22;36:4,9;37:21;
71:6,18,20
**worker (2)**
5:13,13
**workers (1)**
87:14
**working (6)**
12:14;13:3;20:22;
50:3;69:8;100:2
**Workman (2)**
130:14;131:14
**world (1)**

96:25
**worried (1)**
102:15
**worse (2)**
89:9;116:15
**worst (4)**
39:8;99:23;101:8;
105:4
**worth (1)**
64:1
**wound (2)**
51:24;52:1
**wrap (2)**
97:8;129:16
**write (2)**
10:5;90:20
**writing (1)**
125:9
**written (7)**
59:20;61:11;74:11;
89:9;112:25;120:3,25
**wrong (3)**
29:7;78:5;131:11
**wrote (7)**
12:19;59:22;86:21;
108:25;120:9,14,18

**Y**

**year (37)**
6:4;9:8,14,16;10:16,
16;12:16,19;13:6;
14:11,11,14;18:1;19:5,
8;24:3,13,14,15,16,16;
37:12;40:24;41:8;
42:6;43:8;50:1;76:13;
77:22;79:10;80:9;
81:21;83:20,24;84:20;
86:15;132:9
**years (42)**
5:10;6:13,21;7:1,4,6,
24;8:13;9:16;11:19;
14:14,19;15:15,21,24;
16:10;17:17;22:3,4,18,
20;23:19;25:9;26:20;
31:14;38:18;39:21,23;
43:10;44:6;49:15;
62:14,14;67:19;71:6,
10,17;77:19;80:23;
87:3;129:24;141:20
**Youles (5)**
3:12,13;50:16;
129:20;142:20
**Y-o-u-l-e-s (1)**
3:12
**younger (1)**
52:3

**Z**

**zero (1)**
51:18

**0**

**02 (2)**
35:7,25
**03 (1)**
42:13
**04 (1)**
6:12
**05 (4)**
7:20;20:16,21;21:12
**06 (1)**
20:14
**09 (2)**
7:12,17

**1**

**1 (2)**
18:3,15
**1,000 (1)**
21:15
**1,500 (2)**
10:11,20
**1,800 (1)**
10:11
**1:27 (1)**
143:6
**10 (1)**
5:9
**10:00 (1)**
104:6
**10:08 (1)**
3:3
**10:30 (1)**
104:6
**10-5 (3)**
100:17;105:10;
120:20
**10-6 (1)**
124:7
**10-7 (1)**
108:9
**10-8 (2)**
105:10;120:21
**1099 (2)**
6:3,16
**11 (1)**
121:13
**12-29-13 (1)**
58:3
**14 (1)**
3:2
**15 (7)**
24:4;102:6;103:1;
105:16,17;110:6;
120:11
**1555 (1)**
4:20
**15-minute (3)**
102:14;119:25;
123:3
**16 (2)**

21:8,9
**17 (1)**
124:3
**18 (1)**
33:17
**180 (3)**
10:4;20:8,15
**1961 (1)**
140:2
**1993 (1)**
20:10
**1996 (1)**
35:22

**2**

**2 (4)**
18:7,14,15;142:23
**2.25 (1)**
67:21
**2:00 (6)**
103:2;107:20;
108:25;116:25;117:5,
22
**2:30 (10)**
103:6,7;106:20;
108:9,23,25;117:9,10;
118:22;119:10
**20 (8)**
5:9;21:8,9;23:1;
24:5;53:4;56:2;57:18
**20,000 (1)**
9:18
**2000 (3)**
5:5;6:10;18:21
**2002 (1)**
34:17
**2003 (3)**
6:11;43:4;71:7
**2004 (5)**
6:12;20:24;43:9,15,
18
**2005 (5)**
7:11,16;20:14,19,24
**2009 (2)**
7:4;8:2
**2012 (11)**
13:8,16;61:21,22,22,
22;73:5;78:10;79:11;
93:19;97:5
**2013 (3)**
8:19;13:4;50:20
**2014 (4)**
3:2;13:2;24:8;86:14
**205 (1)**
10:6
**24 (2)**
21:6;121:4
**24/7 (1)**
45:12
**25 (1)**
21:7
**250 (1)**

9:11
**260 (2)**
8:23;9:13
**270 (1)**
9:5
**28 (1)**
61:22

**3**

**3 (3)**
76:17,20;133:25
**30 (4)**
7:10;21:5;22:19;
50:21
**300 (2)**
9:11,12
**325 (1)**
10:6
**35 (2)**
21:5;38:17
**353 (1)**
67:22
**36 (1)**
38:17

**4**

**4 (8)**
33:15;50:20;61:22;
76:23,25;77:6;89:16;
94:21
**4.2 (1)**
67:20
**40 (1)**
22:13
**400 (1)**
38:7
**47 (1)**
122:19
**475 (1)**
10:9
**48 (1)**
121:4
**48843 (1)**
4:21

**5**

**5 (3)**
78:22,23;99:3
**50 (4)**
7:9;8:25;23:18,19
**501 (1)**
44:2
**59 (1)**
57:17

**6**

**6 (3)**
12:17;83:1,2
**6:30 (1)**

MORETTI GROUP   800-536-0804
Court Reporting and Videoconferencing

(19) whereas - 6:30

ANNA F. COLE v.
ORION MARION, LLC, et al

LANCE R. YOULES
November 14, 2014

118:2
**60 (1)**
  22:13
**600 (1)**
  13:10

---

### 7

**7 (5)**
  88:11,14;115:21;
  116:23;117:23
**7:00 (5)**
  117:4,7,22;118:22;
  119:9
**70s (2)**
  31:13,18
**7-18-12 (1)**
  128:2
**7-28 (1)**
  91:15
**72-hour (1)**
  121:4
**7-9 (1)**
  91:14
**7th (2)**
  118:22;119:10

---

### 8

**8 (3)**
  99:4;142:11,16
**800 (1)**
  21:15

---

### 9

**9 (2)**
  61:21,22
**9:45 (1)**
  104:7
**90 (1)**
  25:7
**93 (3)**
  5:5;7:23;20:18
**95 (3)**
  6:20,23;25:7
**96 (3)**
  35:13,24;36:21
**97 (1)**
  35:14
**99 (2)**
  36:21;40:6