# *Report of Lance R. Youles*

### Estate of George Cole v.
### Crittenden County Health & Rehabilitation Center, et al.

Lance R. Youles certifies and describes as follows:

1.  I was retained by the law firm of Edwards & Kautz which represents the Plaintiff.

2.  This report was produced by my office.

3.  For purposes of this report, all references made to "CCHRC" shall mean Crittenden County Health & Rehabilitation Center; Orion Marion, LLC; Orion Operating Services, LLC; and, Atrium Centers, LLC.   This includes CCHRC owners, Board(s) of Directors, Management Company, Administrator(s), Director(s) of Nursing (DON), facility staff, and consultants.

4.  For purposes of this report, all references made to "Governing Body" shall mean Orion Marion, LLC; Orion Operating Services, LLC; and, Atrium Centers, LLC.

### RECORDS RECEIVED, ACQUIRED, REVIEWED, AND RELIED UPON

5.  I have reviewed records and information from the following facilities, agencies, individuals, and sources concerning George Cole:

    A.  Death Certificate;
    B.  Advanced directives;
    C.  CCHRC: Miscellaneous admission records and medical records;
    D.  Atrium Living Centers, LLC: Miscellaneous background information via www.atriumlivingcenters.com;
    E.  Lourdes Hospital: Miscellaneous medical records;
    F.  Crittenden Hospital: Miscellaneous medical records;
    G.  Kentucky Cabinet for Health and Family Services, Office of Inspector General (OIG), Division of Health Care Facilities and Services: CCHRC licensing documents and regulatory surveys;
    H.  www.medicare.gov (nursing home consumer website): CCHRC regulatory surveys, resident data, facility ratings, and facility information; and,
    I.  Miscellaneous law firm correspondence.

1

EXHIBIT

B

## MY BACKGROUND, EDUCATION, AND TRAINING

6. I have practiced, managed, or consulted in nursing facilities, assisted living facilities, and senior housing businesses since 1978. My background ranges from high school experiences as a Nurse's Aide to post college roles as an Administrator, multi-facility management, turnaround consultant, and facility ownership. My management experience and knowledge of eldercare laws, regulations, and standards ranges from subacute nursing facilities to home health care. Most of my career has been devoted to helping nursing facilities in financial and/or regulatory peril throughout the country. My consulting roles include receivership, temporary management, and monitoring appointments for the State of Michigan. In addition, I served as an expert witness for the State of Indiana, Office of the Attorney General, to evaluate the competency of Nursing Home Administrators under administrative review for managing nursing facilities that received Substandard Quality of Care violations.

7. I am a graduate of Ferris State University in Big Rapids, Michigan, with a Bachelor of Science degree in Health Services Management, and an Associate of Science degree in Occupational Safety and Health, both received in 1978.

8. I have been a Licensed Nursing Home Administrator in good standing since 1978.

9. I have testified in Kentucky Courts as a Nursing Home Expert.

## MY NURSING HOME EXPERTISE

10. Based upon my education, training, experience, and research, I am familiar with the standards of care for nursing facilities in Kentucky and the United States.

11. Based upon my education, training, experience, and research, I am familiar with the standards of practice for Administrators of nursing facilities in Kentucky and the United States.

12.   Based upon my experience as a consultant, corporate executive, and owner of nursing facilities, I am qualified to opine on the duties of a "Governing Body". This includes hiring a competent Administrator, establishing, monitoring, and enforcing internal operating standards, maintaining compliance with State and Federal regulations, providing sufficient facility resources and operating capital, promoting ethical management practices, and to pursue facility profitability without compromising the quality and continuity of resident care.

13.   During my professional career I have experience with nursing home residents who were at significant risk of **neglect, falls, and injuries of unknown source** due to their diagnoses and complete dependency on facility governing boards, administration, management, and staff to ensure that they attain or maintain their highest practicable physical, mental, and psychosocial well-being in accordance with State and Federal laws/regulations.

14.   The statutory role and authority of Nursing Home Administrators is defined as follows:

> 42 C.F.R. § 483.75:
>
> "A facility must be administrated in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing of each resident."
>
> 902 KAR § 20:026 3 (2):
>
> "All facilities shall have an administrator who is responsible for the operation of the facility and who shall delegate such responsibility in his absence."
>
> KRS 216A.010 (2):
>
> "The term "nursing home administrator means any individual responsible for planning, organizing, directing, and controlling the operation of a nursing home, or who in fact performs such functions, whether or not such functions are shared by one or more persons."

3

## SCOPE OF MY REVIEW

15.  As is customary for professionals in my field, I have relied on my assessment of Mr. Cole's medical records, CCHRC records, OIG records, research, and other relevant information to formulate opinions concerning the standard of care at CCHRC during his (7) month stay from 3/9/12 to 10/8/12.

16.  The opinions expressed in this report are limited to the care of George Cole at CCHRC, but may include events which occurred before, during, or after his stay if a pattern of abuse and/or neglect involving other residents becomes apparent, and that conduct is closely related to this case.

17.  The opinions expressed in this report are limited to the operation of Skilled and Intermediate Care Nursing Facilities in Kentucky.  The scope of my review includes regulatory compliance, internal facility standards, facility ownership/governance, corporate control and oversight, facility administration, day-to-day operations, caregiver staffing, operating policies and procedures, caregiver competency, unsafe caregiver acts, unsafe facility conditions, resident rights, and the hiring, training, direction, supervision, and management of individuals who practiced or worked at CCHRC during Mr. Cole's stay.

18.  My findings and opinions may reference practitioners, clinicians, and unlicensed staff as employees, agents, or contractors of CCHRC, but only to the extent of their conformance with nursing home laws, regulations, internal operating standards, industry practices, and other regulatory, administrative, and institutional standards.

19.  All findings and opinions contained within this report are based on the records provided to me, research, my education, training, and extensive experience with matters involving resident abuse and neglect.

4

### MY STAFFING EXPERTISE

20.     No factor has a greater impact on the quality of a nursing home resident's care and life than **staffing levels**, whether measured by moments in time i.e., incidents and condition changes, or periods of time i.e., physical and/or cognitive declines. Facility staffing problems range from low one-size-fits-all patterns, to inconsistent deployment, untimely lapses in caregiver coverage, unstable workforce, and unproductive staff.  Unlike many resident care issues, caregiver staffing levels are managed by facility Administrators and Management Companies due to their specialized expertise regarding staffing laws, standards, practices, and economics. Although Physicians, Nurses, and clinicians are the instrument of resident care, their contributions and authority is confined to a nursing home model they did not design and do not manage, especially facility staffing issues.   Planning, managing, and funding caregiver staffing patterns requires executive training and experience. I have devoted a significant portion of my professional career to this complex issue. This includes my roles as a facility Administrator, multi-facility corporate executive, consultant, facility owner, author, and public speaker.

### APPLICABLE STANDARDS

21.     George Cole was entitled to receive nursing home care, treatment, protection, and services in accordance with the following standards:

- Volume 42, Code of Federal Regulations, Part 483, Subpart B;
- Volume 42, Code of Federal Regulations, Part 488;
- KRS Chapter 216;
- KRS Chapters 209 and 620;
- 902 KAR § 20:026.1. et. seq.;
- 902 KAR § 20:048.1. et. seq.;
- 902 KAR § 20:300.1. et. seq.;
- Long term care industry standards and practices; and,
- CCHRC internal operating standards, i.e., policies, procedures, etc.

5

22.   Resident **"NEGLECT"** in <u>nursing facilities</u> is defined as follows:

> ## *"Resident Neglect"*
> ### <u>42 C.F.R. § 488.301</u>:
>
> "Failure to provide goods and services necessary to avoid physical harm, mental anguish or mental illness."

23.   An **"AVOIDABLE ACCIDENT"** in <u>nursing facilities</u> is defined as follows:

> ## *"Avoidable Accident"*
> ### <u>42 C.F.R. § 483.25 (h)(1) and (2) – "Guidance to Surveyors"</u>
>
> "**AVOIDABLE ACCIDENT** means that an accident occurred because the facility failed to:
>
> - Identify environmental hazards and individual resident risk of an accident, including the need for supervision; and/or
> - Evaluate/analyze the hazards and the risk; and/or
> - Implement interventions, including adequate supervision, consistent with a resident's needs, goals, plan of care, and current standards of practice in order to reduce the risk of an accident; and/or
> - Monitor the effectiveness of the interventions and modify the interventions as necessary, in accordance with current standards of practice."

24.   An **"INJURY OF UNKNOWN SOURCE"** in <u>nursing facilities</u> is defined as follows:

> ## *"Injury of Unknown Source"*
> ### <u>42 C.F.R. § 488.13 (c) (2) and (4) – "Guidance to Surveyors"</u>
>
> "An injury should be classified as an "Injury of Unknown Source" when both of the following conditions are met:
>
> - The source of the injury was not observed by any person <u>or</u> the source of the injury could not be explained by the resident; <u>and</u>,
> - The injury is suspicious because the extent of the injury <u>or</u> location of the injury (e.g., the injury is located in an area not generally vulnerable to trauma) <u>or</u> the number of injuries observed at one particular point in time <u>or</u> the incidence of injuries over time."

25.  **ADEQUATE SUPERVISION"** in <u>nursing facilities</u> is defined as follows:

> ## *"Adequate Supervision"*
>
> <u>42 C.F.R. § 483.25 (h)(1) and (2) – "Guidance to Surveyors"</u>
>
> "Adequate supervision refers to an intervention and means of mitigating the risk of an accident. Facilities are obligated to provide adequate supervision to prevent accidents. Adequate supervision is defined by the type and frequency of supervision, based on the individual's assessed needs and identified hazards in the resident environment."

26.  **"IMMEDIATE JEOPARDY"** in <u>nursing facilities</u> is defined as follows:

> ## *"Immediate Jeopardy"*
>
> <u>According to the "CMS State Operations Manual"</u>
>
> "A situation in which immediate corrective action is necessary because the facility's noncompliance with one or more requirements of participation has caused or is likely to cause serious injury, harm, impairments, or death to a resident receiving care in the facility."

## APPLICABLE RESEARCH, PUBLICATIONS, AND AUTHORITY

27.  The unsafe conditions at CCHRC that denied Mr. Cole timely medical attention at the end of his stay are widely recognized hazards in the nursing home industry. These "risk windows" are identified by: Youles, Lance R., "Preventing Neglect"; <u>Advance for Long Term Care Management</u>; posted online 2/16/11.  In particular, dependent nursing home residents are at higher risk of condition changes during **weekend periods (Friday at 5:00 p.m. to Monday at 9:00 p.m.)** due to more tenuous caregiver staffing conditions, less supervision of Certified Nurse's Aides (CNA), Floor Nurses assume greater managerial responsibilities, less physician availability, and the absence of upper management in the building, especially the DON, ADON, and Administrator.

## BACKGROUND

28. CCHRC is a (1) story 101 bed for-profit Skilled Nursing Facility (SNF) in Marion, Kentucky.  It was constructed in 1961.

29. Orion Marion, LLC is the <u>licensee</u> of CCHRC.

30. Orion Operating Services, LLC is the <u>parent company</u> of CCHRC.

31. Atrium Centers, LLC is the <u>management company</u> of CCHRC and currently operates (44) Skilled Nursing Facilities in Ohio, Michigan, Kentucky, and Wisconsin.

32. Donna Davis and Tammy Workman were Administrators during Mr. Cole's stay at CCHRC.

33. OIG completed the following "Complaint Survey" at CCHRC on **10/29/12** which resulted in the following "Federal" violations:

## "OIG Complaint Survey"

### KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES, OFFICE OF INSPECTOR GENERAL (OIG), DIVISION OF HEALTH CARE FACILITIES AND SERVICES

| | |
|---|---|
| Survey Date: | 10/29/12 |
| Survey Type: | Complaint |
| Violations Received: | Federal (OBRA) |
| Highest Scope/Severity: | (J) "Immediate Jeopardy" |
| Total Number of Immediate Jeopardy Violations: | (3) |
| Total Number of Federal Violations: | (3) |

### FEDERAL (OBRA) VIOLATIONS RECEIVED

| Federal Violation: | Scope/Severity: | | Description: |
|---|---|---|---|
| 1.  483.13 (b), F-223 | "J" | Immediate Jeopardy | Resident Abuse |
| 2.  483.13 (c), F-226 | "J" | Immediate Jeopardy | Resident Abuse Policies/Procedures |
| 3.  483.75, F-490 | "J" | Immediate Jeopardy | Administration |

### CMS/OIG ENFORCEMENT ACTION - POST SURVEY

* Civil monetary fines
* Loss of onsite CNA training privileges for (2) years
* Attending physicians were notified in writing of Substandard Quality of Care Violations
* Tammy Workman was referred to the Nursing Home Administrators Board for possible disciplinary action

34.    CCHRC receives Medicare and Medicaid reimbursement and is therefore required to comply with 42 C.F.R., Part 483, Subpart B, (OBRA Regulations).

35.    The following "Survey Analysis" measures CCHRC regulatory compliance in 2012 against Kentucky and US averages:



*"Survey Analysis"*

**CCHRC VS. "KENTUCKY" AND "US"**

| Period:<br>Statistics: | 2012<br>Federal (OBRA) Violations Received | | | |
|---|---|---|---|---|
| **CCHRC Violations:**<br>11 Total: | **KY Average:**<br>6.2 Total | **CCHRC Variance:**<br>44% Higher | **US Average:**<br>7.2 Total | **CCHRC Variance:**<br>35% Higher |
| Source: | www.Medicare.gov | | | |

36.    CCHRC is currently rated at "(1) star" for <u>**Health Inspections, Staffing, and Overall**</u> according to the <u>www.medicare.gov.</u>, CMS (5) star nursing home rating system, which is "Much Below Average" (lowest possible rating).

37.    **George Cole was a 75-year-old resident who was admitted to CCHRC on 3/9/12 for rehabilitation, (24) hour Skilled Nursing Care, supervision, behavior management, and assistance with his activities of daily living.**

38.    Mr. Cole was represented at CCHRC by his wife "Anna" who signed admission records and acted on his behalf regarding nursing and medical care. She was very active in her husband's care and treatment.

39.    Mr. Cole was considered a "Do Not Resuscitate (DNR)" at CCHRC.

40.    Stephen Burkhart, MD was Mr. Cole's attending physician at CCHRC.

41.    Mr. Cole relied on the Medicare Program and personal funds to pay for his stay at CCHRC.

## FINDINGS

42.  George Cole was <u>completely dependent on CCHRC</u> for (24) hour Skilled Nursing

Care and close supervision due to limitations imposed by the following diagnoses:

- Alzheimer's Disease
- Dementia
- Sundowning Syndrome
- Psychosis
- Abnormality of Gait
- Weakness
- Chronic Obstructive Pulmonary Disease
- Hypertension
- Anemia
- Gastroesophageal Reflux Disease
- Paralysis Agitans
- Encephalopathy
- Peripheral Vascular Disease
- Coronary Artery Disease
- History of Alcohol Abuse

43.  Mr. Cole was considered a **HIGH FALL RISK** during his stay at CCHRC.

44.  Mr. Cole is described as follows according to a <u>7/9/12</u> "Admission Nursing

Assessment" at CCHRC:

- 5' 6"
- 128 lbs.
- (2) person assist for transfers and ambulation
- Propels self in wheelchair
- Needs assistance with eating/nutrition
- Pureed diet
- Combative at times

45.  Mr. Cole is described as follows according to his "Fall Risk Care Plan" at CCHRC:

| Date: | Intervention: |
|-------|---------------|
| 3/9/12 | "Instruct and remind to use call light to ask for assistance" |
| 4/6/12 | "Do not leave in wheelchair/chair alone in room" |
| 6/25/12 | "Keep in view of staff" |

46.  Mr. Cole is described as follows according to a <u>8/10/12</u> "Care Plan" at CCHRC:

- "Do not leave resident in room alone while lap belt is in place."

10

47.  Mr. Cole's "feeding ability/staff assistance" was addressed as follows according to his medical records at CCHRC:

| Date: | Medical Record: | Interventions: |
|---|---|---|
| 7/9/12 | Nutritional Assessment | "Assistance" |
| 7/12/12 | Nutrition/Hydration | "11. Assist with meals as needed." |
| | Risk Care Plan | |
| 9/5/12 | Initial Restorative Assessment | "Eats with spoon/fork assisted" |
| September | Nurse's Aide Care Plan | "Requires set up only" |
| 9/19/12 | Nurse's Note | "Resident must be fed most of the time" |
| 9/21/12 | Nurse's Note | "Must be fed for all meals" |
| 9/25/12 | Nurse's Note | "Must be fed by staff" |
| 9/26/12 | Nurse's Note | "Must be fed by staff for all meals" |
| 9/27/12 | Nurse's Note | "Must be fed by staff for all meals" |
| 10/2/12 | Nurse's Note | "Must be fed by staff for all meals" |

48.  Mr. Cole is described as follows according to a 10/6/12 "Nurse's Note" at CCHRC:

- "Late entry for 10/4/12 3-11 shift on 10/3/12"  Reported resident had been acting strange talking a lot and was found hitting himself in the head. Encouraged resident not to do harm."

49.  Mr. Cole is described as follows according to a 10/6/12 "Physician Telephone Order" at CCHRC:

- "Q-15 minute checks while in isolation."

50.  Mr. Cole is described as follows according to a 10/7/12 "Physician Telephone Order" at CCHRC:

1. "D-5 ½ normal saline @ 75 ml/hr."
2. "Monitor IV site q-shift"
3. "Intake & output q-shift"
4. "Change IV tubing q-72 hrs."

51.  The following excerpt was taken from a handwritten comment by Anna Cole that appears next to a 10/6/12 CCHRC "Nurse's Note":

- "Wounds I spoke about to Administrator & entire staff about because they were not from a fall but the new roommate they put in George's room. He was about 6' 2" and had his full faculties and I am sure from the position of George's wounds on the inside bend of his elbows that this guy got hold of George. He also had bruises all over his collar bones on chest that appeared as someone's fingers had punched him. 10/23/12 – Anna Cole"

11

52.   George Cole's (7) month intermittent stay at CCHRC was characterized by the following <u>inpatient hospital stays</u>:

## *"Interim Hospital Stays"*
### <u>George Cole at Crittenden County Health & Rehabilitation Center (CCHRC)</u>

| DATES: | INPATIENT STAY: | PRIMARY DIAGNOSIS: |
|---|---|---|
| 1. 7/4/12 – 7/9/12 | Crittenden Hospital | Sepsis, Aspiration Pneumonia, Acute Renal Failure, and Severe Dehydration |
| 2. 10/8/12 DEATH | Crittenden Hospital | Sepsis, Pneumonia, Dehydration, Methicillin Resistant Staph Aureus, Clostridium Difficile Intestinal infection |

SOURCES:   Crittenden Hospital records
NOTE:   <u>This chart only reflects hospital transfers while at CCHRC</u>

53.   George Cole's (7) month intermittent stay at CCHRC was characterized by the following <u>negative outcomes</u>:

## *"Negative Outcomes"*
### <u>George Cole at Crittenden County Health & Rehabilitation Center (CCHRC)</u>
### <u>March 9, 2012 to October 8, 2012</u>

* Severe intake problems in September/October
* Loss of independent eating/drinking ability
* Severe Dehydration (Please see finding 52)
* Acute Renal Failure (Please see finding 52)
* Multiple in-house acquired infections including Sepsis (Please see Finding 52)
* Decline in mobility

SOURCES:   CCHRC records and Crittenden Hospital records
STANDARDS:   Please see paragraphs (21 – 26)
EXPERTISE:   Owner, Administrator, Turnaround Specialist, Consultant, & Multi-Facility Executive

54.   George Cole's (7) month intermittent stay at CCHRC was characterized by the following <u>accidents, injuries of unknown source, and allegation(s) of abuse</u>:

## *"Accidents"*, *"Injuries of Unknown Source"*, and *"Allegation(s) of Abuse"*

<u>George Cole at Crittenden County Health & Rehabilitation Center (CCHRC)</u>
<u>March 9, 2012 to October 8, 2012</u>

### ACCIDENTS:

* Pattern of falls/found on the floor including 4/6/12, 6/29/12, 8/27/12, 9/20/12, and 10/6/12.
* Fall interventions limited to bed/chair pressure alarms, low bed, lap tray, self-release lap belt, and placing near Nurse's Station. No "individualized supervision" until 10/6/12 when he fell in his room after placed in <u>respiratory isolation</u>.
* All accidents were not witnessed by staff
* Sustained skin tears and bruising to his upper extremities from 9/20/12 fall

### INJURIES OF UNKNOWN SOURCE:

* Numerous skin tears, bruises, hematomas, and evidence of physical trauma to his upper/lower extremities, shoulder, back, buttocks, and chest. These injuries were not witnessed by staff and could not be explained.

### ALLEGATION(S) OF PHYSICAL ABUSE:

* Please see "allegation of physical abuse" by Anna Cole in finding (51).

-----------------------------------------------------------------------------------

SOURCES:   CCHRC medical records and Crittenden Hospital medical records
STANDARDS:   Please see paragraphs (21 – 26)

55.   Mr. Cole's **Cause of Death** is listed as follows on his "Death Certificate":

- **IMMEDIATE CAUSE:**            SEPSIS                          (ONSET – 1 DAY)
- **UNDERLYING CAUSE(S):**     MRSA/PNEUMONIA        (ONSET – 3 DAYS)

## APPLICABLE STANDARDS OF CARE AND THE NURSING HOME'S
## BREACH OF THE STANDARDS OF CARE

| 56. | BREACH #1: | FAILURE TO PREVENT RESIDENT NEGLECT |
| | STANDARDS: | PLEASE SEE OPINION 60-A |

**BASIS OF BREACH:**

A. George Cole was completely dependent on CCHRC for close supervision, protection against accident hazards, timely assessment, timely treatment, and timely access to emergency medical treatment.

B. Mr. Cole was a victim of **NEGLECT** during his stay at CCHRC based on failures identified in this report and standards in paragraphs (21) to (26).

C. Mr. Cole experienced several negative outcomes during his stay at CCHRC. Please see finding (53). Many of these outcomes were avoidable according to standards in paragraphs (21) to (26).

D. CCHRC management/staff approached Mr. Cole's care and protection as though his susceptibility to accidents, infections, dehydration, renal failure, and condition changes was an unavoidable consequence of his diagnoses. They appeared to exercise less caregiver "vigilance" because aggressive intervention, in their view, would not prevent these negative outcomes. However, **he was NOT classified as End-Stage (6 or fewer months to live), enrolled in Hospice, or diagnosed as Terminal according to his medical records at CCHRC.** In addition, he received Medicare "Skilled" Care during his (7) month stay i.e., Physical, Occupational, and Speech therapies. It is important to recognize that residents must have "**rehabilitation potential**" in order for them to qualify/continue to receive Medicare Part-A coverage. **Nursing home residents who are diagnosed with a terminal illness and receive/require palliative care do not possess this "potential" and therefore do not legitimately qualify for Skilled Care.** Falsely representing Skilled Care in order to receive Medicare reimbursement may subject facility officials, Administrators, staff, and physicians to substantial civil and criminal penalties.

E. CCHRC officials/staff deflected accountability for Mr. Cole's **FALL RISK** by characterizing him as alert/oriented and able to act in a responsible manner. Findings (45) and (48) represent two "examples" of this irresponsible conduct. The underlying motive for this deflective approach is simple; once caregivers acknowledge that residents no longer possess rational or safe judgment, and are therefore not capable or competent to safely represent themselves, **then, staff assumes "FULL" responsibility for their care, safety, and wellbeing.** Tragically, some caregivers embrace deflective conduct like reminding educating, or encouraging severely impaired/dependent residents like Mr. Cole to act safely because this meaningless exercise portrays them as responsible and rational.

14

F. The "timing" of Mr. Cole's condition change is a significant factor in this case. It occurred during a **"weekend period"** (10/6 and 10/7) which is a <u>well-known hazard in the nursing home industry</u>.   Please see paragraph (27).

G. <u>CCHRC nursing staff failed to adequately document Mr. Cole's bedside care during the weekend period of 10/6/12 – 10/7/12 when he experienced a change in condition prior to his death</u>.   Nurse's notes are especially important for unstable residents like Mr. Cole who require copious documentation. Physicians, Nurses, Dieticians, Therapists, and other professionals heavily rely on nurse's notes to determine a resident's ongoing mental/physical status and to guide them in treatment decisions.   There is no other source of information in a medical chart that offers this detailed account (diary) of his/her facility stay, including treatment administrative records (TAR) and medication administrative records (MAR).   **Inconsistent/sparse nurse's notes are a reliable index of staffing and continuity of care problems especially for dependent/Skilled residents like Mr. Cole.**   In particular, negative outcomes such as those identified in finding (53) should be heavily scrutinized whenever they are preceded by untimely <u>gaps in nurse's notes</u>, because **the absence of documentation implies that these conditions were not identified, reported, and addressed in a timely/responsible manner.**   The following chart illustrates untimely "gaps" in nurse's notes during <u>Mr. Cole's last day at CCHRC</u>:

## George Cole at Crittenden County Health & Rehabilitation Center (CCHRC)
### <u>Untimely "Gaps" in Narrative Nurses Notes on Sunday 10/7/12 (Last day)</u>

| <u>Date:</u> | <u>From:</u> | <u>To:</u> | <u>Documentation Gap:</u> |
|---|---|---|---|
| <u>SUN</u> 10/7/12 | 2:00 a.m. | 7:00 a.m. | (5+) hours |
| | 7:00 a.m. | 2:30 p.m. | (7+) hours |
| | 2:30 p.m. | 10:00 p.m. ↓ | (7+) hours |
| | | (Discharged to Hospital via EMS) | |
| <u>MON</u> 10/8/12 | 7:50 a.m. | (Died at Hospital) | |

**NOTE: This chart represents a "conservative" illustration.**

H. Mr. Cole was diagnosed with "Sepsis" and "Dehydration" during both of his interim hospital stays at CCHRC.   In fact, his dehydration was characterized as **"severe"** during his first hospital stay, which suggests that CCHRC nursing staff failed to address this medical condition until it became life-threatening. Please see finding (52).

I. Mr. Cole's "Cause of Death" was **<u>SEPSIS</u>**.   Please see finding (55).

J. Mr. Cole experienced a spiraling decline in his food/fluid intake at CCHRC during the end of stay in general and the last weekend in particular. However, he failed to receive the following care and treatment despite this decline:

- No "documented" evidence of meal-to-meal feeding assistance despite his complete dependency on nursing staff. Tragically, there **are conflicting directives regarding the level of feeding assistance he required** as evidenced by finding (47)
- No "documented" evidence of restorative feeding assistance
- No meal-to-meal CNA food/fluid consumption records
- No intake and output records until 2:30 p.m. on 10/7/12
- No IV therapy until 2:30 p.m. on 10/7/12
- **No "documented" evidence of close bedside assessment on 10/7/12 from his IV insertion until hospital discharge**
- No "documented" evidence of (15) minute "visual" checks as ordered on 10/6/12 after he was placed in respiratory isolation. This supervision was ordered after his fall. Unfortunately, placing him in isolation reduced the amount of "face-to-face" supervision and "bedside" assessment he subsequently received
- His **nails were pale and lips were cyanotic** according to the last nurse's note on 10/7/13, which suggests that he was not closely monitored. The previous entry was (7+) hours earlier as previously noted

These were the negligent conditions that set the stage for his Sepsis, Dehydration, and Renal Failure during the weekend of 10/6-7/12.

K. Anna Cole approached CCHRC Administration regarding her concern that **Mr. Cole was physically abused by his roommate** as identified in finding (51). This would account for some of his trauma/injuries of unknown source. However, there is no documented evidence that her "allegation of abuse" was investigated by facility officials and/or reported to OIG, which is consistent with the survey violations previously identified in paragraph (33).

L. Providing a nutritional care plan and CNA care cards that accurately identified Mr. Cole's intake dependency status more likely than not would have prevented his negative outcomes.

M. Providing face-to-face staff feeding assistance more likely than not would have prevented Mr. Cole's negative outcomes.

N. Providing intake/output records prior to the weekend of 10/6-7/12 more likely than not would have prevented Mr. Cole's negative outcomes.

O. Providing CNA food/fluid consumption records more likely than not would have prevented Mr. Cole's negative outcomes.

16

P. Providing <u>accurate and timely nursing assessment</u> during the weekend of 10/6-7/12 more likely than not would have prevented Mr. Cole's negative outcomes.

Q. Providing <u>proper nursing documentation</u> more likely than not would have prevented Mr. Cole's negative outcomes.

R. Providing <u>timely access to medical treatment</u> during the weekend of 10/6-7/13 more likely than not would have prevented Mr. Cole's negative outcomes.

S. <u>Accepting full responsibility for Mr. Cole's care and treatment</u> more likely than not would have prevented his negative outcomes.

T. As a Nursing Home Administrator, who is responsible for preventing resident neglect under State and Federal laws/regulations, I found evidence that George Cole was a victim of **NEGLECT** at CCHRC.

| 57. | BREACH #2: | FAILURE TO PROVIDE A SAFE ENVIRONMENT AND ADEQUATE SUPERVISION TO PREVENT ACCIDENTS |
| --- | --- | --- |
| | STANDARDS: | PLEASE SEE OPINION 60-B |

**BASIS OF BREACH:**

A. George Cole was "completely dependent" on CCHRC for protection against accident hazards and injuries of unknown origin.  <u>He could not be relied upon to act in a safe and responsible manner.</u>

B. Mr. Cole was considered a **HIGH FALL RISK** during his stay at CCHRC.

C. Mr. Cole experienced a **pattern** of "falls/found on the floor" during his stay at CCHRC.  Please see finding (54).

D. Mr. Cole experienced **numerous** "Injuries of Unknown Source" during his stay at CCHRC.  Please see finding (54).

E. Most of the falls identified in finding (54) constitute **AVOIDABLE ACCIDENTS** based on the negligent acts/conditions identified in this report and standard defined in paragraph (23).  For example, Mr. Cole was found on the floor in his room shortly after he was placed in "respiratory isolation" on 10/6/12. He was secured to his wheelchair with a "lap belt" at the time of the incident which violated the following care plan interventions:

- **"Do not leave in wheelchair/chair alone in room."**
- **"Do not leave resident in room alone while lap belt is in place."**

Please see findings (45) and (46).

17

F. Most of Mr. Cole's falls occurred during his <u>second stay</u> at CCHRC when he was treated with psychoactive medication (Risperdal) to address periods of agitation. Unfortunately, using a chemical restraint may have tempered his hostile behavior, but it created another significant problem **(HIGH FALL RISK)**, <u>because Administration was unwilling to devote the necessary supervision</u>.

G. CCHRC failed to ensure that Mr. Cole received **ADEQUATE SUPERVISION** based on the failures identified throughout this report and the standard in paragraph (25).

H. It appears that CCHRC officials subscribe to the policy that residents must fall, fall frequently, and sustain serious trauma/injuries before it is required to undertake assertive interventions. In other words, ACTUAL HARM must be experienced to validate this risk and justify higher caregiver staffing levels. This lack of resolve by CCHRC officials/staff was very apparent during my review and exposed him to unnecessary harm.

I. Providing <u>adequate bedside supervision</u> more likely than not would have prevented many of Mr. Cole's accidents and injuries of unknown origin.

J. Providing <u>a sufficient number of CNA's</u> more likely than not would have prevented many of Mr. Cole's accidents and injuries of unknown origin. CCHRC is rated at "(1) star" for **Staffing** as previously identified in paragraph (36), which is **the lowest CMS quality rating**.

K. Using <u>psychoactive medication as a secondary versus primary intervention</u> more likely than not would have prevented many of Mr. Cole's accidents and injuries of unknown origin.

L. Providing <u>an effective care plan</u> more likely than not would have prevented many of Mr. Cole's accidents and injuries of unknown origin.

M. Complying <u>with Mr. Cole's Falls Care Plan</u> more likely than not would have prevented many of his accidents and injuries of unknown origin.

N. <u>Accepting full responsibility for Mr. Cole's care and treatment</u> more likely than not would have prevented many of his accidents and injuries of unknown origin.

O. CCHRC received Federal violation F-323 (Accidents) in response to an OIG survey conducted on 7/18/12 (cited during Mr. Cole's stay).

P. As a Nursing Home Administrator, who is responsible for providing a safe environment and adequate supervision to prevent resident accidents under State and Federal laws/regulations, I found evidence that George Cole was a victim of resident **NEGLECT** at CCHRC.

18

| 58. | BREACH #3: | FAILURE TO PROVIDE EFFECTIVE FACILITY ADMINISTRATION AND A RESPONSIBLE GOVERNING BODY |
|-----|------------|------|
|     | STANDARDS: | PLEASE SEE OPINION 60-C |

**BASIS OF BREACH:**

A. Orion Marion, LLC, Orion Operating Services, LLC, and Atrium Centers, LLC constitute the "Governing Body" for purposes of this report.

B. The negative outcomes and incidents Mr. Cole experienced at CCHRC were inevitable based on operating policies/practices that placed the interests of facility owners, Management Company, Administrator, and staff above his health and wellbeing. This rationing of care and treatment was apparent during my review.

C. CCHRC received (3) "Immediate Jeopardy" Federal violations on 10/29/12 including **FACILITY ADMINISTRATION**, which took place during the last month of Mr. Cole's stay and reflects many dysfunctional operational conditions that caused/contributed to his negative outcomes. Please see finding (26) for the definition of Immediate Jeopardy and finding (35) for a description of the survey. It is important to recognize that these violations are rare (>5%) and represent the most severe category of noncompliance possible.

D. Donna Davis and Tammy Workman were Administrators at CCHRC during Mr. Cole's (7) month stay. Turnover among Nursing Home Administrators is a well-known catalyst for operational, continuity of care, and survey problems.

E. CCHRC is currently rated at "(1) star" for **(3) of the (5) CMS quality categories** according to the www.medicare.gov., CMS (5) star nursing home rating system which is "Much Below Average" (lowest possible rating).

F. Tammy Workman fell below the standard of practice for a Licensed Nursing Home Administrator in Kentucky based on the failures identified in this case, and the survey violations including **ADMINISTRATION** received on 10/29/12. Managing a nursing facility that receives (3) Immediate Jeopardy violations casts significant doubt on an Administrator's professional ability, judgment, and commitment.

G. Atrium Centers, LLC did not earn its management fees at CCHRC in 2012 based on the negligent care identified in this report.

H. CCHRC officials misrepresented the quality and scope of their services based on the negligent care identified in this report.

I. There is no documented evidence that CCHRC nursing staff received the proper training and supervision based on the **systemic operational failures** identified in this report.

19

J. Quality Assurance activities at CCHRC in 2012 appear to be nonexistent based on the negligent care identified in this report.

K. Providing <u>effective facility Administration</u> more likely than not would have prevented Mr. Cole's negative outcomes.

L. Providing <u>an effective Management Company</u> more likely than not would have prevented Mr. Cole's negative outcomes.

M. Providing <u>a responsible Governing Body</u> more likely than not would have prevented Mr. Cole's negative outcomes.

N. **In my opinion, the highest duty of care is owed to nursing home residents who completely rely on their caregivers as did George Cole at CCHRC.**

O. As a Nursing Home Administrator, who is responsible for administrating a facility in a manner that enables it to use its resources effectively and efficiently in order to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing of each resident, I found evidence that George Cole was a victim of resident **NEGLECT** at CCHRC.

## <u>RECORDS REQUESTED</u>

59.  The following CCHRC records are expected to result in additional opinions when they become available to me:

- All Incident Reports regarding Mr. Cole
- Internal investigation(s) and/or evidence that Anna Cole's allegation of physical abuse to CCHRC Administration was reported to OIG
- All Minimum Data Sets (MDS)
- Narrative Nurse's Notes from 3/9/12 to 7/4/12 and 7/9/12 to 7/28/12
- All CNA ADL records especially food/fluid consumption
- Building floor plan
- Resident census during Mr. Cole's stay <u>per-wing-per-day</u>
- Nursing policies and procedures
- Listing of all facility management staff during Mr. Cole's stay
- All nursing in-service records generated during Mr. Cole's stay
- All employee meeting minutes generated during Mr. Cole's stay
- Resident Council meeting minutes generated during Mr. Cole's stay
- Complete profit and loss (income statements) during Mr. Cole's stay
- Atrium management contract
- 2012 Medicare and Medicaid Cost Reports
- All caregiver hours worked, per-day, per-shift, per-wing, during his stay, including **employee schedules, daily assignment sheets,** and any **payroll reports** generated during the relevant period of this case in **hours worked per-patient-per-day (HPPD)**.

## OPINION

60.   Based on my education, training, management expertise, regulatory knowledge, and knowledge of Skilled Nursing Facilities, it is my belief to a reasonable degree of professional certainty that the owners, Board(s) of Directors, Management Company, Administrator, DON, facility staff, and consultants at CCHRC failed to provide the necessary care and services for George Cole to attain or maintain his highest practicable physical, mental, and psychosocial wellbeing, which constitutes NEGLECT.  The repeated failure of CCHRC to provide the necessary care, and to prevent the ownership/management failures in this report, caused and/or significantly contributed to Mr. Cole's negative outcomes, incidents, and accidents. Accordingly, CCHRC fell below the standard of care for a Skilled Nursing Facility operating in Kentucky based on <u>facility and administrative standards</u> identified in paragraphs (21) – (26) in general and the following failures in particular:

A.  **FAILURE TO PREVENT RESIDENT NEGLECT;**

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| * Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.13 (c), F-224<br>42 C.F.R. § 488.301 |
| * Kentucky Statutes/Administrative Rules: | KRS 216.515 (6) (8)<br>902 KAR § 20:300.3<br>902 KAR § 20:300.5 (2) |
| * Industry (KY & US): | Apply, and there is a breach |

B.  **FAILURE TO PROVIDE A SAFE ENVIRONMENT AND ADEQUATE SUPERVISION AND ASSISTIVE DEVICES TO PREVENT ACCIDENTS; AND,**

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| * Federal Statutes/Administrative Rules:<br>* Kentucky Statutes/Administrative Rules | 42 C.F.R. § 483.25 (h) (1) (2), F-323<br>902 KAR § 20.026.4 (2) (a) 3<br>902 KAR § 20:300.8. (7) |
| * Industry (KY & US): | Apply, and there is a breach |

C.  **FAILURE TO PROVIDE EFFECTIVE FACILITY ADMINISTRATION AND A RESPONSIBLE GOVERNING BODY.**

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| * Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.75, F-490<br>42 C.F.R. § 483.75, (d) (2) (i), F-493 |
| * Kentucky Statutes/Administrative Rules: | 902 KAR § 20:026.3. (2)<br>902 KAR § 20:026.3. (1)<br>902 KAR § 20:300,15. (1)<br>902 KAR § 20:300.15. (2) |
| * Industry (KY & US): | Apply, and there is a breach |

## CONDUCT OF THE DEFENDANTS

61.    Based on my review and analysis of the records provided to me, it is my opinion that the negligent care/treatment George Cole received at CCHRC constitutes a "conscious disregard" of his safety, health, dignity, wellbeing, and life based on administrative, regulatory, and institutional standards identified in paragraphs (21) – (26).

## CLOSING COMMENTS

62.    I have not prepared any exhibits at the present time.  However, I reserve the right to refer to any documents reviewed as exhibits if I amend my report or provide testimony in this matter.

63.    I offer my opinions with confidence.  However, I reserve the right to amend my report if additional information becomes available to me.

64.    Some of my opinions address subject matter that is common to other nursing home experts.  However, my opinions offer a perspective that is unique to my expertise and is not duplicative.

65.    All findings and opinions contained within this report are based on the records provided to me, research, my education, training, and extensive experience with matters involving resident abuse and neglect.

66.    My findings and opinions are based on a thorough analysis of this case which may not be contained or attached to this report.   Therefore, I reserve the right to disclose these additional details during my deposition and/or trial testimony.

Respectfully submitted:

_____          _____
Lance R. Youles, BS, LNHA                        Date